**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| SOUNDEXCHANGE, INC., | ) | |
| | ) | |
| Plaintiff | ) | No. 1:24-cv-05491-NRB |
| | ) | |
| v. | ) | **ANSWER AND** |
| | ) | **COUNTERCLAIMS** |
| SIRIUS XM RADIO INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ANSWER

Defendant Sirius XM Radio Inc. ("Sirius XM" or the "Company"), by and through its undersigned counsel, answers the Complaint of Plaintiff SoundExchange, Inc. ("SoundExchange" or "Plaintiff") as follows:

## RESERVATION OF RIGHTS AND GENERAL DENIAL

By answering the Complaint, Sirius XM does not intend to consent to jurisdiction or waive any previously asserted defenses. Sirius XM denies all allegations contained in the Complaint, except as otherwise expressly admitted herein. Sirius XM specifically denies any liability to Plaintiff for any relief including, but not limited to, the relief sought in the section titled "Prayer for Relief." Sirius XM reserves any applicable rights, defenses, or objections, including the right to seek to amend or supplement its Answer as may be necessary.

## NATURE OF THE ACTION

1.      Sirius XM denies the allegations in Paragraph 1.

2.      Sirius XM admits that it owns and operates a satellite digital audio radio service, known in the applicable federal regulations as "SDARS." Sirius XM admits that one of Sirius XM's services delivers music via satellite to radios. Sirius XM admits that it provides the only

SDARS in the continental United States.  Sirius XM otherwise denies the allegations in Paragraph 2.

3.      Sirius XM admits that Sirius XM offers a service that transmits audio entertainment over the internet via computers, phones, and other connected devices (often referred to in this regulatory context as "webcasting").  Sirius XM admits that other companies offer streaming music over the internet.  Sirius XM otherwise denies the characterizations contained in Paragraph 3.

4.      Paragraph 4 contains legal conclusions to which no response is required.  To the extent a response is required, Sirius XM admits that it delivers music as part of its SDARS and streaming service pursuant to statutory licenses provided under the Copyright Act and that it pays royalties owed under those licenses to SoundExchange for distribution to copyright owners and artists.  Sirius XM admits that SoundExchange is a non-profit organization appointed by the Copyright Royalty Board to receive and distribute royalty revenues to copyright owners.  Sirius XM otherwise denies the allegations in Paragraph 4.

5.      Paragraph 5 contains legal conclusions to which no response is required. To the extent a response is required, Sirius XM denies the allegations in Paragraph 5.

6.      Sirius XM admits that it does not currently offer any SDARS subscription packages that contain only satellite radio service and not other services, including webcasting.  Sirius XM otherwise denies the allegations in Paragraph 6.

7.      Paragraph 7 contains characterizations and/or legal conclusions to which no response is required.  To the extent a response is required, Sirius XM denies the allegations in Paragraph 7.

8.      Sirius XM denies the allegations in Paragraph 8.

9.      Sirius XM denies the allegations in Paragraph 9.

10.     Sirius XM denies the allegations in Paragraph 10.

11.     Paragraph 11 contains legal citations and/or characterizations of the cited regulations to which no response is required.  Sirius XM denies the remaining allegations in Paragraph 11.

12.     Sirius XM denies the allegations in Paragraph 12.

13.     Sirius XM admits that its good-faith efforts to resolve this dispute without litigation have failed, and otherwise denies the allegations in Paragraph 13.

## THE PARTIES

14.     Paragraph 14 contains legal citations and/or characterizations of the cited regulations to which no response is required.  Sirius XM denies the remaining allegations in Paragraph 14, including the characterization of SoundExchange as being "charged with . . . enforcing the terms of the statutory license."

15.     Sirius XM admits the allegations contained in Paragraph 15.

## JURISDICTION AND VENUE

16.     The allegations in Paragraph 16 contain characterizations and/or legal conclusions to which no response is required.

17.     The allegations in Paragraph 17 contain characterizations and/or legal conclusions to which no response is required.

18.     Sirius XM admits it provides service to customers in Virginia as part of its national business and has used servers in Virginia to deliver its webcasting service to customers in Virginia. Sirius XM admits that it communicates marketing and advertising materials to consumers in Virginia, along with those in the other 49 states.  Sirius XM admits that it has agreements with certain automakers to provide services, and that these agreements cover new vehicles sold or leased

in Virginia and in the 49 other states.  Sirius XM otherwise denies the allegations in Paragraph 18, including that the Court has personal jurisdiction over Sirius XM pursuant to Va.  Code Ann. § 8.01-328.1.

19.    The allegations in Paragraph 19 contain characterizations and/or legal conclusions to which no response is required.

### FACTUAL BACKGROUND

**I.**    **Sirius XM has unreasonably allocated revenue to webcasting.**

    **A.**    **The Statutory Framework for the Licensing of Digital Performance Rights.**

20.    The allegations in Paragraph 20 contain legal citations and/or characterizations of the cited regulations to which no response is required.

