## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SOUNDEXCHANGE, INC.,

*Plaintiff*,

v.

SIRIUS XM RADIO INC.,

*Defendant*.

Case No. 1:24-cv-05491-NRB

Hon. Naomi Reice Buchwald

## DEFENDANT SIRIUS XM RADIO LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS

Todd Larson
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8238
Facsimile: (212) 310-8007
Todd.Larson@weil.com

Andrew S. Tulumello (admitted *pro hac vice*)
Crystal L. Weeks (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7100
Facsimile: (202) 857-0940
Drew.Tulumello@weil.com
Crystal.Weeks@weil.com

*Counsel for Defendant Sirius XM Radio LLC*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 3

PROCEDURAL HISTORY ..................................................................................... 5

LEGAL STANDARD ............................................................................................. 6

ARGUMENT ........................................................................................................... 7

    I.      The Complaint Must be Dismissed Because the Copyright Act Does Not
            Provide A Private Right of Action to SoundExchange ................................... 7

            A.     Congress has not expressly authorized a private right of action in
                     Section 114 ........................................................................................ 7

            B.     Nor can a private right of action be implied. ........................................... 11

                  i.      Section 114 does not contain "rights-creating" language ............. 12

                  ii.     Section 114 provides alternative methods of enforcement .......... 13

                  iii.    Congress has explicitly authorized private rights of actions
                        in other sections of the Copyright Act ......................................... 17

            C.     Extra-textual policy reasons are insufficient to recognize an
                     implied right. .................................................................................... 20

    II.     Other Doctrinal Considerations Compel Dismissal .................................... 23

CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Sandoval,*
532 U.S. 275 (2001) .................................................................................................... *passim*

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .................................................................................................... 6

*Bank of N.Y. v. First Millennium, Inc.,*
607 F.3d 905 (2d Cir. 2010) ........................................................................................ 6

*Bates v. United States,*
522 U.S. 23 (1997) ...................................................................................................... 16

*BedRoc Ltd. v. United States,*
541 U.S. 176 (2004) .................................................................................................... 7

*Bell v. Hood,*
327 U.S. 678 (1946) .................................................................................................... 23

*Bellikoff v. Eaton Vance Corp.,*
481 F.3d 110 (2d Cir. 2007) ........................................................................... 7, 8, 11, 12

*Blue Chip Stamps v. Manor Drug Stores,*
421 U.S. 723 (1975) .................................................................................................... 7

*California v. Sierra Club,*
451 U.S. 287 (1981) .................................................................................................... 12

*Cannon v. Univ. of Chi.,*
441 U.S. 677 (1979) .................................................................................................... 12

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
511 U.S. 164 (1994) .................................................................................................... 7, 8

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984) .................................................................................................... 19, 24

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund,*
583 U.S. 416 (2018) .................................................................................................... 13

*Gonzaga Univ. v. Doe,*
536 U.S. 273 (2002) .................................................................................................... 13

*Halebian v. Berv*,
   631 F. Supp. 2d 284 (S.D.N.Y. 2007) (Buchwald, J.) *aff'd in relevant part,
   vacated in part, remanded*, 644 F.3d 122 (2d Cir. 2011) ............................................11, 12, 13

*Henson v. Santander Consumer USA Inc.*,
   582 U.S. 79 (2017)..................................................................................................................8

*Hernandez v. Mesa*,
   589 U.S. 93 (2020)..............................................................................................................7, 22

*Jarecki v. G.D. Searle & Co*,
   367 U.S. 303 (1961)..............................................................................................................14

*Jesner v. Arab Bank, PLC*,
   584 U.S. 241 (2018)..............................................................................................................23

*Kisor v. Wilkie*,
   588 U.S. 558 (2019)..............................................................................................................24

*Lehman Bros. v. Wu*,
   294 F. Supp. 2d 504 (S.D.N.Y. 2003).................................................................................18

*Loper Bright Enters. v. Raimondo*,
   144 S. Ct. 2244 (2024)..............................................................................................19, 23, 24

*Lopez v. Jet Blue Airways*,
   662 F.3d 593 (2d Cir. 2011).................................................................................................11

*Magwood v. Patterson*,
   561 U.S. 320 (2010)................................................................................................................8

*Mahon v. Mainsail LLC*,
   No. 20-CV-1523-YGR, 2020 WL 4569597 (N.D. Cal. Aug. 7, 2020)...................................9

*Marbury v. Madison*,
   5 U.S. 137 (1803)............................................................................................................24, 25

*Mass. Mut. Life. Ins. Co. v. Russell*,
   473 U.S. 134 (1985)..............................................................................................................20

*Matzell v. Annucci*,
   64 F.4th 425 (2d Cir. 2023) ...................................................................................................6

*McCracken v. Verisma Sys.*,
   91 F.4th 600 (2d Cir. 2024) ..............................................................................................6, 25

*McDonnell v. United States*,
   579 U.S. 550 (2016)..............................................................................................................14

iii

*MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*,
    66 F.4th 77 (2d Cir. 2023) ...................................................................25

*Nestlé USA, Inc. v. Doe*,
    593 U.S. 628 (2021)..............................................................7, 11, 23, 24

*Oklahoma v. Castro-Huerta*,
    597 U.S. 629 (2022).................................................................................8

*Olmsted v. Pruco Life Ins. Co. of N.J.*,
    283 F.3d 429 (2d Cir. 2002)..............................................11, 12, 17, 20

*Oxford Univ. Bank v. Lansuppe Feeder*, *LLC*,
    933 F.3d 99 (2d Cir. 2019)................................................................7, 12

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984)................................................................................22

*Pinter v. Dahl*,
    486 U.S. 622 (1988)................................................................................7

*Ray Charles Found. v. Robinson*,
    795 F.3d 1109 (9th Cir. 2015) .........................................................18, 19

*Recording Indus. Ass'n of Am. v. Verizon Internet Servs., Inc.*,
    351 F.3d 1229 (D.C. Cir. 2003) ......................................................19, 20

*Rodriguez ex rel. Rodriguez v. DeBuono*,
    175 F.3d 227 (2d Cir. 1999)................................................................23

*Russello v. United States*,
    464 US. 16 (1983)................................................................................16

*Schweiker v. Chilicky*,
    487 U.S. 412 (1988)..............................................................................17

*Sirius XM Radio Inc. v. Adeptus Partners, LLC*,
    No. 1:24-cv-6953-NRB (S.D.N.Y. Sept. 16, 2024) (ECF No. 5) ............2

*Sirius XM Radio Inc. v. Adeptus Partners, LLC*,
    No. 654079/2024 (N.Y. Sup. Ct. Aug. 12, 2024) ..................................2

*Sony Corp. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)..............................................................................20

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004)................................................................................7

*SoundExchange, Inc. v. AccuRadio, LLC,*
    No. 24-cv-6125 (N.D. Ill.) ................................................................22

*SoundExchange, Inc. v. LiveOne, Inc.,*
    No. 22-cv-4410 (C.D. Cal.) ..............................................................22

*SoundExchange, Inc. v. Music Choice,*
    No. 19-cv-0999, 2021 WL 5998382 (D.D.C. Dec. 20, 2021) ................22

*SoundExchange, Inc. v. Muzak LLC,*
    No. 15-cv-0476 (D.D.C.) ...................................................................22

