**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

SOUNDEXCHANGE, INC.

                                Plaintiff,

     v.

SIRIUS XM RADIO INC.

                               Defendant.

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:24-cv-05491-NRB

**Oral Argument Requested**

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 4

    A.    The Statutory License ............................................................................................. 4

    B.    SoundExchange's Enforcement Power ................................................................... 5

    C.    This Case ................................................................................................................. 6

ARGUMENT ........................................................................................................................... 7

    I.    Congress Intended To Authorize A Cause Of Action To Recover Underpaid
        Royalties. ................................................................................................................. 8

    A.    Section 114 has clear rights-creating language. .................................................... 8

    B.    The Copyright Act creates no other mechanism to recover underpaid royalties. ..... 15

    C.    The references to enforcement in Section 115 do not nullify Section 114's
        enforcement language. ............................................................................................ 20

    II.    *Loper* Does Not Counsel A Different Result. ..................................................... 23

    III.    Even If Section 114 Creates A Right Of Action Only For Royalty Recipients,
          SoundExchange Has Standing To Sue On Their Behalf. ....................................... 24

    CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Sandoval*,
532 U.S. 275 (2001)...............................................................................8, 15, 23

*Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*,
632 F. Supp. 3d 517 (S.D.N.Y. 2022)..........................................................9

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
501 U.S. 104 (1991).......................................................................................14

*Bitmanagement Software GmBH v. United States*,
989 F.3d 938 (Fed. Cir. 2021).....................................................................13

*Bloomberg v. N.Y. City Dep't of Educ.*,
119 F.4th 209 (2d Cir. 2024) ........................................................................7

*Briggs v. Bremby*,
792 F.3d 239 (2d Cir. 2015)........................................................................10

*Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*,
411 F.3d 306 (2d Cir. 2005).........................................................................16

*Cmty. Voice Line, L.L.C. v. Great Lakes Commc'n Corp.*,
18 F. Supp. 3d 966 (N.D. Iowa 2014)..........................................................7

*Cobb v. U.S. Dep't of Educ. Off. for C.R.*,
487 F. Supp. 2d 1049 (D. Minn. 2007)........................................................7

*Cox v. Cmty. Loans of Am. Inc.*,
625 F. App'x 453 (11th Cir. 2015) ...............................................7, 10, 11, 22

*Fathers & Daughters Nev., LLC v. Lingfu Zhang*,
284 F. Supp. 3d 1160 (D. Or. 2018) ............................................................9

*Fitzgerald v. Barnstable Sch. Comm.*,
555 U.S. 246 (2009)......................................................................................18

*Fixed Income Shares: £Series M v. Citibank N.A.*,
130 F. Supp. 3d 842 (S.D.N.Y. 2015)......................................................7, 22

*Halebian v. Berv*,
631 F. Supp. 2d 284 (S.D.N.Y. 2007).....................................................20, 24

*Herman & Maclean v. Huddleston*,
    459 U.S. 375 (1983)...........................................................................................22

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)......................................................................................24, 25

*Kimber Baldwin Designs, LLC v. Silv Commc'ns, Inc.*,
    225 F. Supp. 3d 670 (S.D. Ohio 2016) ...........................................................7

*King v. Burwell*,
    576 U.S. 473 (2015)..........................................................................................15

*Landegger v. Cohen*,
    5 F. Supp. 3d 1278 (D. Colo. 2013)..................................................................7

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024)..............................................................................3, 21, 23

*Lopez v. Jet Blue Airways*,
    662 F.3d 593 (2d Cir. 2011)..............................................................................20

*McCoy v. Synchrony Bank*,
    No. 15-cv-13310, 2015 WL 6386554 (S.D. W. Va. Oct. 21, 2015) .......................10

*N.Y. State Citizens' Coal. for Child. v. Poole*,
    922 F.3d 69 (2d Cir. 2019).............................................................................8, 10

*Olmsted v. Pruco Life Ins. Co. of N.J.*,
    283 F.3d 429 (2d Cir. 2002).............................................................................8, 20

*Oxford Univ. Bank v. Lansuppe Feeder, LLC*,
    933 F.3d 99 (2d Cir. 2019).......................................................................... *passim*

*Pulsifer v. United States*,
    601 U.S. 124 (2024)...........................................................................................12

*Ray Charles Found. v. Robinson*, 795 F.3d 1109 (9th Cir. 2015) ................................7, 15, 19, 23

*Ross v. A. H. Robins Co.*,
    607 F.2d 545 (2d Cir. 1979)..............................................................................22

*SoundExchange, Inc. v. AccuRadio, LLC*,
    No. 24-cv-6125 (N.D. Ill. filed July 19, 2024) .......................................................14

*SoundExchange, Inc. v. LiveOne, Inc.*,
    No. 22-cv-4410 (C.D. Cal. filed June 28, 2022).....................................................14

*SoundExchange, Inc. v. Music Choice*,
    No. 19-cv-0999, 2021 WL 5998382 (D.D.C. Dec. 20, 2021) ..................................14

*SoundExchange, Inc. v. Muzak LLC*,
    854 F.3d 713 (D.C. Cir. 2017) ...........................................................................14, 15, 17, 21

*SoundExchange, Inc. v. Muzak LLC*,
    No. 16-7041 (D.C. Cir. Nov. 16, 2016) ..........................................................................14, 17

*SoundExchange, Inc. v. Sirius XM Radio Inc.*,
    65 F. Supp. 3d 150 (D.D.C. 2014) .............................................................................14, 15, 21

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
    600 U.S. 181 (2023)..............................................................................................................24

*Torres v. U.S. Dep't of Homeland Sec.*,
    411 F. Supp. 3d 1036 (C.D. Cal. 2019) ................................................................................7

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,
    444 U.S. 11 (1979)...............................................................................................................10

*United States v. Huber*,
    603 F.2d 387 (2d Cir. 1979).................................................................................................11

*WTGD 105.1 FM v. SoundExchange, Inc.*,
    No. 5:14-cv-00015, 2014 WL 12819789 (W.D. Va. Sept. 12, 2014)....................................15

*Xerox Corp. v. Apple Computer, Inc.*,
    734 F. Supp. 1542 (N.D. Cal. 1990) ..............................................................................18, 19

## Statutes

15 U.S.C. § 80a-46(b) ...................................................................................................................10

15 U.S.C. § 717c-1 .......................................................................................................................23

17 U.S.C. § 104A(c) ........................................................................................................................9

17 U.S.C. § 104A(d) ........................................................................................................................9

17 U.S.C. § 114(d)(2) ................................................................................................................4, 13

17 U.S.C. § 114(f)(1) ......................................................................................................................4

17 U.S.C. § 114(f)(1)(A).................................................................................................................13

17 U.S.C. § 114(f)(1)(B)..........................................................................................................4, 5, 10

17 U.S.C. § 114(f)(2) ......................................................................................................................4

17 U.S.C. § 114(f)(3)(B).................................................................................................................13

17 U.S.C. § 114(f)(3)(B)(i) ...........................................................................4, 8, 13, 17

17 U.S.C. § 114(f)(4)(A) .....................................................................................8, 23

17 U.S.C. § 114(g) .....................................................................................................5