21.    The allegations in Paragraph 21 contain legal citations and/or characterizations of the cited regulations to which no response is required.  To the extent a response is required, Sirius XM denies the allegations in Paragraph 21.

22.    The allegations in Paragraph 22 contain legal citations and/or characterizations of the cited regulations to which no response is required.  To the extent a response is required, Sirius XM denies the allegations in Paragraph 22.

23.    Sirius XM admits that it has filed the required Notice of Use of Sound Recordings with the United States Copyright Office.  The remainder of Paragraph 23 contains legal conclusions to which no response is required.

24.    Sirius XM admits that SoundExchange is the sole entity designated by the CRB to receive and distribute statutory royalties and, to the extent required by the Copyright Act, that it remits statutory royalty payments to SoundExchange for distribution to copyright owners and artists.  Sirius XM denies that it currently owes any statutory royalty fees to SoundExchange.

25.    Sirius XM admits the allegations in Paragraph 25.

26.    The allegations in Paragraph 26 contain legal citations and/or characterizations of the cited regulations to which no response is required.  To the extent a response is required, Sirius XM denies the allegations in Paragraph 26.

27.    Sirius XM admits that Paragraph 27 purports to quote language from the cited Determination, which speaks for itself.

28.    The allegations in Paragraph 28 contain legal citations and/or characterizations of the cited regulations to which no response is required.  To the extent a response is required, Sirius XM admits that SDARS has historically been incapable of monitoring how many listeners hear each transmission of a recording, while webcasting applications can do so.  Sirius XM otherwise denies the allegations in Paragraph 28.

29.    Sirius XM admits that Paragraph 29 purports to quote language from the cited Determination, which speaks for itself, but to the extent it purports to interpret or characterize the cited determination or quoted language, Sirius XM denies the allegations.

**B.    Sirius XM allocated revenue to webcasting without any basis in fact regarding the value or usage of its services.**

30.    Sirius XM admits that it currently offers the music subscriptions (1) Music Showcase, (2) Music & Entertainment, and (3) Platinum.[1]  Sirius XM also admits that the Music & Entertainment packages have contained webcasting services since July 2019.  Sirius XM admits that its Music Showcase package has contained webcasting services since September 2020.  Sirius XM otherwise denies the allegation in Paragraph 30.

31.    Sirius XM denies the allegations in Paragraph 31.

---

[1] "Platinum" used to be known as "All Access"; "Music & Entertainment" used to be known as "Select"; and "Music Showcase" used to be known as "Mostly Music."  The Complaint uses the current names for these products retroactively so Sirius XM will assume that all references are inclusive of both prior and current product names.

32.     Sirius XM denies the allegations in Paragraph 32.

33.     Sirius XM admits that on October 11, 2021, Sirius XM informed SoundExchange that, beginning with its October 15, 2021 royalty payment, Sirius XM was changing how it was allocating revenue attributable to its separately licensed webcasting service when calculating its SDARS Gross Revenue.  Sirius XM admits that in October 2022, based on updated data, Sirius XM increased the webcasting revenue exclusion to 25.2% for self-pay Platinum subscribers.  Sirius XM otherwise denies the characterizations and allegations in Paragraph 33.

34.     Sirius XM denies the allegations in Paragraph 34.

**C.     Sirius XM's exclusion of webcasting revenue unreasonably far exceeds that necessary to avoid double-counting.**

35.     Sirius XM admits that one purpose of the webcasting exclusion from SDARS Gross Revenues, but not the only one, is to prevent double-counting revenue for which Sirius XM is already paying a different royalty.  Sirius XM also admits that Paragraph 35 purports to quote language from the cited Determination, which speaks for itself.  Sirius XM otherwise denies the allegations in Paragraph 35.

36.     Sirius XM denies the allegations in Paragraph 36.

**D.     The pricing history for Sirius XM's products conflicts with Sirius XM's allocations of revenue to webcasting both before and after October 2021.**

37.     Sirius XM denies the allegations in Paragraph 37.

38.     Sirius XM admits that Paragraph 38 purports to quote language from the cited Determination, which speaks for itself, but to the extent it purports to interpret or characterize the cited Determination or quoted language, Sirius XM denies the allegations.  Sirius XM otherwise denies the allegations in Paragraph 38.

39.     Sirius XM admits that Paragraph 39 purports to quote language from statements made by Jim Meyer and Jennifer Witz, which speak for themselves.  Sirius XM otherwise denies the allegations in Paragraph 39.

40.     Sirius XM admits Paragraph 40 purports to quote language from the cited Determination, which speaks for itself.  Sirius XM otherwise denies the allegations in Paragraph 40.

41.     Sirius XM admits that Paragraph 41 purports to quote language from a document which speaks for itself.  Sirius XM otherwise denies the allegations in Paragraph 41.