*SoundExchange, Inc. v. Sirius XM Radio Inc.,*
    65 F. Supp. 3d 150 (D.D.C. 2014) ....................................................22

*SoundExchange, Inc. v. Sirius XM Radio Inc.,*
    No. 17-cv-2666 (D.D.C.) ...................................................................22

*SoundExchange, Inc. v. Sirius XM Radio Inc.,*
    No. 23-cv-1083-PTG-WBP (E.D. Va. Aug. 16, 2023) (ECF No. 1) ........5

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ...........................................................................23

*Tex. & Pac. Ry. Co. v. Rigsby,*
    241 U.S. 33 (1916) ...........................................................................12

*Touche Ross & Co. v. Redington,*
    442 U.S. 560 (1979) .........................................................................17

*Wilson v. Libby,*
    535 F.3d 697 (D.C. Cir. 2008) ..........................................................17

*Xerox Corp. v. Apple Comput., Inc.,*
    734 F. Supp. 1542 (N.D. Cal. 1990) .........................................8, 17, 18

**Statutes & Regulations**

15 U.S.C. § 80a–26(f) ...............................................................................12

15 U.S.C. § 80a–27(i) ...............................................................................12

15 U.S.C. § 80a–34(b) ..............................................................................12

15 U.S.C. § 80a–36(a) ..............................................................................12

15 U.S.C. § 80a–48(a) ..............................................................................12

17 U.S.C. § 103 ........................................................................................17

17 U.S.C. § 106 ..............................................................................................4, 17

17 U.S.C. § 112 ...............................................................................1, 4, 10, 14

17 U.S.C. § 114 ...................................................................................... *passim*

17 U.S.C. § 115 .................................................................................................8, 9

17 U.S.C. § 203 ...............................................................................................18

17 U.S.C. § 304 ...............................................................................................18

17 U.S.C. § 409 ...............................................................................................17

17 U.S.C. § 501 ...........................................................................8, 10, 16, 17

17 U.S.C. §§ 502–510 ...................................................................................8, 17

17 U.S.C. § 803 ...........................................................................................4, 16

18 U.S.C. § 2318 ..............................................................................................9

28 U.S.C. 1404 ................................................................................................6

Copyright Royalty and Distribution Reform Act of 2004 ............................15

Digital Performance Right in Sound Recordings Act,
    Pub. L. No. 104–39, 109 Stat. 336 (1995) ......................................13, 14

Securities Exchange Act § 10 .........................................................................7

Small Webcaster Settlement Act
    Pub. L. No. 107-321, 116 Stat. 2784 (2002) .......................................14

37 C.F.R. § 201 ...............................................................................................18

37 C.F.R. § 261 ...............................................................................................14

37 C.F.R. § 351 ...............................................................................................4

37 C.F.R. § 380 .........................................................................................3, 4, 15, 17

37 C.F.R. § 382 ......................................................................................3, 4, 5, 15, 17

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal
    Texts* (2012) ........................................................................................13

Fed. R. Civ. P. 12 ........................................................................................5, 6

Fed. R. Civ. P. 41 .............................................................................................6

*Hearing on the CARP (Copyright Arbitration Royalty Panel) Structure and Process Before the H. Subcomm. on Cts., the Internet, and Intell. Prop.*, 107th Cong. (2002) (statement of Marybeth Peters, Register of Copyrights and Associate Librarian for Copyright Services, Copyright Office of the United States, The Library of Congress) ........................................................15

H.R. Rep. No. 94–1476 (1976) ......................................................................17

H.R. Conf. Rep. 94–1733 (1976) ...................................................................17

Notice of Intent to Audit, 84 Fed. Reg. 45175 (Aug. 28, 2019) ......................5

S. Rep. No. 94–473 (1975) ............................................................................17

SoundExchange, *Advocacy For Creators*, https://www.soundexchange.com/advocacy/ .........................................22

SoundExchange, *Annual Report* (July 20, 2023), https://www.soundexchange.com/news/soundexchange-releases-2022-annual-report/ ...............................................................................................4

SoundExchange, *What We Do For Digital Service Providers*, https://www.soundexchange.com/what-we-do/for-digital-service-providers/ ......................21

## INTRODUCTION

This case is about whether Congress authorized a nonprofit private collective to sue under Section 114 of the Copyright Act.  Section 114 does not provide that collective with any explicit private right of action.  Congress knew how to supply private rights of action in multiple provisions of the Copyright Act, but has not done so in Section 114.  Congress's determination should be conclusive, and the claims should be dismissed with prejudice.

The allegations in this case arise from a royalty dispute between SoundExchange—a nonprofit organization appointed by the Copyright Royalty Board ("CRB") to collect and distribute royalty revenues to copyright owners—and Defendant Sirius XM Radio LLC[1] ("Sirius XM"), an audio entertainment company that provides satellite radio and webcasting services to consumers.  The dispute implicates regulations promulgated by the CRB, the administrative body charged with establishing the rates and terms for statutory licenses provided by the U.S. Copyright Act.

SoundExchange's Complaint asserts two claims.  First, SoundExchange raises a technical disagreement with Sirius XM's methodology (but not entitlement) to apportion revenues between satellite and webcasting revenues—an apportionment that determines the amount of royalty payments owed for satellite radio music performances.  *See* Compl., ECF No. 1, ¶¶ 63–67.  Sirius XM sells subscription packages that combine satellite radio and online streaming ("webcasting"), and because the two services are governed by different licenses and royalty rates, Sirius XM must apportion the revenue from those packages between the two.  *Id.* ¶ 7.  Second, SoundExchange complains about Sirius XM's failure to pay approximately $10 million resulting from a purported "audit" of its 2018 royalty payments conducted by Adeptus Partners, LLC ("Adeptus") and one of

---

[1] Sirius XM Radio LLC is the successor to Sirius XM Radio Inc.  *See* ECF No. 55 (Supplemental Rule 7.1 Disclosure).

1

Adeptus's partners, Lewis Stark.  *Id.* ¶¶ 68–72; *see also* Decl. of Catherine Brooker ("Brooker Decl."), ECF No. 18, ¶¶ 19, 21.

There is nothing amiss with the methodology Sirius XM uses to apportion revenues for its royalty calculations.  Since 2021, Sirius XM has retained outside professionals to design and conduct statistically rigorous surveys of more than 25,000 Sirius XM subscribers to determine the precise values subscribers place on the satellite radio and webcasting components of their subscriptions.  Sirius XM has apportioned revenue (and thus royalty payments) in accordance with consumer value and guidance from the CRB.  Compl. ¶ 48.  The audit that is the focus of SoundExchange's claim was in reality a flawed and biased examination by a firm beholden to SoundExchange, and Sirius XM is currently seeking legal recourse against Adeptus and its partner, Lewis Stark, for their failure to conduct an independent audit as required by contract and the governing federal regulations.[2]

This Court does not need to wade into the technical details of this royalty dispute or resolve the underlying royalty disagreement.  Congress did not give SoundExchange the right to sue statutory licensees under Section 114, and there is no indication Congress intended for courts to "imply" or create such a right.  To the contrary, SoundExchange's statutory role is simple, clear, and limited:  it is the entity designated by the CRB to collect royalties from statutory license users and to distribute those royalties to artists and copyright owners.