17 U.S.C. § 114(g)(2) ......................................................................................5, 8, 25

17 U.S.C. § 114(g)(2)(B)–(D) ................................................................................17

17 U.S.C. § 114(g)(3) ............................................................................................5, 8

17 U.S.C. § 114(g)(3)(B) ....................................................................................6, 12

17 U.S.C. § 114(g)(3)(C) ...............................................................................6, 9, 11

17 U.S.C. § 114(g)(5)(A) ..........................................................................................8

17 U.S.C. § 115(c)(1)(A) .........................................................................................17

17 U.S.C. § 115(c)(2)(D) .........................................................................................23

17 U.S.C. § 115(d)(3)(C)(i)(VIII) .....................................................................20, 22

17 U.S.C. § 115(d)(3)(G)(ii) ..............................................................................21, 22

17 U.S.C. § 115(d)(6)(A) ........................................................................................22

17 U.S.C. § 115 (e)(6)(A)(v) .............................................................................21, 22

17 U.S.C. § 501(f)(2) .................................................................................................9

17 U.S.C. § 512(a)–(d) ............................................................................................23

17 U.S.C. § 512(h)(6) ................................................................................................9

17 U.S.C. § 603(b)(1) ................................................................................................9

17 U.S.C. § 801(b)(1) ..............................................................................................16

17 U.S.C. § 801(b)(3)(D) .........................................................................................23

17 U.S.C. § 910 .........................................................................................................9

17 U.S.C. § 1201(a) ...................................................................................................9

17 U.S.C. § 1201(a)(1)(E) .........................................................................................9

17 U.S.C. § 1321(b) ...................................................................................................9

17 U.S.C. § 1401(*l*)(2)(B) ..............................................................................................10

17 U.S.C. § 1401(a)(1) ....................................................................................................10

18 U.S.C. § 2318 .............................................................................................................23

20 U.S.C. § 1019d(b) ......................................................................................................23

47 U.S.C. § 613(j) ...........................................................................................................23

Orrin G. Hatch–Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264, §
   102, 132 Stat. 3676 (2018) (codified at 17 U.S.C. § 115(d)(6)(C)) ...........................20, 21, 22

Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-39,
   § 3, 109 Stat. 336 (codified at 17 U.S.C. § 114(g)(2)) .................................................5

Small Webcaster Settlement Act of 2002, Pub. L. No. 107-321
   § 5, 116 Stat. 2780 (codified at 17 U.S.C. § 114(g)(3)) ...............................................21

Small Webcaster Settlement Act of 2002, Pub. L. No. 107-321, § 5(b), (c), 116
   Stat. 2780 (codified at 17 U.S.C. § 114(g)(2), (3)) .....................................................6

**Other Authorities**

37 C.F.R. § 380.2(a) ..................................................................................................5, 6, 25

37 C.F.R. § 380.4(d) ........................................................................................................5

37 C.F.R. § 380.4(d)(2) ...................................................................................................25

37 C.F.R. § 380.6(g) .........................................................................................................7

37 C.F.R. § 382.3(a) ..................................................................................................5, 6, 25

37 C.F.R. § 382.5(d) ........................................................................................................5

37 C.F.R. § 382.5(d)(2) ...................................................................................................25

37 C.F.R. § 382.7(g) .........................................................................................................7

Determination of Rates and Terms for Preexisting Subscription Services and
   Satellite Digital Audio Radio Services, 82 Fed. Reg. 56725 (Nov. 30, 2017) ....................16

Determination of Royalty Rates and Terms for Transmission of Sound Recordings
   by Satellite Radio and "Preexisting" Subscription Services ("SDARS III"), 83
   Fed. Reg. 65210 (Dec. 19, 2018) ............................................................................14, 17

*Enforce*, BLACK'S LAW DICTIONARY (7th ed. 1999) .......................................................9

H.R. Rep. No. 104-274 (1995)...................................................................................4

*In re Determination of Rates and Terms for Preexisting Subscription Services and*
     *Satellite Digital Audio Radio Services*,
     No. 2006-1 (U.S. Copyright Royalty Judges May 15, 2017) ..................................16

3 NIMMER ON COPYRIGHT § 10.15 (2024) ...................................................................13

1 NIMMER ON COPYRIGHT § A.01 (2024)......................................................................17

Notice and Recordkeeping for Digit. Subscription Transmissions, 63 Fed. Reg.
     34289 (June 24, 1998)..........................................................................................6, 25

S. Rep. No. 104-128 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 356 ..........................13

Sirius XM Holdings, Inc., Form 8-K (June 11, 2018) .....................................................6, 15

# INTRODUCTION

In Section 114 of the Copyright Act, Congress allowed music service providers like Sirius to perform copyrighted sound recordings without permission from artists and copyright owners. In exchange, Congress mandated that the service providers pay a royalty to the artists and copyright owners. Congress left no doubt that the royalty is mandatory; the statute expressly states that service providers have a "binding" obligation to pay royalties for the sound recordings they perform, and that artists and copyright owners are correspondingly "entitled" to payment. Nor did Congress leave any doubt about whom it was empowering to collect and enforce the royalty obligation: the statute expressly charges a collective (SoundExchange) with collecting and distributing the royalties, subject to a deduction of SoundExchange's costs for "enforcement" of the royalty obligation. Indeed, SoundExchange has repeatedly and successfully sued music service providers, including Sirius, that failed to pay royalties they owe.

Sirius now asks this Court to deprive SoundExchange of the enforcement authority that Congress provided. In Sirius's view, Congress did not provide a mechanism for SoundExchange—or anyone else—to sue Sirius for failing to pay the royalties it owes. The point bears repeating: although Sirius does not say it expressly, its position is that no one—not SoundExchange, not a copyright owner or artist, nor a government regulator—can enforce Section 114's "binding" royalty obligation. Yet Sirius offers no plausible explanation for Section 114's enforcement language. It contends that SoundExchange can "enforce" by "monitoring" or "auditing," but those undertakings are toothless without the right to sue in the event it discovers an underpayment. Sirius would transform Section 114's "binding," "enforce[able]" royalty obligation into a mere suggestion that Sirius should pay royalties to the extent it wishes to.

Sirius nonetheless tells the Court that it must adopt Sirius's atextual and inequitable interpretation because the Court would be supposedly engaging in impermissible statutory "gap-

1

filling" if it permitted enforcement against Sirius. But the Second Circuit employs a well-established three-part test for assessing whether Congress intended to provide a right of action. Although that test is demanding, and many statutes do not satisfy it, Section 114 easily meets every element and demonstrates that Congress intended—unsurprisingly—Sirius's royalty obligation to be enforceable.

*First*, courts ask whether a statute contains "rights-creating language." Section 114's distinctive licensing and enforcement provisions could hardly employ clearer "rights-creating language." Section 114 explicitly gives artists and copyright owners the right to receive royalties and SoundExchange the right to collect and distribute them. Section 114 also expressly envisions a remedy: it states that SoundExchange can deduct costs for "enforcement of rights," which necessarily presupposes that SoundExchange may enforce those rights. As the Second Circuit recently held in construing a statute that similarly envisioned enforcement, such language is "effectively equivalent to providing an express cause of action." *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 105 (2d Cir. 2019). Section 114 acts as a compulsory contract between royalty recipients and service providers. It is natural and necessary that the parties to that contract be able to sue for breach. Practice under the statute further confirms Congress's remedial language. Music services, like Sirius, have always operated on the understanding—and indeed affirmatively acknowledged—that SoundExchange can bring underpayment suits.

*Second*, courts ask whether Congress created an alternative method of enforcement. Congress did not provide any other means to recover an underpayment. As Sirius has acknowledged, the Copyright Royalty Board lacks jurisdiction to resolve underpayment disputes. And Sirius pointedly does not contend that a suit for copyright infringement would provide royalty recipients with the royalties to which Section 114 entitles them. Because of the breadth of the

Section 114 royalty right, an infringement suit would provide no relief to large classes of Section 114 beneficiaries and would exclude large classes of Section 114 royalty-generating works. Congress did not intend a remedy for enforcing Section 114 that covers only a subset of royalty recipients for a subset of works.