42.     Sirius XM denies the allegations in Paragraph 42.

43.     Sirius XM admits that until October 2021, Sirius XM allocated half the difference in price between its Platinum (previously All Access) package and Music & Entertainment (previously Select) packages to webcasting.  Sirius XM admits that prior to July 2019, the All Access package included webcasting but the Music & Entertainment (then Select) package did not.  Sirius XM admits that in July 2019, webcasting was added to the Music & Entertainment package.  Sirius XM otherwise denies the allegations in Paragraph 43.

44.     Sirius XM admits that since 2017 it has reduced the retail prices of some of its webcasting-only services and has made changes to the retail prices of its packages that combine satellite radio and webcasting services.  Sirius XM also admits that there are multiple providers offering a variety of music and non-music audio webcasting products, and that Sirius XM's SDARS is the only service offering satellite radio.  Sirius XM otherwise denies the allegations in Paragraph 44.

45.     Sirius XM admits that Paragraph 45 purports to quote language from documents that speak for themselves.  Sirius XM otherwise denies the allegations in Paragraph 45.

46.    Sirius XM denies the allegations in Paragraph 46.

47.    Sirius XM denies the allegations in Paragraph 47.

**E.    Sirius XM's reliance on its constant sum surveys to allocate revenue to webcasting post-October 2021 is not reasonable.**

48.    To the extent Paragraph 48 is quoting a document, the document speaks for itself. Sirius XM otherwise denies the allegations in Paragraph 48.

49.    To the extent Paragraph 49 is quoting a document, the document speaks for itself. Sirius XM otherwise denies the allegations in Paragraph 49.

50.    Sirius XM admits that Paragraph 50 purports to quote language from a Determination which speaks for itself. Sirius XM otherwise denies the allegations in Paragraph 50.

51.    To the extent Paragraph 51 purports to quote language from a document, the document speaks for itself. Sirius XM otherwise denies the allegations in Paragraph 51.

52.    Paragraph 52 contains legal citations and/or characterizations regarding one CRB Determination to which no response is required. To the extent a response is required, Sirius XM denies the allegations in Paragraph 52.

53.    Sirius XM denies the allegations in Paragraph 53.

**F.    Sirius XM must remit the overdue royalty payments plus pay late fees.**

54.    The allegations in Paragraph 54 contain legal citations and/or characterizations of the cited regulations to which no response is required. To the extent a response is required, Sirius XM admits the allegations in Paragraph 54.

55.    The allegations in Paragraph 55 contain legal citations and/or characterizations of the cited regulations to which no response is required. Sirius XM admits that Paragraph 55

purports to quote language from a regulation which speaks for itself. Sirius XM otherwise denies the allegations in Paragraph 55.

56.    Sirius XM denies the allegations in Paragraph 56.

**II.    Sirius XM has failed to pay royalties an independent auditor has determined it owes to SoundExchange.**

57.    The allegations in Paragraph 57 contain legal citations and/or characterizations of the cited regulations to which no response is required. To the extent a response is required, Sirius XM admits that Paragraph 57 purports to quote language from a regulation which speaks for itself.

58.    Sirius XM admits that Paragraph 58 purports to quote language from a document which speaks for itself.

59.    Sirius XM denies the allegations in Paragraph 59.

60.    Sirius XM denies the allegations in Paragraph 60.

61.    Sirius XM denies the allegations in Paragraph 61.

62.    Sirius XM denies the allegations in Paragraph 62.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violation of 37 C.F.R § 382.21(a) and 17 U.S.C. § 114(f)(1)(B)—Underpayment Based on Exclusion of Revenue**

63.    Sirius XM repeats and incorporates by reference each response set forth above.

64.    Paragraph 64 contains characterizations and/or legal conclusions to which no response is required.

65.    Sirius XM admits that its SDARS royalties are calculated as a percentage of Sirius XM's Gross Revenues, as defined in 37 C.F.R. § 382.22. Sirius XM further admits that it excludes from its reported Gross Revenues an amount that it attributes to revenues from webcasting. Sirius XM otherwise denies the allegations in Paragraph 65.

66.    Sirius XM denies the allegations in Paragraph 66.

67.    Sirius XM denies the allegations in Paragraph 67.

## SECOND CAUSE OF ACTION
### Violation of 37 C.F.R §§ 380.6(g) and 382.7(g)—Failure to Remit the Amount of Underpayment Determined by an Auditor

68.    Sirius XM repeats and incorporates by reference each response set forth above.

69.    Paragraph 69 contains legal conclusions to which no response is required.

70.    The allegations in Paragraph 70 contain legal citations and/or characterizations of the cited regulations to which no response is required.  Sirius XM admits that Paragraph 70 purports to quote language from a regulation which speaks for itself.