The time has long passed when Courts "imply" or create rights of action where Congress did not expressly provide them.  The Supreme Court in recent decisions has emphasized that doing

---

[2] Sirius XM filed a lawsuit against Adeptus and Stark in the Commercial Division of the New York Supreme Court on August 12, 2024.  Compl., *Sirius XM Radio Inc. v. Adeptus Partners, LLC,* No. 654079/2024 (N.Y. Sup. Ct. Aug. 12, 2024), ECF No. 2.  On September 13, 2024, Adeptus and Stark removed to this Court.  *See* Notice of Removal, *Sirius XM Radio Inc. v. Adeptus Partners, LLC,* No. 1:24-cv-6953-NRB (S.D.N.Y. Sept. 16, 2024), ECF No. 5.  That removal was improper, and Sirius XM has moved to remand.

so is "an extraordinary act," and that courts no longer need defer to what agencies—let alone private litigants appointed by those agencies—say is their preferred construction of a statute. At the heart of these cases is a concern for the separation of powers. It is for courts (and not others) to say what statutes mean, and for Congress (and not others) to prescribe who has enforcement authority to fill any purported "gaps" in federal statutes. SoundExchange's claims should be dismissed with prejudice.

## FACTUAL BACKGROUND[3]

This case involves a dispute about the proper calculation of royalties for the transmission of copyrighted sound recordings under the Copyright Act and its implementing regulations. Plaintiff SoundExchange is a nonprofit organization which has been designated by the CRB—the regulatory agency charged with setting statutory license royalty rates—as the entity to collect royalties from statutory license users and to distribute those royalties to artists and copyright owners. Compl. ¶ 14. Pursuant to its authority under the governing regulations, *see, e.g.*, 37 C.F.R. §§ 380.4, 380.7, 382.1, SoundExchange collects statutory royalties from satellite radio services, internet radio services, and other entities that digitally transmit sound recordings to the public. *Id.* It then distributes those royalties to the artists and record companies who own the recordings. *Id.*

Sirius XM's satellite radio service transmits more than 135 channels of music, sports, news, talk, comedy, entertainment, and weather to the vehicles of approximately 34 million subscribers nationwide. *See* Brooker Decl. ¶¶ 3–4. Sirius XM also provides its subscribers the ability to

---

[3] The facts of this case are set out in full in Sirius XM's motion to dismiss for lack of personal jurisdiction, filed in the Eastern District of Virginia on September 22, 2023. ECF No. 17. In this motion, Sirius XM repeats only those facts relevant to the Court's narrow determination of whether SoundExchange has a private right of action for its claims.

stream Sirius XM programming over the internet via their computers, phones, and other connected devices (often referred to in this regulatory context as "webcasting"). Compl. ¶ 3.

Section 106 of the Copyright Act, 17 U.S.C. § 106(6), grants record companies and artists the right to be compensated under U.S. copyright law for public performances of their copyrighted sound recordings performed by means of a digital audio transmission. At the same time, the Act provides for a licensing mechanism that enables users like Sirius XM to obtain a "statutory license" to cover the prescribed performances of sound recordings and to transmit them by way of a digital audio service. *See id.* §§ 112(e); 114(d)(2). This allows Sirius XM, provided it follows the conditions of the statutory license set forth in Section 114, to perform sound recordings publicly without needing to negotiate individually with every separate sound recording owner.

By regulation, Sirius XM pays those royalties to SoundExchange which, after deducting amounts for general and administrative costs, later distributes them to artists and copyright owners. Royalty payments from Sirius XM—together with Pandora—represent over 80% of the more than $1 billion in royalties that SoundExchange distributes to record labels and working artists each year. Brooker Decl. ¶ 13.[4] The Copyright Act provides that the CRB shall set "reasonable rates and terms of royalty payments." *See* 17 U.S.C. § 114(f)(1)(A). The CRB sets the rates and terms for the statutory licenses for five-year license periods, and it does so by adjudicating adversarial proceedings—essentially live trials—between the affected parties (typically SoundExchange on one side and the services in the particular license category on the other). *Id.* § 803(b); 37 C.F.R. § 351.1.

Separately, CRB regulations allow SoundExchange to review the payments it receives from Sirius XM via an independent audit. 37 C.F.R. §§ 380.6(a)–(b) (Webcasting); 382.7(a)–(b)

---

[4] *See also SoundExchange Releases 2022 Annual Report* (July 20, 2023), https://www.soundexchange.com/news/soundexchange-releases-2022-annual-report/.

(satellite digital audio radio service ("SDARS")).  On July 29, 2019, SoundExchange filed with the CRB a notice of intent to audit Sirius XM's royalty payments for its various service offerings for 2018.  *See* Notice of Intent to Audit, 84 Fed. Reg. 45175, 45176 (Aug. 28, 2019).  Pursuant to that notice, SoundExchange engaged Adeptus, a financial firm headquartered in New York, to provide consulting services, and Adeptus examined Sirius XM's royalty payments for the 2018 calendar year.  Compl. ¶ 59; Brooker Decl. ¶¶ 18–19.  In September 2022, Adeptus issued its findings for that examination, alleging that Sirius XM underpaid its royalties for the 2018 calendar year in various respects by approximately $10.3 million.  Brooker Decl. ¶ 19.  Sirius XM acknowledged that a small number of the alleged calculation errors (comprising roughly 3% of the alleged underpayment total) were properly identified but contested the remainder of the findings. Compl. ¶ 62.

## PROCEDURAL HISTORY

On August 16, 2023, with no prior notice to Sirius XM and amid continued negotiations to resolve the audit dispute, SoundExchange filed a complaint in the Eastern District of Virginia, purporting to seek relief under § 114(f)(1)(B) of the Copyright Act (and the corresponding CRB regulations) for Sirius XM's alleged underpayment of royalties.  *See* Compl., *SoundExchange, Inc. v. Sirius XM Radio Inc.*, No. 23-cv-1083-PTG-WBP (E.D. Va. Aug. 16, 2023), ECF No. 1. Specifically, SoundExchange alleges that Sirius XM used an unreasonable "method[] for attributing revenues to webcasting in order to exclude them from [Sirius XM's] SDARS Gross Revenues," Compl. ¶ 65, resulting in underpayment of royalties (Count I); and that Sirius XM failed to remit the amount of underpayment separately determined by its purported auditor (Count II).

On September 22, 2023, Sirius XM moved to dismiss the suit, arguing lack of personal jurisdiction under Rule 12(b)(2) and improper venue under Rule 12(b)(3).  ECF No. 17.  In the

alternative, Sirius XM moved under 28 U.S.C. § 1404(a) to transfer venue to the Southern District of New York or the District of Columbia. *Id.* On July 15, 2024, the Court granted in part and denied in part Sirius XM's motion to dismiss. ECF No. 33. Although the court found it had personal jurisdiction over Sirius XM, it granted Sirius XM's motion to transfer the case to the Southern District of New York. *Id.*

Following transfer of the case to this Court, on August 12, 2024, Sirius XM answered the Complaint and asserted counterclaims. ECF No. 47. On August 19, 2024, Sirius XM requested a pre-motion conference for an anticipated motion for judgment on the pleadings under Fed. R. Civ. P. 12(c). ECF No. 48. SoundExchange filed a letter in opposition. ECF No. 50. On September 12, 2024, the Court granted Sirius XM leave to file this motion. ECF No. 52.