*Third*, courts ask whether there are other private causes of action in the relevant legislation that indicate that Congress intended the provision in question to be unenforceable. Sirius emphasizes that Section 115 contains a cause of action, but that provision narrowly applies to recovery of administrative costs (not royalties) from those operating outside of the statutory license. When it comes to the more typical royalty payments for those covered by the Section 115 statutory license, Section 115 uses precisely the same "enforcement of rights" language as Section 114 in stating that a Section 115 collective may recover its costs for enforcing a music service's royalty obligation. If anything, that language indicates that Congress intended the Section 115 license to be enforceable, just like the Section 114 license that it created years earlier.

Faced with a test that SoundExchange clearly satisfies, Sirius seeks to minimize it, claiming that courts "no longer" find that Congress intended to provide a right of action where it has not expressly authorized one. But this statute *expressly* presupposes SoundExchange's "enforcement" of Sirius's royalty obligation. Sirius asks this Court to nullify Congress's enforcement provision; SoundExchange asks this Court to give it its plain meaning. Nor is Sirius correct to contend that the Supreme Court's recent decision in *Loper* supports its position. *Loper* stands for the proposition that a court should not defer to an agency's interpretation of an ambiguous statute. But SoundExchange's position does not rest on an agency interpretation; it flows from the text, structure, and history of Section 114.

In sum, Section 114 presents a paradigmatic example of a statute where Congress intended private enforcement: the statute calls for enforcement by *this* plaintiff, SoundExchange, to enforce the royalty obligation of *this* defendant, Sirius, and the statute creates no other mechanism for doing so. Sirius should not be allowed to shirk its royalty obligations with impunity. Sirius's motion for judgment should be denied.

## **BACKGROUND**

### A.  The Statutory License

To facilitate the provision of digital music services while protecting the rights of artists and copyright owners, Congress created a statutory license regime.[1] The license functions as a kind of compulsory contract between service providers like Sirius, on the one hand, and artists and copyright owners on the other. Specifically, Congress allowed service providers like Sirius to opt into a statutory license to transmit digitally *all* copyrighted sound recordings, and thereby avoid negotiating countless individual license agreements with copyright owners. 17 U.S.C. § 114(d)(2). Congress imposed a royalty obligation on service providers that make use of the blanket license. *Id.* § 114(f)(1), (f)(3)(B)(i). Parties to this license can negotiate royalty rates themselves, or the Copyright Royalty Board ("CRB") will set the rate. *Id.* § 114(f)(1), (2). These rates are "binding on all copyright owners of sound recordings and entities performing sound recordings . . . ." *Id.* § 114(f)(1)(B). The Act and the regulations adopted by the CRB require Sirius to pay these royalties to a "collective" (SoundExchange), which then distributes the royalties to artists and

---

[1] *See* 17 U.S.C. § 114. Congress created the digital performance right that is the subject of the statutory license to address its concern that, without such a right, "copyright law is inadequate to address all of the issues raised by these new technologies dealing with the digital transmission of sound recordings and musical works and, thus, to protect the livelihoods of the recording artists, songwriters, record companies, music publishers and others . . . ." H.R. Rep. No. 104-274, at 13 (1995). In creating the digital performance right while subjecting that right to a statutory license, Congress was mindful of the need to "strike a balance among all of the interests affected thereby." *Id.*

copyright owners. SoundExchange is the only such collective authorized to collect and distribute these royalty payments. *See, e.g.*, *id.* § 114(g); 37 C.F.R. §§ 380.2(a), 380.4(d), 382.3(a), 382.5(d). The Act requires SoundExchange to distribute 50% of the royalties to the sound recording's copyright owner, 45% to the featured recording artist, and 5% to trust funds that benefit nonfeatured musicians and vocalists. 17 U.S.C. § 114(g)(2).

**B.  SoundExchange's Enforcement Power**

Section 114 authorizes SoundExchange to deduct from its royalty distributions expenses it incurs from the "licensing and enforcement of rights" (among other things):

> [SoundExchange] may deduct from any of its receipts[] . . . the reasonable costs of such collective incurred . . . in . . . (C) the licensing and *enforcement of rights* with respect to . . . performances subject to licensing under . . . this section, *including* those incurred in participating in negotiations or arbitration proceedings . . . .

17 U.S.C. § 114(g)(3) (emphases added). Importantly, Congress added these provisions in 2002, at the same time it provided for collective administration of royalties. When Congress initially created the statutory license for digital performances of sound recordings in 1995, Congress provided that the service providers would pay royalties directly to copyright owners, who in turn would pay artists the 50% share to which the artists were entitled. Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-39, § 3, 109 Stat. 336, 342–43 (codified at 17 U.S.C. § 114(g)(2)). However, by the time of the first rate-setting proceeding under the new statutory license, it was clear that non-collective, individual administration was impractical. The Recording Industry Association of America—SoundExchange's predecessor—began performing the role of a collective administrator for its members and agreed to be designated as the collective

for all royalty recipients. Notably, it was the *licensees*, and not the copyright owners, who pushed for this comprehensive collective administration.[2]

In 2002, Congress amended Section 114 to recognize the industry practice that had sprung up to deal with the difficulties of decentralized administration. Specifically, Congress provided that a collective, rather than copyright owners, would collect and distribute royalties. Small Webcaster Settlement Act of 2002, Pub. L. No. 107-321, § 5(b), (c), 116 Stat. 2780, 2784 (codified at 17 U.S.C. § 114(g)(2), (3)). At the same time, Congress added the "enforcement of rights" language, recognizing that, as part of the collective administration scheme Congress was adopting, the collective would need to engage in "the settlement of disputes relating to the collection and calculation of the royalties . . . [and] the licensing and enforcement of rights . . . ." 17 U.S.C. § 114(g)(3)(B), (C). In 2002 and since, Section 114's collective has been SoundExchange. *See, e.g.*, 37 C.F.R. §§ 380.2(a), 382.3(a).

Pursuant to its enforcement authority, SoundExchange has brought various lawsuits alleging underpayment of royalties. For example, SoundExchange sued Sirius for underpayment in 2013, and Sirius settled by making a $150 million payment.[3]

### C.  This Case

This case addresses two instances in which Sirius has underpaid the royalties it owes. First, for years, Sirius has been overstating one of the deductions it makes in its royalty calculations, resulting in a massive underpayment to the tune of more than $150 million. Compl. ¶¶ 8, 30–56, ECF No. 1. Second, an independent auditor determined that for the 2018 calendar year, Sirius otherwise underpaid additional millions in royalties. *Id.* ¶¶ 57–62. The relevant regulation requires

---

[2] Notice and Recordkeeping for Digit. Subscription Transmissions, 63 Fed. Reg. 34289, 34292 (June 24, 1998).

[3] Sirius XM Holdings, Inc., Form 8-K (June 11, 2018) (attached as Ex. 1); *see also* Pt. I.A.3, *infra*.

Sirius to pay SoundExchange what the auditor determined Sirius owes, 37 C.F.R. §§ 380.6(g), 382.7(g), but Sirius has refused to pay. This suit seeks to recover the funds Sirius illegally retained.

## ARGUMENT

The Second Circuit employs a well-established three-part test to determine whether Congress intended to provide a private right of action: (1) whether the "provision[] allegedly violated" contains "rights-creating language" focused on the "individuals protected" rather than the "regulated entities"; (2) whether Congress "provided an alternate means of enforcing the relevant provisions"; and (3) whether "Congress expressly provided a cause of action" elsewhere in the statute. *Oxford Univ. Bank*, 933 F.3d at 104. Pursuant to this test, courts in this circuit and others routinely conclude that Congress intended to provide a right of action even where it did not say so expressly.[4] In particular, as the Second Circuit explained in *Oxford Univ. Bank*, when Congress uses language that "necessarily presupposes that a party" may bring suit, that is "effectively equivalent to providing an express cause of action." *Id.* at 105.