71.    Sirius XM denies the allegations in Paragraph 71.

72.    Sirius XM denies the allegations in Paragraph 72.

## PRAYER FOR RELIEF

Sirius XM denies the allegations contained in the "Prayer for Relief" of the Complaint, including subparagraphs "a" through "f," and denies that SoundExchange is entitled to any relief whatsoever.

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming any burden of proof they would not otherwise bear, Sirius XM asserts the following affirmative and other defenses.  Sirius XM reserves the right to assert further defenses as the case proceeds.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of unjust enrichment.

### THIRD AFFIRMATIVE DEFENSE

SoundExchange's claims are barred, in whole or in part, to the extent that they rely upon an audit that fails to comply with, and is invalid under, the governing regulations.

### FOURTH AFFIRMATIVE DEFENSE

SoundExchange's claims are barred, in whole or in part, by the equitable doctrine of unclean hands.

### FIFTH AFFIRMATIVE DEFENSE

SoundExchange is not entitled to any award of attorneys' fees or costs with respect to any of the claims alleged.

### PRAYER FOR RELIEF

WHEREFORE, Sirius XM respectfully requests that this Court:

(a)    Deny any and all relief requested by the Plaintiff;

(b)    Dismiss the Complaint with prejudice and enter judgment in favor of Sirius XM;

(c)    Award Sirius XM its costs and attorneys' fees and expenses in defending against the Complaint; and

(d)    Award such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS OF SIRIUS XM RADIO INC.

Sirius XM Radio Inc. ("Sirius XM" or "the Company"), by and through undersigned counsel, as and for its counterclaims against SoundExchange, Inc. ("SoundExchange"), alleges as follows based on knowledge as to its own conduct and activities and on information and belief as to all other matters except where otherwise alleged:

### THE PARTIES

1.    Defendant/Counterclaim Plaintiff Sirius XM is a Delaware corporation with its principal place of business in New York, New York.

2.    Plaintiff/Counterclaim Defendant SoundExchange is a nonprofit organization formed and existing under the laws of the State of Delaware, with its principal place of business in Washington, D.C.

### JURISDICTION AND VENUE

3.    This Court has subject-matter jurisdiction over Sirius XM's counterclaims under 28 U.S.C. § 1367.

4.    SoundExchange has voluntarily submitted to the personal jurisdiction of the United States District Court for the Southern District of New York by maintaining this action.

5.    The Court may also exercise specific personal jurisdiction over SoundExchange because SoundExchange's claims and Sirius XM's counterclaims arise from and relate to SoundExchange's forum-related contacts.  *See* N.Y. C.P.L.R. § 302(a).  SoundExchange received and retained royalty overpayments calculated at and sent from Sirius XM headquarters in New York and hired a New York-based firm that performed a "royalty inspection" of Sirius XM's records at Sirius XM's headquarters in New York.

6.    Venue is proper in the Southern District of New York under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Sirius XM's counterclaims occurred in the

District and because SoundExchange is subject to this Court's personal jurisdiction.

**SIRIUS XM'S ROYALTY OVERPAYMENTS TO SOUNDEXCHANGE**

7.      SoundExchange is designated by the Copyright Royalty Board ("CRB"), the specialized regulatory agency charged with determining certain statutory royalty rates, as the sole entity in the United States to receive and distribute digital performance royalties from license users like Sirius XM.  After it receives performance royalties, it pockets a hefty administrative fee and then, at some future time, remits the remaining amount to artists and copyright owners.

8.      The statutory royalties that SoundExchange receives derive from a compulsory licensing regime that exists under the Copyright Act.  That licensing regime enables license users like Sirius XM to obtain a "statutory license" to cover prescribed performances of sound recordings and to transmit them to listeners by way of a digital audio service.  17 U.S.C. §§ 112(e), 114(d)(2).  So long as Sirius XM complies with the conditions of the statutory license set forth in the Copyright Act, it need not negotiate individually with each record label and recording artist to use their works.  It can simply pay the royalties it owes to them via SoundExchange.

9.      The amount of royalties that license users like Sirius XM must pay to SoundExchange depends on the methods they use to transmit sound recordings and the particular category of statutory license (or licenses) under which they operate.

10.      As an operator of a satellite digital audio radio service ("SDARS"), Sirius XM pays royalties equivalent to 15.5% of its "Gross Revenues" from its satellite radio service, as that term is defined in the governing CRB regulations.  37 C.F.R. §§ 382.21, 382.22.

11.      Separately, as an operator of a non-interactive "webcasting" service (which allows users to stream sound recordings over the internet via computers, phones, and other connected devices), Sirius XM pays a specified royalty fee for each webcasted transmission of a sound

recording (i.e., it pays royalties on a "per-performance" basis rather than as a percentage of its streaming-related revenue).  *See id*. § 380.10(a) (setting webcasting royalty rates).