Four days later, SoundExchange filed a letter for a pre-motion conference seeking leave to file a motion to dismiss Sirius XM's counterclaims. ECF No. 53. Therein, SoundExchange argued that Sirius XM had no private right of action under Section 114. *Id.* at 3. On October 22, 2024, before filing this motion, Sirius XM noticed the voluntary dismissal of its counterclaims without prejudice under Fed. R. Civ. P. 41(a)(1)(A)(i) and 41(c), ECF No. 59, which the Court entered on October 23, 2024, ECF No. 60.

## LEGAL STANDARD

In deciding a Rule 12(c) motion, courts apply the same standard applicable to a motion to dismiss under Rule 12(b)(6). *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). "To survive a motion for judgment on the pleadings, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Matzell v. Annucci*, 64 F.4th 425, 433 (2d Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Judgment on the pleadings is appropriate where there is no private right of action under which a plaintiff can recover. *See McCracken v. Verisma Sys.*, 91 F.4th 600, 610 (2d Cir. 2024).

**ARGUMENT**

**I.    The Complaint Must be Dismissed Because the Copyright Act Does Not Provide A Private Right of Action to SoundExchange**

The Supreme Court has made clear that Congress—not the Judiciary—has authority to establish private rights of action, and that "implying" rights of action imperils bedrock separation of powers principles. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004) ("[T]his Court has recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases."); *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 636–37 (2021) ("[J]udicial creation of a cause of action is an extraordinary act that places great stress on the separation of powers."); *see also Hernandez v. Mesa*, 589 U.S. 93, 100 (2020) (explaining the Court has come "to appreciate more fully the tension between th[e] practice [of implying rights of action] and the Constitution's separation of legislative and judicial power"). Simply put, "private rights of action to enforce federal law *must* be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (emphasis added).[5] Because Congress has not done so here, SoundExchange's Complaint must be dismissed.

**A.    Congress has not expressly authorized a private right of action in Section 114.**

In determining whether Congress has created a private right of action, the "inquiry begins with the statutory text, and ends there…if the text is unambiguous." *Oxford Univ. Bank v. Lansuppe Feeder*, *LLC*, 933 F.3d 99, 106 (2d Cir. 2019) (emphasis omitted) (quoting *BedRoc Ltd. v. United* States, 541 U.S. 176, 183 (2004)); *see Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116

---

[5] *See also Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176–77 (1994) (finding no implied aiding-and-abetting liability under Securities Exchange Act § 10(b) because "Congress knew how to impose aiding and abetting liability when it chose to do so"); *Pinter v. Dahl*, 486 U.S. 622, 650 (1988) (refusing to infer liability for mere solicitation of a securities purchase, because "[w]hen Congress wished to create such liability, it had little trouble doing so"); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 733–34 (1975) (refusing to infer a cause of action for nonpurchasers or nonsellers of securities, because "[w]hen Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble in doing so expressly").

(2d Cir. 2007) (considering first whether the statutory provisions at issue "explicitly provide[d] a private right of action"). "Congress expresses its intentions through statutory text passed by both Houses and signed by the President," *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022), and a court "may not 'replace the actual text [of a statute] with speculation as to Congress' intent,'" *id.* (quoting *Magwood v. Patterson*, 561 U.S. 320, 334 (2010)). Rather, courts must "'presume more modestly' that 'the legislature says what it means and means what it says.'" *Id.* (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017)); *see also Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173 (1994) ("[T]he text of the statute controls[.]").

Section 114 does not expressly authorize a private right of action for claims like those brought here by SoundExchange and "means what it says." *Castro-Huerta*, 597 U.S. at 642 (quoting *Henson*, 582 U.S. at 89). Congress has explicitly authorized several private rights of actions throughout the Copyright Act, but not for claims under Section 114. For example, Section 501 clearly provides that the owner of an exclusive right under a copyright is entitled "*to institute an action* for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b) (emphasis added); *see also Xerox Corp. v. Apple Comput., Inc.*, 734 F. Supp. 1542, 1545 (N.D. Cal. 1990) ("The main vehicle for enforcement of rights under the Copyright Act is the infringement action."). And Sections 502–505 expressly provide the remedies for an infringement action. A court may "grant temporary and final injunctions . . . to prevent or restrain infringement of a copyright," § 502(a), impound records, *see* § 503(a)(1), and award damages and costs, *see* §§ 504–505.

Section 115, which covers the use and reproduction of musical works under a compulsory license analogous to the Section 114 statutory license at issue in this matter—including license

payment administration by an intermediary entity (the Mechanical Licensing Collective, or the "MLC")—is particularly apt comparison, and shows that Congress knows well how to provide a royalty collective with the right to sue statutory licensees.  Section 115 of the Act has a subsection entitled "Legal enforcement efforts" which explicitly allows the MLC to "commence an action in an appropriate district of the United States for damages and injunctive relief."   17 U.S.C. § 115(d)(6)(C).   No comparable authorization to SoundExchange can be found anywhere in Section 114.

Congress has also explicitly provided a private right of action to copyright owners injured by criminal violations of the Copyright Act.   For example, 18 U.S.C. § 2318(e)(1) expressly provides that a copyright owner "may bring a civil action in an appropriate United States district court," for trafficking in counterfeit labels.  *See e.g.*, *Mahon v. Mainsail LLC*, No. 20-CV-1523-YGR, 2020 WL 4569597, at *8 (N.D. Cal. Aug. 7, 2020) (explaining that 18 U.S.C. § 2318(e)(1) gives a private right of action to "[a]ny copyright owner who is injured, or is threatened with injury," by a violation of the statute).  When Congress intends to provide a private right of action in the Copyright Act, it knows how to do so expressly.

SoundExchange does not purport to assert a claim arising under any of these sections of the Copyright Act where Congress has provided a private right of action.  *See* Compl. ¶¶ 63–67. It purports instead to sue under Section 114 of the Copyright Act, but Section 114 does not provide any private right to sue.

Section 114 provides (in relevant part) that the "schedule of reasonable rates and terms determined by the Copyright Royalty Judges shall . . . be binding on all copyright owners of sound recordings and entities performing sound recordings" during the relevant five-year period. 17 U.S.C. § 114(f)(1)(B).   It also authorizes Copyright Royalty Judges ("CRJs") to designate a

"nonprofit collective" (SoundExchange) to "distribute receipts from the licensing of transmissions in accordance with subsection (f)."  *Id.* § 114(g)(2).  It provides that SoundExchange, as the "nonprofit collective,"

> ***may deduct from any of its receipts,*** prior to the distribution of such receipts to any person or entity entitled thereto other than copyright owners and performers who have elected to receive royalties from another designated nonprofit collective and have notified such nonprofit collective in writing of such election***, the reasonable costs of*** such ***collective incurred after November 1, 1995, in***—
>
> (A) the administration of the collection, distribution, and calculation of the royalties;
>
> (B) the settlement of disputes relating to the collection and calculation of the royalties; and
>
> (C) the licensing and enforcement of rights with respect to the making of ephemeral recordings and performances subject to licensing under section 112 and this section, including those incurred in participating in negotiations or arbitration proceedings under section 112 and this section, except that all costs incurred relating to the section 112 ephemeral recordings right may only be deducted from the royalties received pursuant to section 112.