Section 114 satisfies the Second Circuit's test in spades. *First*, not only does Section 114 expressly give artists, copyright owners, and SoundExchange the right to receive royalties, it expressly contemplates that SoundExchange will "enforce[]" that right. Sirius offers no plausible account of that enforcement language. *Second*, Congress created no alternate means for enforcing Section 114. Although Sirius avoids saying it directly, its view is that no one can enforce Section

---

[4] *See, e.g.*, *Bloomberg v. N.Y. City Dep't of Educ.*, 119 F.4th 209, 212–13 (2d Cir. 2024) (finding an implied cause of action in Title VI)*; Oxford Univ.*, 933 F.3d at 105 (Investment Company Act); *Ray Charles Found.*, 795 F.3d at 1122 (Copyright Act); *Cox v. Cmty. Loans of Am. Inc.*, 625 F. App'x 453, 457 (11th Cir. 2015) (Military Lending Act); *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1059 (C.D. Cal. 2019) (Immigration and Nationality Act); *Kimber Baldwin Designs, LLC v. Silv Commc'ns, Inc.*, 225 F. Supp. 3d 670, 678 (S.D. Ohio 2016) (Telecommunications Act); *Fixed Income Shares: £Series M v. Citibank N.A.*, 130 F. Supp. 3d 842, 848–49 (S.D.N.Y. 2015) (Trust Indenture Act); *Cmty. Voice Line, L.L.C. v. Great Lakes Commc'n Corp.*, 18 F. Supp. 3d 966, 986 (N.D. Iowa 2014) (Telecommunications Act); *Landegger v. Cohen*, 5 F. Supp. 3d 1278, 1292 (D. Colo. 2013) (Exchange Act); *Cobb v. U.S. Dep't of Educ. Off. for C.R.*, 487 F. Supp. 2d 1049, 1055 (D. Minn. 2007) (Title IX).

114 against Sirius if it chooses not to pay the royalties that it owes. *Third*, the Copyright Act's other rights of action only confirm that Congress intended that Section 114's statutory license be enforceable.

## I.  Congress Intended To Authorize A Cause Of Action To Recover Underpaid Royalties.

### A.  Section 114 has clear rights-creating language.

#### 1.  *Section 114 contains express and distinctive rights-creating and remedial language.*

The first factor in determining whether Congress intended a right of action is whether the statute includes "rights-creating language." *Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 432 (2d Cir. 2002). Rights-creating language is a particularly strong sign of Congress's intent to create a right of action if it focuses on the "individuals protected," as opposed to the regulated party. *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001).

Congress could not have more clearly created rights for artists, copyright owners, and SoundExchange. Section 114 contains a specific formula for paying statutory royalties to artists and copyright owners. 17 U.S.C. § 114(g)(2). And it repeatedly states that artists and copyright owners are "entitled" to receive payments. *Id*. § 114(g)(3); *see also id.* § 114(f)(4)(A), (g)(5)(A). Congress was also clear in bestowing on SoundExchange, as the designated "collective," the right to collect and distribute royalties on behalf of artists and copyright owners. *See* 17 U.S.C. § 114(g)(2)–(3). Even when discussing the regulated party (Sirius), Section 114 focuses on the requirement that music service providers pay royalties to SoundExchange: a service provider like Sirius can unlock the statutory license only "by paying royalty fees." *Id.* § 114(f)(3)(B)(i). In short, Section 114 grants "a specific entitlement to an identified class of beneficiaries." *N.Y. State Citizens' Coal. for Child. v. Poole*, 922 F.3d 69, 81 (2d Cir. 2019) (holding that statute requiring states to make payments to foster parents was focused on the rights of the intended beneficiaries).

But Section 114 does not merely include rights-creating language. Unlike many statutes, the provision also presupposes *a remedy.* If Sirius fails to comply with its royalty obligation, then SoundExchange is entitled to deduct from its receipts its costs in "the licensing and *enforcement of rights with respect to . . . performances subject to licensing* under . . . this section, *including* those incurred in participating in negotiations or arbitration proceedings under section 112 and this section." 17 U.S.C. § 114(g)(3)(C) (emphasis added). "Enforcement" means forcing compliance with a law. *Enforce*, BLACK'S LAW DICTIONARY (7th ed. 1999) ("enforce vb. 1. To give force or effect to (a law, etc.); to compel obedience to.").[5] And enforcement of a legal obligation typically encompasses bringing a lawsuit. *See, e.g.*, *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 632 F. Supp. 3d 517, 531–32 (S.D.N.Y. 2022) (contractual term requiring a trustee to "enforce [a buyer]'s obligation under the Purchase Agreement" included a duty to bring suit); *Fathers & Daughters Nev., LLC v. Lingfu Zhang*, 284 F. Supp. 3d 1160, 1170–71 (D. Or. 2018) (contract provision authorizing a licensee to "enforce copyrights against Internet infringers" included the right to "sue for copyright infringement"). The Copyright Act uses the word "enforcement" in a dozen other contexts to mean litigation. *See, e.g.*, 17 U.S.C. § 104A(c), (d) (referring to "*[e]nforcement* of copyright in restored works" by a suit for infringement (emphasis added)).[6] The

---

[5] Black's alternate definition of "enforce" likewise is enlightening: "to compel a person to pay damages for not complying with (a contract)." See Part I.A.2, *infra*, for argument that Congress legislated with the understanding that Section 114 functions as a compulsory contract in mind.

[6] Additional examples include: 17 U.S.C. § 501(f)(2) (allowing "[a] television broadcast station" to "file a civil action . . . *to enforce* that television broadcast station's rights"); *id.* § 502(b) (discussing "*enforcement* of the injunction"); *id.* § 512(h)(6) (discussing "*enforcement* of a subpoena duces tecum"); *id.* § 603(b)(1) (providing for regulations guiding the "*enforcement*" of customs exclusions, which may include requirement to "obtain a court order enjoining importation"); *id.* § 910 (titled "*Enforcement* of exclusive rights," subsection (b)(1) provides that "[t]he owner of a mask work protected under this chapter . . . shall . . . be entitled *to institute a civil action* for any infringement with respect to the mask . . ."); *id.* § 1201(a)(1)(E) (providing that the exceptions under certain subparagraphs of *id.* § 1201(a) "may [not] be used as *a defense in any action to enforce any provision* of this title other than this paragraph"); *id.* § 1321(b) (design owner may "*enforce* the rights in that design" in "the same action" in which they seek

broader phrase, "enforcement of rights with respect to . . . performances subject to licensing" is even clearer. The only "rights with respect to . . . performances subject to licensing" that Section 114 discusses are the rights of artists and copyright owners to receive royalties. Moreover, Section 114 states that that the royalty rates the CRB sets "shall[] . . . be *binding*" on entities performing sound recordings. 17 U.S.C. § 114(f)(1)(B) (emphasis added). Something is "binding" only when there is "legal force to impose an obligation." *McCoy v. Synchrony Bank*, No. 15-cv-13310, 2015 WL 6386554, at *2 (S.D. W. Va. Oct. 21, 2015) (quoting Black's Law Dictionary).[7]

Plainly, if SoundExchange may deduct costs it incurs for "enforcement" of a "binding" obligation, SoundExchange must be able to enforce that binding obligation. The Second Circuit has squarely held that Congress intends to provide a right of action where Congress includes express language in the statute that contemplates enforcement. In *Oxford Univ. Bank*, for example, the Second Circuit recently held that analogous language in the Investment Companies Act ("ICA") authorizes a private right of action. 933 F.3d at 105–06. The ICA provides that contracts made in violation of the Act are "unenforceable by either party" and that "a court may not deny rescission [of such a contract] *at the instance of any party*." 15 U.S.C. § 80a-46(b) (emphasis added). Reasoning that this language referring to the "recission at the instance of any party"

---

"judicial review" of refusal to register the design); *id.* § 1401(*l*)(2)(B) (defining "rights owner" under the section as, *inter alia*, "*any person to which a right to enforce a violation of this section may be transferred*," while including civil actions as "remedies" for engaging in unauthorized acts under the section (17 U.S.C. § 1401(a)(1)); *id.* § 1328 (similar); *id.* § 1508(c)(2)(B) (providing that a district court can "*stay*[] *proceedings to enforce the award*" of relief granted by the Copyright Claims Board while a "challenge [to that award] is pending" in front of the Board) (all emphases added).