12.     In 2011, Sirius XM began combining its SDARS with webcasting and certain additional premium non-music channels in its "All Access" subscription package, which it later rebranded as the "Platinum" package in 2019.  Because the Platinum package combined multiple types of services for a single, undifferentiated subscription price (and because those services require royalty payments under two different statutory licenses), Sirius XM risked dramatic overpayment of SDARS royalties.  Absent a mechanism for identifying and excluding revenue from the combination that was attributable to components other than SDARS, Sirius XM would pay (under current rates) 15.5% of an overinflated revenue pool comprising *both* satellite revenue and webcasting revenue.  It would also pay twice for its subscribers' webcast transmissions: once under the per-performance webcast license, and again on the webcast portion of the combined revenue included in the SDARS royalty pool.

13.     Fortunately, the SDARS regulations provide a remedy for this scenario: the definition of SDARS "Gross Revenue" specifically allows SDARS providers to *exclude* revenue attributable to separately licensed activities, including statutory webcasting.  *See, e.g.*, *id.* § 382.22(b)(7)(iv).  The CRB has explained that these regulations are designed to prevent Sirius XM from paying SoundExchange royalties for activities not actually covered by the SDARS statutory license.  *See* 73 Fed. Reg. 4080-01, 4087–88 (Jan. 24, 2008) ("Revenue Defined").

14.     For years, Sirius XM followed this regulatory guidance for its Platinum combination, deducting from its subscription revenue the value allocable to the webcasting component.  SoundExchange never objected to this practice, even during the course of the parties'

prior multi-year litigation over Sirius XM's calculation of SDARS Gross Revenues.  *See generally SoundExchange v. Sirius XM Radio Inc.*, 1:13-cv-01290 (D.D.C.).

15.     In 2017, in an opinion arising from the aforementioned litigation, the CRB reaffirmed Sirius XM's entitlement to reduce its SDARS gross revenues for activities not covered by the SDARS license.  It held that license users should strive to employ deduction methodologies that comport with "a standard of reasonableness."  82 Fed. Reg. 56725-01, 56726 (Nov. 30, 2017).  That standard of reasonableness, it counseled, could be satisfied through use of "some additional data or information from which to identify or reasonably estimate the revenue attributable to each item in the bundle."  *Id.* at 56734.  The CRB further explained that Sirius XM could satisfy that standard so long as it employed a deduction methodology that was "understandable," "transparent," and "reasonably accurate."  *Id.* at 56732.

16.     Following this guidance, Sirius XM set out to refine its revenue calculation and deduction methodology through the development of empirical data identifying how its subscribers value the components of their combined webcasting and satellite radio packages.  Sirius XM retained expert economic and survey specialists to design and conduct statistically rigorous and reliable surveys of thousands of Sirius XM subscribers to obtain *precisely* what the CRB Judges indicated was required:  hard data transparently and accurately demonstrating the revenue attributable to the streaming portion of Sirius XM's packages that combine SDARS and webcasting services.

17.     In August 2021, Sirius XM finalized its updated deduction methodology.  It then implemented the methodology as to the vast majority of its subscription packages that combined webcasting, including not only the Platinum package (where it updated its prior approach), but also its Music & Entertainment and Music Showcase packages (for which it implemented a

webcasting revenue exclusion for the first time).  In the interest of transparency, Sirius XM notified SoundExchange it was doing so and reserved all rights to seek recoupment of the excess royalties it had paid in the past on the Music & Entertainment and Music Showcase packages, for which it had combined webcasting with satellite radio starting in July 2019 and September 2020, respectively.

18.    By this time, Sirius XM had unavoidably overpaid SoundExchange significant excess royalties on revenue derived from the streaming component of combined subscription packages, other than the Platinum combination.

## SOUNDEXCHANGE'S IMPROPER "ROYALTY INSPECTION"

19.    As the sole entity in the United States charged with receiving and distributing digital performance royalties from certain statutory license users, SoundExchange has a right to audit the royalty payments it receives from a statutory licensee once for any given calendar year to confirm the accuracy of its royalty payments.  *See* 37 C.F.R. §§ 380.6, 382.7.

20.    An independent Certified Public Accountant ("CPA") must perform the audit. *Id*. §§ 380.7, 382.1, 382.7(d).  CRB regulations define the required "independence" of a "Qualified Auditor" by reference to the American Institute of Certified Public Accountants ("AICPA") Code of Professional Conduct.  *Id*. § 382.1.  The regulations make clear that the Qualified Auditor must be independent of both SoundExchange *and* the subject of the audit—here Sirius XM.  72 Fed. Reg. 24084, 24109 (May 1, 2007) ("[W]e conclude that it is more important, in the interest of establishing a high level of credibility in the results of the audit, that the auditor be independent of both parties. . . .  In sum, the Copyright Royalty Judges are requiring that the auditor be certified

and independent of both SoundExchange and the Services[2] being audited."); *see also* 81 Fed. Reg. 26316-01, 26403 (May 2, 2016) (rejecting SoundExchange's proposal to allow non-CPAs to perform audits because "CPAs inspire confidence in the audit results because of the standards of their profession").