*Id.* § 114(g)(3) (emphasis added).

Section 114 (unlike Section 115 as discussed above) nowhere authorizes SoundExchange *to sue* statutory license holders like Sirius XM for alleged royalty underpayments.  *Compare* § 501(b) ("The legal or beneficial owner of an exclusive right under a copyright is entitled. . . to *institute an action* for any infringement of that particular right committed while he or she is the owner of it." (emphasis added)).  Section 114(g) expressly provides for *cost-recovery* related to SoundExchange's overhead, CRB rate-setting proceedings contemplated under Section 112, *see* § 112(e)(3), and negotiations and arbitrations about rate setting that might occur pursuant to Sections 112 and 114 of the Act, *see* § 114(e), (f), (g)(3)(C).  It enables SoundExchange to reduce its distributions to copyright owners for these limited and enumerated expenses.  But it

emphatically does not provide the powerful right to initiate a federal lawsuit. Nothing in the text of Section 114 comes close to creating a private right of action.

**B.      Nor can a private right of action be implied.**

Where, as here, a statute does not expressly provide for a private right of action, there is a "strong presumption that Congress did not intend a private right of action," and a plaintiff has a "heavy burden" to demonstrate otherwise. *Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 433 (2d Cir. 2002); *see also Bellikoff*, 481 F.3d at 116 ("[Where] no provision of [a statute] explicitly provides a private right of action[,] . . . we begin with the presumption that Congress did not intend one."). In *Alexander v. Sandoval*, the Supreme Court "severely restricted the '*ancien regime*' affording courts latitude to find implied rights of action." *Halebian v. Berv*, 631 F. Supp. 2d 284, 299 (S.D.N.Y. 2007) (Buchwald, J.) (quoting *Sandoval*, 532 U.S. at 287), *aff'd in relevant part, vacated in part, remanded*, 644 F.3d 122 (2d Cir. 2011). The Court has since described the standard for implying a private right of action as "extraordinarily strict." *Nestlé*, 593 U.S. at 637.

To determine whether an implied right of action exists, "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286. Only when statutory text and structure "yield a clear manifestation of congressional intent to create a private cause of action" can a court imply a private remedy. *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011); *see also Sandoval*, 532 U.S. at 288 n.7 (explaining that the "interpretive inquiry" into whether a statute supports implication of a private right of action "begins with the text and structure of the statute and ends once it has become clear that Congress did not provide a cause of action" (citation omitted)). SoundExchange cannot meet its "heavy burden" to overcome the "presumption that Congress did not intend" to create an implied private right of action in this case. *Olmsted*, 283 F.3d at 433.

In *Olmsted* and later in *Bellikoff*, the Second Circuit articulated several factors for courts to consider when determining whether, in the absence of an explicit right of action, the heavy presumption against implying one may be overcome.  *See Berv*, 631 F. Supp. 2d at 299–300 (applying factors); *see also Oxford*, 933 F.3d at 104 (same).  In both cases, the Second Circuit held that Congress did not intend to create a private right of action in various provisions of the Investment Company Act.  *See Olmsted*, 283 F.3d at 431 (no private right of action for violations of 15 U.S.C. §§ 80a–26(f) and 27(i)); *Bellikoff*, 481 F.3d at 117 (same for 15 U.S.C. §§ 80a–34(b), 36(a), and 48(a)).  The factors that "buttressed" that conclusion, *Bellikoff*, 481 F.3d at 116, were: (1) "whether the provision contains 'rights-creating language' for those protected under the statute"; (2) "whether the statute has provided an alternative method of enforcement"; and (3) "whether Congress provided a private right of action for enforcement of any other section of the statute," *Berv*, 631 F. Supp. 2d at 299–300 (quoting *Olmsted*, 283 F.3d at 432–34).  Each of these factors "'buttresse[s]' the conclusion that Congress did not intend to create an implied private right of action" for SoundExchange's claims in this case.  *Oxford*, 933 F.3d at 104 (quoting *Bellikoff*, 81 F.3d at 116).

### i.    *Section 114 does not contain "rights-creating" language*

"[T]he absence of 'rights-creating language'" in Section 114 "indicates a lack of congressional intent to create [a] private right[] of action."  *Bellikoff*, 481 F.3d at 116 (quoting *Olmsted*, 283 F.3d at 435).

"Rights-creating language" is language "explicitly conferr[ing] a right directly on a class of persons *that include[s] the plaintiff in [a] case*," *Cannon v. Univ. of Chi.*, 441 U.S. 677, 690 n.13 (1979) (emphasis added), or language identifying "the class for whose *especial* benefit the statute was enacted," *id.* at 688 n.9 (quoting *Tex. & Pac. Ry. Co. v. Rigsby*, 241 U.S. 33, 39 (1916)).  "Statutes that focus on the person regulated rather than the individuals protected create 'no

implication of an intent to confer rights on a particular class of persons.'" *Sandoval*, 532 U.S. at 289 (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)).  And "even where a statute is phrased in . . . explicit rights-creating terms, a plaintiff suing under [the] implied right of action still must show that the statute manifests an intent to create not just a private *right* but also a private *remedy*." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (quoting *Sandoval*, 532 U.S. at 286).

Section 114 addresses the "scope of exclusive rights in sound recordings"—*i.e.*, copyrights granted to the artists and record companies who create sound recordings—and provides a mechanism for digital services to license and pay for those rights via an intermediary "collective" (currently SoundExchange).  § 114(g)(2).  It does not "focus" on SoundExchange by any means, and grants it no rights whatsoever that may be enforced against license holders.  And even if Section 114 could be interpreted as providing such a right, it does not provide a "private *remedy*." *Gonzaga*, 536 U.S. at 284.  At most, Section 114 authorizes SoundExchange to deduct enumerated expenses before making its royalty distributions to copyright owners.  *See* § 114(g)(3), (4).  Congress does not hide private rights of action in subsections of statutes detailing how administrative costs and expenses can be handled.  *See Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 431 (2018) ("Congress does not hide elephants in mouseholes.") (internal quotation marks omitted); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56–58 (2012) (discussing Supremacy-of-Text Principle).

### ii.    *Section 114 provides alternative methods of enforcement*

The text and structure of Section 114 show that Congress intended "alternative method[s] of enforcement," short of a private right of action.  *Berv*, 631 F. Supp. 2d at 299.

**Text.**  Congress enacted the Digital Performance Right in Sound Recordings Act ("DPRA") in 1995.  Pub. L. No. 104–39, 109 Stat. 336 (1995).  The DRPA created, for the first time, a *digital* performance right in sound recordings.  The legislation amended Section 114 to give digital radio

13

services (like Sirius and XM Radio at the time) statutory licenses to obtain and pay for the new digital performance right. *Id*. § 3(4)(f)  As part of the DPRA, Congress included a limited antitrust exemption to allow copyright owners to designate nonexclusive "common agents" to negotiate statutory licenses with digital services and receive royalties. *Id.* § 3(4)(e)(1).  But despite ample provisions in the Copyright Act to emulate, Congress in the DRPA did not grant copyright owners or their "common agent" the ability to initiate lawsuits against statutory licensees for the alleged underpayment of royalties. *See* Digital Performance Right In Sound Recordings Act of 1995, Pub. L. No. 104–39, 109 Stat 336.