[7] *See also Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 18 (1979) (holding that statute declaring certain contracts "void" "necessarily contemplates that the issue of voidness under its criteria may be litigated somewhere"); *Cox*, 625 F. App'x at 457 (same); *cf. Poole*, 922 F.3d at 79 (holding that act's "binding obligation" for states to "make payments to foster parents" argued in favor of implying cause of action under Section 1983 when state underpaid); *Briggs v. Bremby*, 792 F.3d 239, 242 (2d Cir. 2015) (holding that statute implied cause of action under Section 1983 in part because statute used mandatory language requiring state to make certain payments).

"necessarily presupposes that a party may seek rescission in court by filing suit," the court concluded that it was "effectively equivalent to providing an express cause of action." *Oxford Univ. Bank*, 933 F.3d at 105 (internal quotation marks omitted). Section 114 shares the ICA's distinctive presupposition of the right to sue. 17 U.S.C. § 114(g)(3)(C). The Eleventh Circuit reached a similar conclusion in construing a statute that declared certain contracts "void." As the court explained, "[b]y declaring certain contracts void, [the statute] by its terms necessarily contemplates that the issue of voidness under its criteria may be litigated somewhere." *Cox v. Cmty. Loans of Am. Inc.*, 625 F. App'x 453, 457 (11th Cir. 2015).

Sirius has no answer for Section 114's express reference to enforcement by SoundExchange. Sirius claims that Section 114 uses "enforcement of rights" to refer exclusively to "negotiations or arbitration proceedings." Def. Sirius XM Radio LLC's Mem. of Law in Supp. of Its Mot. for Judgment on the Pleadings ("Mot.") 14–15, ECF No. 62. But Sirius ignores what the statute actually says: SoundExchange is entitled to recover its costs of licensing and enforcement, "*including* those incurred in participating in negotiations or arbitration proceedings." 17 U.S.C. § 114(g)(3)(C) (emphasis added). "[I]ncluding" as defined in the Copyright Act means what it means everywhere: the term is "illustrative and not limitative." *Id.* § 101; *see also United States v. Huber*, 603 F.2d 387, 394 (2d Cir. 1979) (a "list beginning with the word 'include[] . . . is not exhaustive but merely illustrative.").[8]

That leaves Sirius to claim that SoundExchange can "enforce" Section 114 by "actively monitor[ing]," "negotiat[ing]," "investigating," and "audi[ting]." Mot. 15. But monitoring,

---

[8] To the extent Sirius is suggesting that SoundExchange could enforce Sirius's royalty obligation via arbitration proceedings, that is incorrect. As Sirius acknowledges elsewhere, arbitration was the forum for the original rate-*setting* process, and thus is an example of the costs associated with licensing, not enforcement. Mot. 14–15. There is no arbitration mechanism for enforcing royalty obligations under the statute.

negotiating, investigating, and auditing enforce nothing without a mechanism to compel compliance if those activities reveal an underpayment. Sirius's "enforcement" has no force at all.[9] Sirius's contentions on these points are disingenuous. For example, Sirius points to SoundExchange's ability to initiate audits. Mot. 15. But this power, like all the others Sirius references, is toothless if SoundExchange cannot sue Sirius to recover the underpayment the auditor finds. This very lawsuit seeks to recover underpayments an auditor has found and Sirius refuses to pay. Compl. Count II. Sirius also says (without citation or explanation) that SoundExchange can "pursu[e] statutory licensees who have failed to make timely payments . . . ." Mot. 15. That, too, is what SoundExchange is doing in this case. Again, monitoring licensees, notifying copyright owners, and sending strongly-worded letters are not substitutes for bringing suit: those activities are all impotent if not backed by the ability to sue.

Sirius contends that reading Section 114's cost-deduction provision to permit enforcement would be like finding an elephant hidden in a mousehole. Mot. 13. But Sirius's position is more akin to ignoring the elephant in the room. Congress expressly envisioned that SoundExchange would "enforce[]" Sirius's royalty obligation as part of a statutory license. Sirius's interpretation drains that grant of enforcement authority of any meaning. This Court should hold that Section 114 means what it says: that SoundExchange can enforce Sirius's obligation to pay royalties for the music it licenses.

---

[9] Section 114 also permits SoundExchange to deduct costs for "the settlement of disputes relating to the collection and calculation of the royalties . . . ." 17 U.S.C. § 114(g)(3)(B). This is yet more reason that "enforcement" cannot mean mere "negotiation" and other non-litigation tactics. "When a statutory construction . . . render[s] an entire subparagraph meaningless, . . . the canon against surplusage applies with special force." *Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (internal quotation marks omitted).

>    2.   *Congress's presumption that SoundExchange has a right of action*
>          *accords with Section 114's creation of a kind of compulsory contract.*

That Congress expressly envisioned SoundExchange would sue to recover unpaid royalties is hardly surprising considering that Section 114 creates a "statutory license." *See* 17 U.S.C. § 114(d)(2), (f)(1)(A), (f)(3)(B). "Copyright licenses are a type of contract and, therefore, governed by common law contracting principles." *Bitmanagement Software GmBH v. United States*, 989 F.3d 938, 946 (Fed. Cir. 2021). A "statutory license" (sometimes called a "compulsory license") is like other kinds of copyright licenses, except that it comes about by legislative fiat, so is not voluntary for the licensors. In Section 114, Congress forced artists, copyright owners and their collective SoundExchange, on the one hand, into a license relationship with Sirius, on the other, whereby Sirius gained the right to digitally perform sound recordings in exchange for the payment of royalties. 17 U.S.C. § 114(f)(3)(B)(i); S. Rep. No. 104-128, at 24 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 356, 371 ("[E]very . . . service will receive a license to perform the sound recording . . . , provided that the . . . service pays the royalty . . . .").

Naturally, with this kind of relationship in mind, Congress intended that SoundExchange, as the party to whom royalties must be paid, could sue for breach. A license that is unenforceable is no license at all. There are few common-law principles better established than that "[e]very breach gives rise to a claim for damages, and may give rise to other remedies." RESTATEMENT 2D OF CONTRACTS § 236 cmt. a.; *see also* 3 NIMMER ON COPYRIGHT § 10.15 (2024) ("If the grantee under an assignment or license uses the work in violation of the provisions of the authorizing instrument, the grantor may have an action for breach of contract."). "[W]here a common-law principle is well established . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is

evident." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (internal quotation marks omitted).

### 3. The unbroken line of enforcement actions under Section 114 confirm that Congress intended to provide a right of action.