21.    CRB regulations also describe "the information that is within the scope of [such an audit]" by reference to an audit of books and records "performed in the ordinary course of business according to generally accepted auditing standards by [a] Qualified Auditor."   37 C.F.R. §§ 380.6(d), 382.7(d).

22.    If an independent auditor determines that a licensed service like Sirius XM has underpaid royalties, the service "shall remit the amount of any underpayment determined by the auditor to [SoundExchange] . . . ."  *Id*. §§ 380.6(g), 382.7(g).

23.    In the summer of 2019, SoundExchange filed with the CRB a notice of intent to audit Sirius XM's 2018 royalty payments for its various statutory licenses: SDARS, webcasting, and business establishment services.  *See* Notice of Intent to Audit, 84 Fed. Reg. 45175-01, 45176 (Aug. 28, 2019).

24.    SoundExchange thereafter engaged New York-based Adeptus Partners LLP ("Adeptus") to perform the audit.   On information and belief, Adeptus operated at SoundExchange's direction at all relevant times, maintaining loyalty and partiality to SoundExchange throughout its protracted examination of Sirius XM's 2018 financials.

25.    In November 2021, SoundExchange, Adeptus, and Sirius XM entered into a Nondisclosure Agreement ("NDA") relating to the noticed audit.   The NDA reiterated that

---

[2] The "Services" include Sirius XM, a "webcaster" and "broadcast radio simulcaster."  72 Fed. Reg. 24084, 24084 (May 1, 2007).

SoundExchange had requested "an *independent audit* of the payments and distributions of Sirius XM *pursuant to the provisions set forth in 37 C.F.R. § 382.7*, and ha[d] designated [Adeptus] as the Qualified Auditor in accordance with 37 C.F.R. § 382.1 . . . ."

26.     In the NDA, Adeptus "agree[d] that the audit [would] adhere to 37 C.F.R. § 382.7." Adeptus also represented and warranted to Sirius XM that it was "a 'Qualified Auditor' within the meaning of 37 C.F.R. § 382.1," and that it would "at all times . . . remain a 'Qualified Auditor' within the meaning of 37 C.F.R. § 382.1."

27.     Rather than performing an independent audit (as required by CRB regulations and the NDA), Adeptus instead conducted a partisan "royalty inspection," which it framed as a "consulting service conducted under the [AICPA] consulting standards."  Because the AICPA consulting standards do not contain an "independence" requirement, Adeptus's "royalty inspection" flouted CRB regulations by design.

28.     During Adeptus's "royalty inspection," its conduct far exceeded that which is authorized by CRB regulations and disregarded generally accepted auditing standards.  For example, Adeptus requested custom coding and preparation that took dozens of hours of time from Sirius XM's information technology and finance personnel to complete.  It insisted that Sirius XM create data visualizations that *might* unearth an error.  It called for increasingly granular "gap" performance data while refusing to accept Sirius XM's playlist logs as proffered.  It even purportedly conducted a detailed review of the terms and conditions of Sirius XM's direct licenses and artist waivers, under which Sirius XM obtains performance rights directly from record companies and artists (rather than via the statutory licenses).  Rather than confirming that Sirius XM had properly accounted for performances under these direct licenses and artist royalty waivers,

Adeptus reviewed and second-guessed the terms in those licenses to contend that they were *legally* insufficient to convey the rights Sirius XM claimed.

29.     Adeptus's legal interpretations during the course of its "royalty inspection" were improper, groundless, and directly in contravention of governing CRB regulations.  In effect, they sought to nullify Sirius XM's direct licenses and force the Company to pay separately and additionally for performances under its statutory license notwithstanding that Sirius XM had already licensed these performances directly from the copyright owners (as is its right under the statutory license regime).

30.     On information and belief, Adeptus's improper conduct was at the behest of its consulting client, SoundExchange, which has for years attempted to frustrate Sirius XM's ability to exclude appropriate amounts from its Gross Revenues calculations as well as its right to engage in direct licensing.  *See, e.g.*, *Sirius XM Radio Inc. v. SoundExchange Inc., et al.*, 1:12-cv-02259 (S.D.N.Y. Mar. 27, 2012), ECF 1 at 1–6 (detailing SoundExchange's coordinated efforts to block direct licensing).

31.     The inevitable result of Adeptus's "royalty inspection" was a drawn-out and intrusive investigation unlike any proper audit conducted in accordance with generally accepted auditing standards to which Sirius XM has been subject.  Adeptus never simply verified Sirius XM's royalty payments (as required by the governing regulations).  Instead, it probed out-of-scope technical and legal details at SoundExchange's request in an attempt to manufacture underpayments.