In 2002, Congress, through the Small Webcaster Settlement Act, added provisions to Section 114 to enable a collective to deduct its costs from distributions to royalty holders.  Pub. L. No. 107-321, 116 Stat. 2784 (2002).  The following year, SoundExchange was designated by the CRB to serve as the statutorily-authorized collective.  *See* 37 C.F.R. § 261 (2003).  But Congress did not take any action then or thereafter—including in the textual grant of authority to "deduct from any of its receipts . . . the reasonable costs of" enumerated expenses, § 114(g)(3)— to vest SoundExchange with the power to sue for alleged underpayments of statutory royalties.

Nor is the textual reference to arbitration proceedings or "enforcement of rights" such a grant. *See* 17 U.S.C. § 114(g)(3)(C) (allowing deduction of costs in "the licensing and enforcement of rights[,] . . . *including those incurred in participating in negotiations or arbitration proceedings* under section 112 and this section" (emphasis added)).  "Enforcement" should be given its plain meaning in the text in which it was enacted.  *See, e.g.*, *McDonnell v. United States*, 579 U.S. 550, 569 (2016) ("'[A] word is known by the company it keeps.'" (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)).  When the Small Webcaster Settlement Act was enacted in 2002, the current CRB did *not* exist, and statutory licenses were overseen by what was then known as

the Copyright Arbitration Royalty Panel ("CARP") system, which was comprised of "ad hoc arbitration panels" staffed by arbitrators from the American Arbitration Association and similar organizations.  *See Hearing on the CARP (Copyright Arbitration Royalty Panel) Structure and Process Before the H. Subcomm. on Cts., the Internet, and Intell. Prop.*, 107th Cong. (2002) (statement of Marybeth Peters, Register of Copyrights and Associate Librarian for Copyright Services, Copyright Office of the United States, The Library of Congress).  The use of "arbitration" in Section 114 refers to the industry-wide *rate-setting* proceedings that occurred through arbitration under the CARP system before the Copyright Royalty and Distribution Reform Act of 2004 replaced the CARP system with the CRB, which is made up of three CRJs appointed by the Librarian of Congress.  *See id.*

The statute thus contemplates SoundExchange engaging in a number of "enforcement" activities that do not entail, imply, or require the right to initiate lawsuits in federal court.  For example, SoundExchange can negotiate voluntary licenses with digital platforms, *see* 17 U.S.C. § 114(e)(1), and actively monitors digital music providers to enforce compliance with statutory license requirements.  And SoundExchange has mechanisms in place to address instances of unauthorized use or non-payment, including investigating and pursuing statutory licensees who have failed to make timely payments or submit timely and proper statements of account and reports of use, initiating audits pursuant to 37 C.F.R. §§ 380.6(a), 382.7(a), negotiating settlements related to those audit findings, and bringing awareness of potential underpayments to copyright holders who have the express ability to sue to protect their *own* interests.

Congress did not introduce a new private right of action through backdoor language in Section 114 about the types of "expenses" that SoundExchange may deduct before it distributes royalty payments from copyright owners.

15

*Structure.*  The structure of the Copyright Act confirms this conclusion.  Had Congress intended to authorize SoundExchange or any other "common agent" to sue, it would have said so using the words it repeatedly used in many other provisions of the Act.  *See supra* pp. 8–9.  For example, Congress could simply have amended Section 501 to make clear that the "common agent," designated pursuant to Section 114, also could "institute an action" to enforce the copyright.  17 U.S.C. § 501(b).  "'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"  *Bates v. United States*, 522 U.S. 23, 29–30 (1997) (quoting *Russello v. United States*, 464 US. 16, 23 (1983)).

To the contrary, the structure of the Act demonstrates that Congress intended to keep courts *out* of royalty disputes between "common agents" and digital broadcasters.  The statute allows "copyright owners of sound recordings affected by [Section 114]" and licensees to "negotiate and agree upon the royalty rates and license terms."  17 U.S.C. § 114(e)(1), (2)(A).  And it employs an administrative panel of expert CRJs with particularized technical qualifications to determine "[t]he schedule of reasonable rates and terms," reflecting Congress' desire for a careful balancing of statutory factors and the exercise of informed policy judgment.  *Id.* § 114(f)(1)(B).  Congress also expressly vested the CRJs with the power to resolve certain disputes that arise in the wake of their determinations by granting them "continuing jurisdiction" to modify the terms of the royalty payments under the statutory license "in response to unforeseen circumstances that would frustrate the proper implementation of [their final rate] determination."  *Id.* § 803(c)(4).

Congress plainly thought about and provided mechanisms to resolve disputes that arise in relation to the statutory licenses.  The glaring absence of any textual authorization for a common agent to sue strongly undermines any suggestion that Congress intended to create by implication

a private right of action in a federal district court. And "it is where Congress has intentionally withheld a remedy that [courts] must most refrain from providing one[,] because it is in those situations that 'appropriate judicial deference' is especially due." *Wilson v. Libby,* 535 F.3d 697, 709 (D.C. Cir. 2008) (quoting *Schweiker v. Chilicky,* 487 U.S. 412, 423 (1988)).

### iii.    *Congress has explicitly authorized private rights of actions in other sections of the Copyright Act*

"Congress's explicit provision of a private right of action to enforce" other sections of the Copyright Act "suggests that omission of any explicit private right to enforce" Section 114 "was intentional. *Olmsted*, 283 F.3d at 433; *see also Touche Ross & Co. v. Redington*, 442 U.S. 560, 572 (1979) (explaining that explicit private rights of action in other sections of a statute shows that "when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly").

Even before *Sandoval*, when courts were less hostile to implied rights of action, courts recognized that the text and structure of the Copyright Act reflect that the *only* remedy the Copyright Act envisions is that expressly authorized in §§ 501–510. In *Xerox Corp. v. Apple Computer, Inc.*, 734 F. Supp. 1542 (N.D. Cal. 1990), for example, the court found Xerox had no private right of action under various provisions of the Copyright Act in an action against Apple for allegedly selling Xerox's copyrighted work as its own. *Id.* at 1547–48 (citing 17 U.S.C. §§ 103(a), 106(2) and 409(9)). Xerox had sought an order to strike Apple's registration of the copyrighted work, and the court found no basis for that relief under the Copyright Act because, "[v]iewing [it] as a whole, it [wa]s apparent that Congress intended that aggrieved copyright holders find their remedies exclusively in §§ 501–510." *Id.* at 1549.

The *Xerox* court looked to the legislative history of the Copyright Act and found nothing in it evidencing that "additional remedies are implicit in any other sections of the Act." *Id.* (citing

S. Rep. No. 94–473 (1975), H.R. Rep. No. 94–1476 (1976), and H.R. Conf. Rep. 94–1733 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5823).   The court cautioned that the mere "fact that a plaintiff's ideal relief is not specified . . . does not give the courts license to grant such relief simply upon application by the plaintiff," and concluded that, "[i]n copyright law, *remedies not provided are remedies not intended*." *Id.* (emphasis added); *see also Lehman Bros. v. Wu*, 294 F. Supp. 2d 504, 505 (S.D.N.Y. 2003) ("[T]he judicial extension of federal common law to create a right of contribution seems peculiarly inappropriate in the context of federal copyright law, where Congress has otherwise legislated with great particularity as to liability, damages, remedies, and the like.").   That same analysis ends this case.   Despite multiple opportunities, Congress did not use any of the familiar tools at hand to establish a private right of action, and courts have consistently declined to imply such a right in other provisions of the Act.