Congress's intent to provide a private right of action is so clear that even industry participants who stood to gain from contending that the royalty obligation is unenforceable have never before doubted it. Services have always understood Section 114 to include a private right of action, as evidenced by the uniform history of underpayment suits in which no service provider has ever previously objected to SoundExchange's right to bring an action. *See, e.g.*, *SoundExchange, Inc. v. Muzak LLC*, 854 F.3d 713 (D.C. Cir. 2017).[10] In fact, Sirius itself has expressly acknowledged that SoundExchange has a right to sue for underpayments. In a proposal to the CRB in a rate proceeding, "*Sirius XM proposed* . . . to establish a two-year statute of limitations for disputed audit findings" that would apply "*unless the Collective initiated a legal action* before the running of that proposed limitations period."[11]

Sirius is wrong that none of the above-referenced underpayment suits specifically addressed the existence of a private right of action. Mot. 22 & n.8. For example, when the D.C. Circuit heard SoundExchange's underpayment suit against Muzak LLC, the court asked for briefing on the statutory source of SoundExchange's action. *SoundExchange, Inc. v. Muzak LLC*, No. 16-7041 (D.C. Cir. Nov. 16, 2016), Ex. 2. Muzak and SoundExchange *both* responded that SoundExchange has a cause of action. Ex. 3 at 3–10 (SoundExchange Br.); Ex. 4 at 9–10 n.2

---

[10] *See also SoundExchange, Inc. v. Sirius XM Radio Inc.*, 65 F. Supp. 3d 150 (D.D.C. 2014); *SoundExchange, Inc. v. Music Choice*, No. 19-cv-0999, 2021 WL 5998382 (D.D.C. Dec. 20, 2021); *SoundExchange, Inc. v. LiveOne, Inc.*, No. 22-cv-4410 (C.D. Cal. filed June 28, 2022); *SoundExchange, Inc. v. AccuRadio, LLC*, No. 24-cv-6125 (N.D. Ill. filed July 19, 2024).

[11] Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and "Preexisting" Subscription Services ("SDARS III"), 83 Fed. Reg. 65210–11 (Dec. 19, 2018).

(Muzak Brief). The D.C. Circuit was satisfied SoundExchange could pursue its claim. *Muzak LLC*, 854 F.3d at 719. Other courts have likewise understood that Section 114 provides a cause of action for underpayment. *SoundExchange, Inc. v. Sirius XM Radio Inc.*, 65 F. Supp. 3d 150, 156–57 (D.D.C. 2014) ("SoundExchange can seek damages in this court" to the extent that "Sirius XM's gross revenue calculations . . . have been improper.").[12] This unbroken line of authority provides strong evidence that Congress intended to create a right of action. *See Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1122 (9th Cir. 2015) (noting, in holding right of action existed, that "[o]ther courts have entertained suits . . . under these statutory provisions").

Indeed, Sirius itself previously accepted SoundExchange's right to enforce Section 114. Sirius settled the parties' prior litigation by paying $150 million, hardly the action of a party that believed that its counterparty had no ability to enforce its obligations. Ex. 1.

### B. The Copyright Act creates no other mechanism to recover underpaid royalties.

Further confirmation that Congress intended that SoundExchange would enforce Section 114's "binding" royalty obligation comes from the fact that the Act creates no other mechanism for doing so. *See Sandoval*, 532 U.S. at 290. Neither the CRB, a copyright infringement suit, nor the regulatory provisions Sirius half-heartedly lists empower royalty recipients to recover an underpayment. Without a private right of action, Sirius's "binding" royalty obligation is a contradiction in terms: a license that allows the licensee to use without having to pay for the privilege of doing so. "It is implausible that Congress meant the Act to operate in this manner." *King v. Burwell*, 576 U.S. 473, 494 (2015).

---

[12] *See also WTGD 105.1 FM v. SoundExchange, Inc.*, No. 5:14-cv-00015, 2014 WL 12819789, at *2 (W.D. Va. Sept. 12, 2014) ("[SoundExchange] can sue to collect royalties and other fees if a broadcaster does not comply with the terms of its statutory license."), *report and recommendation adopted*, 88 F. Supp. 3d 580, 585–86 (W.D. Va. 2015).

## 1.    Congress did not empower the CRB to hear an underpayment claim.

In an effort to suggest that some other enforcement mechanism may exist, Sirius evasively informs the Court that Congress "expressly vested the CRJs with the power to resolve *certain disputes* that arise in the wake of their determinations." Mot. 16 (emphasis added). But there is no dispute that the CRB lacks jurisdiction to hear underpayment suits like this one. The CRB's authority with respect to Section 114 is limited to "mak[ing] determinations and adjustments of reasonable terms and rates of royalty payments." 17 U.S.C. § 801(b)(1). This case has nothing to do with the appropriate terms and rates of royalty payments; SoundExchange seeks to be paid according to rates set by the CRB years ago.

Sirius itself previously argued to the CRB that "[t]he Copyright Act did not confer any enforcement authority on the Judges. Unlike other federal agencies, the Judges can neither compel compliance with CRB regulations nor fix penalties for proven violations."[13] The CRB agreed and held that the very provision on which Sirius tries to rely here, the CRB's "continuing jurisdiction" to correct errors and modify payment terms, Mot. 16, "does not extend to application and factual dispute resolution regarding application of the regulations."[14] The United States likewise opined in a statement of interest to the D.C. Circuit that "[n]either the Copyright Royalty Board nor the Register of Copyrights has any direct role in the adjudication of cases such as this one—that is,

[13] Sirius XM Inc.'s Reply Memorandum of Law in Further Response to Order Withdrawing Ruling and Soliciting Briefing on Unresolved Issues, *In re Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services*, No. 2006-1 (U.S. Copyright Royalty Judges May 15, 2017) at 2 & n.5 (attached as Ex. 5).

[14] Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 82 Fed. Reg. 56725, 56727 (Nov. 30, 2017). Because the CRB adopted Sirius's position, Sirius is collaterally estopped from arguing otherwise here. *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 308 (2d Cir. 2005) (statements made to an administrative agency can have preclusive effect).

private royalty-payment disputes under the copyright laws."[15] The D.C. Circuit agreed. *Muzak LLC*, 854 F.3d at 718–19 (legal issues presented "only as part of the every-five-year rate 'proceeding' . . . ."). The CRB also has no power to order Sirius to pay what the auditor determines Sirius owes.[16]

### 2. *An infringement suit would not provide relief for underpayment.*

An infringement suit is not an adequate substitute for collective enforcement under Section 114. As the leading copyright treatise explains, "a case to collect compulsory license fees differs from one for infringement." 1 NIMMER ON COPYRIGHT § A.01 (2024). Even Sirius does not argue that an infringement action is a viable mechanism to recover an underpayment. Mot. 13–17 (proposing "alternative methods of enforcement" but not mentioning an infringement action).

*First*, Congress provided that a full 50% of the Section 114 royalties go to featured artists and nonfeatured musicians and vocalists. 17 U.S.C. § 114(g)(2)(B)–(D). These recipients are usually *not* copyright owners and may have no right to sue for infringement. *Id.* § 501(b) (limiting infringement actions to the "legal or beneficial owner of an exclusive right under a copyright . . . ."). An infringement remedy would provide no relief to those artists.

*Second*, Congress has generally limited copyright infringement litigation to *registered* works. *Id.* § 411(a). But Section 114 requires services like Sirius to pay royalties on both non-registered and registered works alike. *Id.* § 114(f)(3)(B)(i). Congress *could* have limited Section 114 royalties to the performance of registered works—indeed it did so with respect to royalties under a different statutory license, *id.* § 115(c)(1)(A)—but it chose not to do so with Section 114

---

[15] Brief for the United States as Amicus Curiae in Support of Neither Party at 8, *SoundExchange Inc. v. Muzak LLC*, No. 16-7041 (D.C. Cir. Jan. 3, 2017) at 8 (attached as Ex. 6).