32.     On July 12, 2022—nearly three years after the "royalty inspection" began— Adeptus issued its tentative findings in a draft "Royalty Examination" report (the "Report"). Therein, Adeptus—aware of AICPA's definition of an independent audit—declared that "[t]he

procedures [it] employed [for its 'royalty inspection' did] *not constitute an audit or an examination* under attestation standards established by . . . AICPA."  In doing so, Adeptus conceded that its "royalty inspection" was at all times in derogation of the mandate of 37 C.F.R. §§ 380.6 and 382.7, which explicitly require an independent audit.  This concession marked Adeptus's breach of its earlier contractual commitment to Sirius XM that it would perform an "independent audit" as a "Qualified Auditor" within the meaning of 37 C.F.R. §§ 382.1 and 382.7.

33.    Consistent with the broader course of Adeptus's "royalty inspection," many of the tentative findings in the Report (and certainly those that were the most financially consequential) turned on unsupported legal conclusions well beyond Adeptus's professional purview as a financial firm.  On information and belief, SoundExchange instructed Adeptus as to these legal conclusions, prompting Adeptus to identify false underpayments.

34.    Adeptus's tentative findings concluded that Sirius XM had underpaid royalties for the 2018 calendar year in various respects by approximately $10.3 million.

35.    Sirius XM responded to Adeptus's tentative findings in a letter dated August 5, 2022.  Therein, Sirius XM raised serious and fundamental concerns with Adeptus's "audit process," as detailed above.  Sirius XM also reserved its rights to "pursue all available legal remedies against [Adeptus] and its partners" arising out of Adeptus's failure to conduct an audit in accordance with governing professional standards and applicable CRB regulations.

36.    Nevertheless, operating in good faith, Sirius XM acknowledged a few limited calculation errors it had made (comprising roughly 3% of the alleged total underpayment)—errors and corrections that were appropriate subject matter of a royalty audit—only further demonstrating the inappropriate overreach of the vast majority of Adeptus's other conclusions.

37.    As the remainder of Adeptus's findings revealed significant defects that Adeptus refused to correct or concede even after receiving Sirius XM's thorough written response, Sirius XM has refused to pay the balance identified in the Report.

## SOUNDEXCHANGE'S LAWSUIT

38.    Sirius XM continued to engage with SoundExchange throughout the first part of 2023, with an eye toward resolving the parties' disagreements over the balance of royalty payments allegedly outstanding.

39.    On August 16, 2023, with no prior notice to Sirius XM, SoundExchange initiated this lawsuit, claiming that Sirius XM (1) underpaid SoundExchange royalties based on its survey-backed royalty apportionment methodology for webcasting deductions and (2) failed to remit the underpayments identified by Adeptus's improper "royalty inspection."

## FIRST COUNTERCLAIM

**Declaratory Judgment that Adeptus was not a "Qualified Auditor"
within the meaning of 37 C.F.R. §§ 380.7 and 382.1 and that Adeptus's "Royalty
Inspection" was not an "Audit" within the meaning of 37 C.F.R. §§ 380.6 and 382.7**

40.    Sirius XM incorporates by reference each of the preceding paragraphs as if fully set forth herein.

41.    Pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, an actual controversy within the jurisdiction of this Court exists between Sirius XM and SoundExchange regarding the parties' duties and obligations under the Copyright Act and governing regulations.

42.    Specifically, CRB regulations require Sirius XM to remit to SoundExchange any royalty underpayment identified through an "audit" of Sirius XM's payments that is conducted by an independent Certified Public Accountant.  37 C.F.R. §§ 380.6, 382.7.

43.    As alleged above, Adeptus, the financial firm SoundExchange hired to audit Sirius XM's 2018 financials, did not perform an independent audit.  Rather, it conducted an unsanctioned

"royalty inspection," which it admitted was in reality "a consulting service." Because Adeptus admits that the procedures it employed "d[id] not constitute an audit or an examination," SoundExchange may not tender a legal demand for underpayments based on Adeptus's Report. *See* 37 C.F.R. §§ 380.6, 382.7.

44.    Moreover, the only "acceptable verification procedure" to determine royalty underpayments by a SDARS licensee is an audit performed by a "Certified Public Accountant *independent* within the meaning of the [AICPA] Code of Professional Conduct." *Id.* §§ 382.1, 382.7(d) (emphasis added).

45.    On information and belief, Adeptus and its agents did not act independently within the meaning of AICPA's Code of Professional Conduct. *See, e.g.*, AICPA Code of Professional Conduct § 1.200.001.01 (Independence Rule) ("A member [e.g., Adeptus] in public practice shall be independent in the performance of professional services as required by standards promulgated by [AICPA]"); *id.* § 0.400.01 (Acceptable Level) ("In connection with independence, an acceptable level is a level at which a reasonable and informed third-party who is aware of the relevant information would be expected to conclude that a member's independence is not impaired."); *id.* § 400.23 (Independence) (setting forth the separate requirements of "independence of mind" and "independence in appearance"); *see also id.* § 1.100.001.01 (Integrity and Objectivity Rule) (observing that, in the performance of any professional service, a member [e.g., Adeptus] "shall maintain objectivity and integrity, shall be free of conflicts of interest, and shall not knowingly misrepresent facts or subordinate his or her judgment to others.").