In its letter opposing a pre-motion conference, SoundExchange cites to the Ninth Circuit's decision in *Ray Charles Foundation v. Robinson*, 795 F.3d 1109 (9th Cir. 2015), as an example of how one court implied a right of action under the Copyright Act.   *See* ECF No. 50 at 2.   But that case is easily distinguishable from this one.   In *Ray Charles*, the court examined whether the plaintiff foundation, as the sole beneficiary of deceased music icon Ray Charles' estate and not a statutory heir, fell within the "zone of interests" of the termination provisions of the Copyright Act (17 U.S.C. §§ 203, 304(c)) for the purpose of statutory standing.   *Ray Charles*, 795 F.3d at 1119–24.   In the course of that analysis, the court observed that the statutes did not "expressly provide" a cause of action but held that one could be implied.   *Id.* at 1122.   Specifically, the court found that a "private right and remedy [we]re contemplated by the termination provisions" because "the statutes plainly accord authors and statutory heirs the ability to terminate prior grants and recapture copyright ownership for works that were not made for hire."   *Id.*   That conclusion was buttressed

by the fact that a regulation explicitly stated that the termination provisions could be enforced by private action, *see id.* (citing 37 C.F.R. § 201.10(f)(6) ("Recordation ... is without prejudice to any party claiming that the legal and formal requirements for issuing a valid notice have not been met, *including before a court of competent jurisdiction*." (emphasis added)), and at least four other courts had "entertained suits challenging termination validity under [the same] statutory provisions," *id.*

Even if the reasoning of *Ray Charles* could be squared with the Supreme Court's more recent holdings in statutory interpretation and implied rights of action cases, it does not compel the same outcome here.  Unlike the termination provisions of the Copyright Act, Section 114 does not "plainly accord" any rights to SoundExchange beyond the right to deduct enumerated expenses before making royalty distributions to copyright owners.  *See* 17 U.S.C. § 114(g)(3), (4); *supra* pp. 12–13.  Nor do the CRB's implementing regulations for Section 114 allow SoundExchange to invoke a private right of action for underpayments.

The CRB regulations generally provide that an independent auditor should determine whether royalties have been properly paid, *see* 37 C.F.R. § 380.6(a)-(b), (d), outline the royalty fees payable for recordings, *see id.* § 382.21(a), and govern audits with regard to receiving payments or distributions of royalties, *see id.* § 382.7(a)-(b), (d), (g).  None of these regulations reflects congressional intent to provide a private right of action.  Nor could they: "Language in a regulation may [only] invoke a private right of action that Congress through statutory text created, [] it may not create a right that Congress has not."  *See Sandoval*, 532 U.S. at 291.  "Agencies may play the sorcerer's apprentice, but not the sorcerer himself."  *Id.*  That distinction is even clearer after the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) (overruling *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837

(1984)), and the last thing this Court should do is defer to a *private entity's* interpretation of the Copyright Act. *Cf. Recording Indus. Ass'n of Am. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1238 (D.C. Cir. 2003) ("The plight of copyright holders must be addressed in the first instance by the Congress; only the 'Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology.'" (quoting *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 431 (1984))).

Because there is no evidence that Congress intended to create a private right or private remedy in Section 114 of the Copyright Act, bedrock principles of separation of powers foreclose the imposition of a cause of action here.

### C.    Extra-textual policy reasons are insufficient to recognize an implied right.

In every implied right of action case, the plaintiff offers a variety of policy reasons for why the proverbial sky will fall in the absence of an implied right to sue. SoundExchange is no different. *See* ECF No. 50 at 3 (foretelling the "collapse" of "the entire statutory licensing scheme Congress created" if this Court finds no implied right of action). But "[i]t is not the province of the courts . . . to rewrite [a statute] in order to make it fit [a particular purpose], no matter how damaging [it may be] to the music industry or [otherwise]." *Recording Indus. Ass'n of Am.*, 351 F.3d at 1238. Policy considerations are simply irrelevant if the text and structure of a statute do not evince a right of action. *See Sandoval*, 532 U.S. at 286–87 ("[Without a showing of congressional intent,] a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." (citing *Mass. Mut. Life. Ins. Co. v. Russell*, 473 U.S. 134, 145, 148 (1985)); *Olmsted*, 283 F.3d at 433–34 (finding no cause of action over argument by plaintiffs that such a ruling would "constitute an ill-advised

break with a long line of decisions recognizing implied private rights of action as a way of promoting the policies served by the [Investment Company Act]").

As SoundExchange's letters to the Court in this case illustrate, *see* ECF Nos. 50, 53, policy arguments can be inherently one-sided and self-serving. SoundExchange has offered no textual, structural, or policy reason as to how, if "Section 114 evinces no [Congressional] intent" to imply "a right of action permitting a statutory licensee [like Sirius XM] to recover *overpaid* royalties," ECF No. 53 at 3 (emphasis added), the same statute can "display[] an intent" to allow SoundExchange to "sue to recover *underpaid* royalties" from statutory licensees, ECF No. 50 at 2 (emphasis added). As Sirius XM pointed out in response to SoundExchange's letter regarding the counterclaims, "[i]t would make little sense for Congress to imply a means of enforcing the relevant provisions of Section 114 *in only one direction* and *only for the benefit of one party*." ECF No. 54 at 2–3. The bottom line is Congress did not intend to provide a right of action in *any* direction under Section 114, and SoundExchange's self-interested gloss on the statute is precisely why decisions over who has a private right of action are best left to Congress.

In any event, SoundExchange's one-sided policy arguments have little force here. For starters, the Copyright Act authorizes copyright owners to enforce their rights in a variety of provisions, and the Congressional scheme will not grind to a halt if this Court rightly declines to edit the statute. A large majority of the sound recordings used by Sirius XM are owned by large record companies who are well versed in protecting their rights under the Copyright Act. Nor does the inability of SoundExchange to sue in federal court defeat its purpose. As discussed above, SoundExchange, as a collective, exists to simplify the process for digital service providers like Sirius XM to obtain licenses for streaming music and to distribute royalties to artists.[6] It also

---

[6] *See* SoundExchange, *What We Do For Digital Service Providers*, https://www.soundexchange.com/what-we-do/for-digital-service-providers/ (last visited Oct. 28, 2024).

engages in advocacy work to influence policy and legislation that supports copyright protection and fair compensation for artists.[7]  Far from defying logic, *see* ECF No. 50 at 3, it is perfectly reasonable that Congress recognized the value in "collective licensing, collective rate determination, and collective collection and distribution of royalties," but withheld the right to collective enforcement in federal court and instead left that to copyright holders and owners.  For the Court to expand the reach of a "claim for damages on the ground that doing so furthers the 'purpose' of the law, . . . risks arrogating legislative power."  *Hernandez*, 589 U.S. at 100.