[16] *SDARS III*, 83 Fed. Reg. at 65263 ("[A]ny pursuit of remedies relating to audit findings would be outside the Judges' jurisdiction . . . .").

royalties. Again, an infringement remedy would provide the owners of unregistered copyrights with no relief. It is implausible that, after carefully providing for royalties to benefit artists and to encompass unregistered sound recordings, Congress intended for that regime to be enforced via a remedy that provides no recovery for those copyright owners and works.[17]

*Third*, it makes little sense that Congress intended that all of those royalty recipients must bring individual claims, each alleging the same violation. The only way to deal with such claims would be to consolidate them. But Congress already has consolidated the claims by granting enforcement power to SoundExchange. Moreover, separate suits by all royalty recipients would be massive in scope. Over the several years in which Sirius has been underpaying, it has played a vast number of distinct sound recordings. Nothing in the Copyright Act suggests Congress intended such an unwieldy system.[18]

Sirius offers little in response. It cites *Xerox Corp. v. Apple Computer, Inc.*, 734 F. Supp. 1542 (N.D. Cal. 1990), in which the plaintiff sought a declaratory judgment of copyright ownership and also asserted what amounted to an infringement claim (although it was not styled as such). In connection with the latter, the plaintiff sought additional *remedies* not provided for in the context of an infringement action, which the court declined to award. *Id.* at 1549 (declining to "imply a new remedy" of copyright cancellation upon a finding of infringement). Here, the issue is not whether non-textual remedies are available in what amounts to an infringement action, but whether a wholly different statutory right comes along with its own right of action. *Xerox* has

---

[17] *Cf. Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) (holding that Title IX's private right of action did not provide a remedial scheme sufficiently comprehensive to foreclose availability of § 1983 remedies in part because Title IX did not cover the full range of possible defendants and therefore provided "divergent coverage").

[18] Sirius tries to dismiss points like these as "policy" arguments. Mot. 20–22. But the unworkability of the system Sirius's position would create is compelling evidence that Congress intended SoundExchange to "enforce" the Section 114 royalty obligation, just as the statute envisions.

nothing to say about the Section 114 statutory license, which did not yet exist when *Xerox* was decided.

Far more on point is the Ninth Circuit's subsequent holding that Sections 203 and 304(c) of the Copyright Act imply a private right of action to challenge a purported termination of a copyright transfer that is separate and distinct from an infringement action (and exists notwithstanding the express cause of action for infringement). *See Ray Charles Found.*, 795 F.3d at 1118, 1122. The provisions of the Copyright Act at issue in *Ray Charles* allow authors and their heirs, in certain circumstances, to "terminate prior grants and recapture copyright ownership for works that were not made for hire." *Id.* at 1122. There, as here, the case was not "about" infringement, *id.* at 1118, but the plaintiffs held rights that would be affected by other provisions of the Act, *id.* at 1120, and "[o]ther courts ha[d] entertained suits . . . under these statutory provisions," *id.* at 1122. Under those circumstances, the court recognized that a "private right and remedy are contemplated by the termination provisions." *Id.*[19] So too here: Congress intended rightsholders to proceed under Section 114 rather than bringing an ill-fitted infringement action that would not provide complete relief.

### 3. *Sirius has identified no alternative mechanism to recover underpayments.*

While Sirius spends several pages of its brief discussing ostensibly "alternative methods of enforcement," Mot. 13–17, this is merely smoke and mirrors as explained above in Part I.A.1, *supra*. Sirius's references to audits, negotiations, monitoring, and the like, *enforce* nothing. They provide no way to compel Sirius XM to comply with its "binding" license obligations. These tactics only, and at most, ask Sirius to pay what it owes free of any legal consequence if it chooses

---

[19] Sirius contends that *Ray Charles* is easily distinguished because it relied on regulations expressly providing a right of action. Mot. 19–20. That difference does not change the fact that the court recognized an implied right of action despite the existence of an infringement remedy in the Copyright Act.

not to do so. If talking were enforcement, SoundExchange would have had no need to bring this lawsuit.

The lack of an alternate enforcement mechanism distinguishes this case from many of the cases Sirius cites that reject an implied cause of action in a regulatory or criminal statute that provides for enforcement by a government entity.[20] Those cases raised the issue of whether the legislature additionally intended for private enforcement. The statutory scheme at issue here is different: Section 114 is not a criminal or regulatory statute that a private party seeks to enforce, but a statute creating rights and obligations between private parties.[21]

### C. The references to enforcement in Section 115 do not nullify Section 114's enforcement language.

Sirius contends that a reference to an enforcement action in Section 115(d)(6)(C) indicates that Congress did not intend Section 114 to be enforceable. Mot. 8–9. However, Sirius' reading of Section 115 is incomplete. Section 115(d)(6)(C) refers to one very specific type of enforcement under Section 115—against an entity that is *not* relying on the statutory license (a "significant nonblanket licensee") to collect administrative assessments rather than royalties. Conversely, the provisions of Section 115 more analogous to Section 114 contemplate legal enforcement without providing an express right of action. One authorizes Section 115's collective to "[e]ngage in legal and other efforts to enforce rights and obligations," including "for amounts owed under licenses." 17 U.S.C. § 115(d)(3)(C)(i)(VIII). Another presupposes the existence of a right of action by

---

[20] *See Olmsted*, 283 F.3d at 433 (Mot. 17) (Investment Company Act provided for enforcement by the SEC); *Lopez v. Jet Blue Airways*, 662 F.3d 593, 597 (2d Cir. 2011) (Mot. 11) (Air Carrier Assistance Act provided for enforcement by the Department of Transportation); *Halebian v. Berv*, 631 F. Supp. 2d 284, 300 (S.D.N.Y. 2007) (Buchwald, J.) (Investment Company Act provided for enforcement by SEC), *aff'd in part, vacated in part*, 644 F.3d 122 (2d Cir. 2011).

[21] Sirius also does not identify any state law that would provide a remedy for a service provider's wrongful retention of money it owes.

referring to "royalties recovered by the [collective] as a result of efforts to enforce rights or obligations under a blanket license, including through a bankruptcy proceeding or other legal action." *Id.* § 115(d)(3)(G)(ii). Still another allows the Section 115 collective to recover costs for "enforcement of rights," just like Section 114(g)(3) does. *Id.* § 115(e)(6)(A)(v). Congress clearly contemplated a private right of action in all these contexts, just as it did in Section 114. Further, Section 115(d)(6)(C) has a savings clause specifying that this express cause of action "shall in no way alter, limit or negate any other right or remedy that may be available to any party at law or in equity." *Id.* § 115(d)(6)(C)(iii).

Even focusing just on Section 115(d)(6)(C) as Sirius does, Sirius is incorrect that it has any bearing on interpretation of Section 114.

*First*, Congress adopted Section 115(d)(6)(C) (and all the other enforcement provisions in Section 115) in 2018, sixteen years *after* Congress enacted the "enforcement of rights" provision of Section 114.[22] This timing is critical (and conspicuously absent from Sirius's brief). "[E]very statute's meaning is *fixed at the time of enactment*.'" *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024) (emphasis added) (quoting *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018)). Congress's adoption of language in 2018 cannot shed any light on what Congress intended in 2002 when it adopted the enforcement language in Section 114. Moreover, at the time Congress added Section 115(d)(6)(C), Section 114 already provided for "enforcement" of a licensee's "binding" payment obligation, and SoundExchange already had successfully brought multiple suits for underpayment of royalties. *See Sirius XM Radio Inc.*, 65 F. Supp. 3d at 156–57; *Muzak LLC*, 854 F.3d at 719. There was no need to be more explicit about enforcement in Section 114.

---

[22] Orrin G. Hatch–Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264, § 102, 132 Stat. 3676, 3706–07 (2018) (codified at 17 U.S.C. § 115(d)(6)(C)); Small Webcaster Settlement Act of 2002, Pub. L. No. 107-321 § 5, 116 Stat. 2780, 2784 (codified at 17 U.S.C. § 114(g)(3)).