46.    Here, Adeptus did not "perform an attest service without being affected by influences that compromise [their] professional judgment." AICPA Professional Ethics Division, *Plain English Guide to Independence*, at 1 (Nov. 2021). Rather, on information and belief,

Adeptus allowed SoundExchange to dictate inspection methodologies and made findings of royalty underpayments at SoundExchange's direction.

47.     Likewise, the circumstances surrounding Adeptus's "royalty inspection" would lead "a reasonable and informed third party who is aware of the relevant information . . . to conclude" that the independence of Adeptus and its auditors was impaired.  AICPA Code of Professional Conduct § 0.400.01; *see also* AICPA Professional Ethics Division, *Plain English Guide to Independence*, at 1 (Nov. 2021) (similar).  On information and belief, Adeptus and its agents relied on unsupported legal conclusions to overstate Sirius XM's alleged overpayments and refused to correct significant methodological deficiencies brought to their attention by Sirius XM. These aspects of Adeptus's "Royalty Inspection" manifest bias and partiality that are fatal to its independence.

48.     A declaratory judgment that Adeptus failed to perform a proper audit and was not independent within the meaning of governing CRB regulations will fully and finally resolve the existing controversy among the parties as to whether Sirius XM is obligated to pay SoundExchange the amount allegedly owed under Count II of SoundExchange's Complaint.

49.     Sirius XM thus requests a declaration by this court that the "royalty inspection" conducted by Adeptus does not qualify as an "audit" within the meaning of 37 C.F.R. §§ 380.6 and 382.7, and that Adeptus did not act as a "Certified Public Accountant independent within the meaning of the AICPA Code of Professional Conduct" under 37 C.F.R. § 382.1.

## SECOND COUNTERCLAIM

### Setoff / Offset / Recoupment

50.     Sirius XM incorporates by reference each of the preceding paragraphs as if fully set forth herein.

51.    As alleged above, Sirius XM pays SoundExchange royalty payments pursuant to its obligations under the Copyright Act.

52.    Through August 2021, when calculating "Gross Revenues" for its SDARS royalty payments, Sirius XM did not deduct revenue allocable to the webcasting portion of its Music & Entertainment or Music Showcase combined subscription packages, and thus paid SoundExchange far more than it was entitled to receive in SDARS royalties for those packages (had an appropriate revenue exclusion been made).  Sirius XM is entitled to recoupment of this money.

53.    SoundExchange alleges in this lawsuit that Sirius XM has underpaid it SDARS royalties and late fees under 37 C.F.R. § 382.21(a) and 17 U.S.C. § 114(f)(1)(B), in an unspecified amount.  Sirius XM denies that it owes any unpaid royalties and late fees.  However, even if Sirius XM is found to owe an amount to SoundExchange for the underpayment of SDARS royalties and late fees, that amount is more than offset by the amount SoundExchange owes to Sirius XM based on royalty overpayments it made prior to August 2021 in connection with several of its most popular subscription packages—as calculated by whatever exclusion methodology the Court deems appropriate.

54.    Sirius XM is informed and believes, and on that basis alleges, that it is entitled to recoupment or setoff of the amount of its overpayments to SoundExchange under CRB regulations in an amount to be proved through discovery and trial.

55.    By reason of the foregoing, Sirius XM seeks to recover from SoundExchange all overpayments made during the royalty period running through August 2021, when Sirius XM implemented its survey-backed royalty deduction methodology as to nearly all combined subscription packages.

## PRAYER FOR RELIEF

WHEREFORE, Sirius XM respectfully prays:

(a)    That judgment be entered in favor of Sirius XM on all claims asserted in SoundExchange's Complaint;

(b)    For a declaratory judgment that Adeptus was not a "Certified Public Accountant independent within the meaning of the AICPA Code of Professional Conduct" as required under CRB regulations, and that Adeptus's "royalty inspection" does not qualify as an audit within the meaning of governing CRB regulations;

(c)    For judgment in Sirius XM's favor on its counterclaims against SoundExchange for damages to which it is entitled;

(d)    For an award to Sirius XM of pre-judgment and post-judgment interest, costs, and fees; and

(e)    For any further relief as the Court deems just and proper.

Dated: August 12, 2024

Respectfully submitted,

By:  _/s/ Todd Larson_

Todd Larson
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153
Telephone: (212) 310-8238
Facsimile: (212) 310-8007
Todd.Larson@weil.com

Andrew S. Tulumello (admitted *pro hac vice*)
Crystal L. Weeks (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7100
Facsimile: (202) 857-0940
Drew.Tulumello@weil.com
Crystal.Weeks@weil.com