SoundExchange's letter opposing this motion also faults Sirius XM for not raising this argument in defense of a previous lawsuit by SoundExchange, *see* ECF No. 50 at 3 (citing *SoundExchange, Inc. v. Sirius XM Radio Inc.*, 13-cv-1290 (D.D.C.)), but in that case, SoundExchange's claims suffered from another defect altogether—they involved a question of regulatory interpretation that fell within the exclusive ("primary") jurisdiction of the CRB, *see SoundExchange, Inc. v. Sirius XM Radio Inc.*, 65 F. Supp. 3d 150, 156 (D.D.C. 2014).  Because Sirius XM prevailed in getting that case moved to the CRB to allow it to provide the necessary interpretation, after which the case settled, there was no need to raise or reach the question of SoundExchange's private right of action, and Sirius XM certainly did not waive its ability to do so here.[8]

---

[7] *See* SoundExchange, *Advocacy For Creators*, https://www.soundexchange.com/advocacy/ (last visited Oct. 28, 2024).

[8] Nor do any of SoundExchange's cases against other licensees bear on the outcome here.  Each one that Sirius XM is aware of was either similarly referred to the CRB, was voluntarily dismissed pursuant to a settlement, or did not assert a right of action under Section 114.  *See, e.g.*, *SoundExchange, Inc. v. LiveOne, Inc.*, 22-cv-4410  (C.D. Cal. dismissed Oct. 13, 2022) (consent judgment entered after settlement); *SoundExchange, Inc. v. Music Choice*, 19-cv-0999, 2021 WL 5998382 (D.D.C. Dec. 20, 2021) (referred to CRB); *SoundExchange, Inc. v. Muzak LLC*, 15-cv-0476 (D.D.C. dismissed Sept. 23, 2020) (settled); *SoundExchange, Inc. v. Sirius XM Radio Inc.*, 17-cv-2666 (D.D.C. dismissed July 9, 2018) (stayed pending CRB ruling and then voluntarily dismissed); *see also SoundExchange, Inc. v. AccuRadio, LLC*, 24-cv-6125 (N.D. Ill. filed July 19, 2024) (pending case, stayed for settlement conference).  In no prior case has a defendant argued SoundExchange lacks a private right of action under Section 114 and there is nothing precluding this Court from considering that question here.  *Cf. Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S.

\*       \*       \*

The Supreme Court has stated that "[a] court 'must' not create a private right of action if it can identify even one 'sound reaso[n] to think Congress might doubt the efficacy or necessity of [the new] remedy.'" *Nestlé*, 593 U.S. at 637 (quoting *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 264 (2018)). Here, there are many sound reasons Congress would not have wanted a private nonprofit entity, accountable to virtually no one, to have the ability to sue for royalty underpayments. Congress understood that copyright owners were the best and most efficient protectors of their rights. Congress also might well have wanted to promote dispute-resolution and compromise in the collection and payment regime rather than litigation. But what Congress plainly did not forget was how to authorize causes of action under the Copyright Act given that the statute provides them in myriad provisions. Congress's deliberate decision *not* to authorize private lawsuits under Section 114 must be respected.

## II.    Other Doctrinal Considerations Compel Dismissal

Outside the straightforward application of *Sandoval* and its progeny, several other doctrinal considerations compel dismissal here. First, although the question whether a litigant has a private right of action under a federal statute "does not implicate jurisdiction," *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999) (citing *Bell v. Hood*, 327 U.S. 678, 682–85 (1946)), and "uncertainty about whether a cause of action exist[s]" is not an "Article III 'redressability' question," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 96 (1998), whether SoundExchange has a private right of action nevertheless implicates this Court's authority. At a minimum, if there is no private right of action then the case simply does not belong in this Court and SoundExchange has no right or ability to press the machinery of Article III courts into service on these claims.

---

89, 119 (1984) ("When questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us.").

Second, significant separation of powers concerns are lurking here.  The Supreme Court's recent holding in *Loper Bright* reaffirmed "the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*:  that courts decide legal questions by applying their own judgment," 144 S. Ct. at 2261, and not by deferring to the "plausible" or "not unreasonable" views of agencies like the CRB, let alone *private* litigants appointed by those agencies such as SoundExchange.  *See also id.* at 2266 ("[A]gencies have no special competence in resolving statutory ambiguities. Courts do."); *id.* at 2274 (Thomas, J., concurring) ("*Chevron* deference compromises [] separation of powers [because] . . . [i]t curbs the judicial power afforded to courts, and simultaneously expands agencies' executive power beyond constitutional limits.").  If *Loper Bright* means anything, it is that Courts now need a far more explicit statement from Congress to give any federal agency—let alone a private nonprofit company appointed by the agency—the ability to exercise coercive enforcement authority.

Similarly, in *Nestlé*, the Supreme Court reiterated that "judicial creation of a cause of action" where Congress has not expressly provided one threatens severe consequences for separation of powers because "a federal court's authority to recognize a damages remedy must rest at bottom on a statute enacted by Congress, and any judicially created cause of action risks upsetting the careful balance of interests struck by [] lawmakers."  593 U.S. at 636–37 (cleaned up).

The upshot of all of these Supreme Court decisions is that if a court concludes there is a void in a statute, it is for Congress, and Congress alone, to fill.  Congress knows how to provide a private right of action in the Copyright Act and has not done so here.  That determination cannot be overridden by "emanations" and "penumbras" based on SoundExchange's policy preferences about how things should work to suit its preferred purposes.  And if Congress disagrees with how

the Court interprets the statute, "it is free to amend the statute to establish a different rule going forward." *Kisor v. Wilkie*, 588 U.S. 558, 616 (2019) (Gorsuch, J. concurring in judgment). That outcome reserves for the Judiciary its role to "say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803), and for Congress and Congress alone to exercise the legislative function.

Each of these principles—the need to protect Courts from spending resources on cases that should not be before them, the responsibility of courts and courts alone to interpret statutes, and the need to leave any statutory gap-filling to Congress—all support the determination that SoundExchange has no private right of action here.

## CONCLUSION

Congress has not authorized private rights of action under Section 114 of the Copyright Act. Because SoundExchange purports to sue under that provision, its claims must be dismissed with prejudice. No amendment could cure this defect, as it goes far beyond a mere pleading deficiency. Sirius XM respectfully requests that the Court dismiss the Complaint with prejudice.[9]

Dated: October 28, 2024                         Respectfully submitted,

                                                By:  */s/ Todd Larson*

                                                Todd Larson
                                                WEIL, GOTSHAL & MANGES LLP
                                                767 Fifth Avenue
                                                New York, NY  10153
                                                Telephone: (212) 310-8238
                                                Facsimile: (212) 310-8007
                                                Todd.Larson@weil.com

---

[9] Because a determination that there is no private right of action is a decision on the merits, dismissal should be with prejudice, *see McCracken v. Verisma Sys., Inc.*, 91 F.4th 600, 610 (2d Cir. 2024), as opposed to without prejudice, which is the appropriate disposition when a Court concludes there is no federal subject matter jurisdiction, *see MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 91 (2d Cir. 2023). The dismissal with prejudice will preclude SoundExchange from filing this suit in another forum claiming that a dismissal without prejudice is not preclusive. *Id.*

Andrew S. Tulumello (admitted *pro hac vice*)
Crystal L. Weeks (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7100
Facsimile: (202) 857-0940
Drew.Tulumello@weil.com
Crystal.Weeks@weil.com

*Counsel for Defendant Sirius XM Radio LLC*