*Second,* Sections 114 and 115 and their legislative contexts are very different. Section 115 is unusual in requiring payment of administrative assessments for usage *not* covered by the statutory license. *See* 17 U.S.C. § 115(d)(6)(A). It is to address the non-obvious details of that unusual requirement that Congress went out of its way to spell out a cause of action for collecting administrative assessments that is available not only to the Section 115 collective, but also to an ancillary organization called the "digital licensee coordinator." 17 U.S.C. § 115(d)(6)(C). Section 114 has no such administrative assessment or licensee coordinator. For the more basic matter of the Section 115 collective's collection and distribution of royalties, Congress assumed (as it did in Section 114) that referring to enforcement by the collective and to handling of the collective's costs of enforcement would be sufficient to enable such enforcement. *Id.* § 115(d)(3)(C)(i)(VIII); *see also id.* § 115(d)(3)(G)(ii), (e)(6)(A)(v).

*Third*, even if Section 115 provided a workable point of comparison, the existence of a private cause of action in one part of a statute is not dispositive of whether there is an implied cause of action elsewhere in the statute. *Oxford Univ. Bank*, 933 F.3d at 106 ("[T]he provision of other (private or public) enforcement mechanisms . . . merely 'suggests' 'that Congress intended to preclude' implied private rights of action. This suggestion can be overcome where, as here, the meaning of the text is clear." (quoting *Sandoval*, 532 U.S. at 290)); *Fixed Income Shares: £Series M v. Citibank N.A.*, 130 F. Supp. 3d 842, 849 (S.D.N.Y. 2015) ("[T]the existence of an express right of action elsewhere in the statute . . . is not dispositive."). Courts have found implied causes of action in such situations.[23] Indeed, the Ninth Circuit found an implied cause of action in the

---

[23] *Herman & Maclean v. Huddleston*, 459 U.S. 375, 377 (1983) (implied cause of action in Securities Act of 1934 despite an explicit cause of action in the parallel 1933 Act); *Oxford Univ. Bank*, 933 F.3d at 105 (Investment Company Act); *Cox*, 625 F. App'x at 455 n.2 (Military Lending Act); *Ross v. A. H. Robins Co.*, 607 F.2d 545, 551, 556 (2d Cir. 1979) (Securities Exchange Act of 1934).

Copyright Act itself, even though the Copyright Act provides express causes of action elsewhere. *Ray Charles Found.*, 795 F.3d at 1122. If there were ever a statute with strong enough textual indications to "overcome" a "suggestion" to the contrary, it is this one. *See Oxford Univ. Bank*, 933 F.3d at 106.

*Fourth*, Sirius argues that where Congress wishes to create a private cause of action, it knows how to do so. Mot. 9, 17 (citing, *e.g.*, 18 U.S.C. § 2318). But Congress also knows how to *forbid* a private cause of action. 20 U.S.C. § 1019d(b) ("Nothing in this section shall be construed to create a private right of action . . . ."); 15 U.S.C. § 717c-1 (same); 47 U.S.C. § 613(j) (same). Congress chose *not* to do so in Section 114. Likewise, Congress knows how to exempt a party from liability. Indeed, Congress did so in several places in the Copyright Act, including in an inapplicable subsection of Section 114.[24] Congress granted no such exemption from service providers' liability for statutory royalties.

## II. *Loper* Does Not Counsel A Different Result.

The Supreme Court's decision in *Loper* concerning deference to agency interpretations of statutes did not change the Supreme Court's jurisprudence on when Congress intended to provide a right of action, an area in which *Sandoval* and its progeny remain the controlling precedent, 532 U.S. 275. Rather, *Loper* held that courts should not defer to an agency's "permissible" interpretation of any ambiguities in its governing statute with respect to the scope of that agency's authority. 144 S. Ct. at 2266. It further disapproved of relying on an agency to supply an interpretation that fills "a statutory 'gap.'" *Id.*

---

[24] 17 U.S.C. § 114(f)(4)(A) ("The receiving agent shall have . . . no liability to any copyright owner of sound recordings or any other person entitled to payment under this section . . . ."); *see also id.* § 801(b)(3)(D) (exempting Copyright Royalty Judges from liability for excess fees); *id.* § 115(c)(2)(D) (exempting from liability certain forms of phonorecord distribution); *id.* § 1202(e) (exemption from liability for certain broadcast transmissions); *id.* § 512(a), (b), (c), (d) (setting out several safe harbors from secondary copyright infringement liability).

That holding is inapplicable here. In the first place, SoundExchange is not relying on any agency interpretation for its right to sue.[25] *Contra Halebian v. Berv*, 631 F. Supp. 2d 284, 299–300 (S.D.N.Y. 2007) (Buchwald, J.). And equally important, SoundExchange's interpretation rests not on a gap in the statute, but the statute's express presumption—using the kind of language that the Second Circuit has held is the "effective[] equivalent" of a private right action—that SoundExchange will enforce Sirius's royalty obligation. *Oxford Univ. Bank*, 933 F.3d at 105. Giving effect to Congress's intent to provide a private right of action does not fill a gap in a statute; it carries out what Congress intended.

## III.    Even If Section 114 Creates A Right Of Action Only For Royalty Recipients, SoundExchange Has Standing To Sue On Their Behalf.

Finally, as noted above, Section 114 expressly designates the "collective," SoundExchange, as the entity entitled to recover its enforcement costs by collecting royalties. But even if one thought that the right of enforcement belonged only to artists and copyright owners, SoundExchange has associational standing to bring suit on their behalf. SoundExchange meets all three elements for associational standing: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). As to the first, royalty recipients have suffered a classic pocketbook injury traceable to Sirius's underpayment of royalties owed to them and plainly redressable by payment of damages and injunctive relief. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,

---

[25] The only point here on which a CRB interpretation is relevant at all is the CRB's opinion that the CRB itself does not have jurisdiction to adjudicate an underpayment claim. Part I.B.1, *supra*. The CRB's position reinforces SoundExchange's point that Congress did not create an alternative remedy to private suit. But SoundExchange does not argue that the CRB's interpretation should receive any particular deference.

600 U.S. 181, 199 (2023) (listing elements of standing). The second and third elements are plainly met as well: rectifying Sirius's underpayment is central to SoundExchange's statutorily designated purpose of collecting and distributing royalties, 17 U.S.C. § 114(g)(2), and collective enforcement of the aggregate underpayment requires no involvement by any royalty recipient—indeed, making such involvement unnecessary was the primary motivation for instituting collective administration.[26]

And under *Hunt*, SoundExchange is fully entitled to bring a claim on behalf of the royalty recipients whose interests it serves. *See* 432 U.S. at 343–45; 37 C.F.R. §§ 380.2(a), 382.3(a) (SoundExchange is only entity designated to collect and distribute royalties under Section 114); 37 C.F.R. §§ 380.4(d)(2), 382.5(d)(2) (SoundExchange is governed by a Board of Directors populated by its constituents). No matter to whom Section 114's right and remedy accrue, SoundExchange is a proper plaintiff to bring this suit.

## CONCLUSION

For these reasons, the Court should deny Sirius's motion.

Dated: November 26, 2024                     Respectfully submitted,

                                             /s/ *Scott A. Zebrak*

Matthew S. Hellman (*pro hac vice*)          Scott A. Zebrak (Bar No. 5620125)
Ruby C. Giaquinto (*pro hac vice*)           Corey Miller (Bar No. 4967709)
JENNER & BLOCK LLP                           Jeff Kane (*pro hac vice*)
1099 New York Avenue, NW                     OPPENHEIM + ZEBRAK, LLP
Washington, D.C. 20001                       4530 Wisconsin Avenue NW, Fifth Floor
Tel: 202-639-6000                            Washington, DC 20016
mhellman@jenner.com                          Tel: 202-480-2999
rgiaquinto@jenner.com                        scott@oandzlaw.com
                                             corey@oandzlaw.com
                                             jkane@oandzlaw.com

*Attorneys for Plaintiff*

---

[26] Notice and Recordkeeping for Digit. Subscription Transmissions, 63 Fed. Reg. 34289, 34292 (June 24, 1998) (noting services' objections to burdens and costs associated with direct, decentralized payment).