# EXHIBIT 3

ORAL ARGUMENT HELD NOVEMBER 9, 2016

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

───────────────

No. 16-7041

───────────────

SOUNDEXCHANGE, INC.

*Appellant*,

v.

MUZAK LLC,

*Appellee*.

───────────────

Appeal from the U.S. District Court for the District of Columbia
No. 1:15-cv-00476-RCL
Judge Royce C. Lamberth

───────────────

**SUPPLEMENTAL BRIEF OF APPELLANT SOUNDEXCHANGE, INC.**

<div style="margin-left:40%">

David A. Handzo
Joshua M. Segal
Emily L. Chapuis
Devi M. Rao
JENNER & BLOCK LLP
1099 New York Avenue, N.W.
Washington, D.C. 20001
(v) (202) 639-6000
(f) (202) 639-6066
dhandzo@jenner.com
jsegal@jenner.com
echapuis@jenner.com
drao@jenner.com

</div>

January 3, 2017                    *Counsel for SoundExchange, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

GLOSSARY ........................................................................................... viii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

ARGUMENT ............................................................................................. 3

I.    THE SOURCE OF SOUNDEXCHANGE'S CAUSE OF ACTION IS THE COPYRIGHT ACT. ......................................................................... 3

II.   NEITHER THE COPYRIGHT ROYALTY BOARD NOR THE REGISTER OF COPYRIGHTS WOULD HAVE JURISDICTION TO ENTERTAIN THIS DISPUTE. .................................................................. 10

    A.    The Copyright Royalty Board Lacks Authority To Entertain This Dispute, And Section 114(f)(2)(C) Does Not Provide Otherwise. ...... 10

    B.    The Register Of Copyrights May Not Resolve This Dispute. ............ 14

    C.    The Board's Continuing Jurisdiction Does Not Apply Here. ............. 17

III.  REGARDLESS OF WHETHER THE BOARD OR REGISTER WOULD HAVE HAD JURISDICTION TO RESOLVE THIS DISPUTE, THE DISTRICT COURT HAD JURISDICTION ........................................... 18

IV.   REFERRAL UNDER THE DOCTRINE OF PRIMARY JURISDICTION IS UNWARRANTED. ...................................................................... 21

CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES*

**CASES**

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ........................................................ 8, 9

*Allied Air Freight, Inc. v. Pan American World Airways, Inc.*, 393 F.2d
441 (2d Cir. 1968) .......................................................................... 22

*Allnet Communication Service, Inc. v. National Exchange Carrier
Ass'n*, 965 F.2d 1118 (D.C. Cir. 1992)........................................... 21, 23

*\*Arista Records, LLC v. Launch Media, Inc.*, 578 F.3d 148 (2d Cir.
2009) ...................................................................................... 23

*Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015) ..................... 9

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014).............................. 9-10

*Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010).......................................... 21

*El Paso Natural Gas Co. v. United States*, 750 F.3d 863, 889 (D.C. Cir.
2014) .................................................................................... 7

*Etheridge v. FedChoice Federal Credit Union*, 789 F. Supp. 2d 27
(D.D.C. 2011) ............................................................................ 24

*\*Fox Television Stations, Inc. v. FilmOn X LLC*, 150 F. Supp. 3d 1, 6
(D.D.C. 2015) ............................................................................ 23

*Government of Guam v. American President Lines*, 28 F.3d 142 (D.C.
Cir. 1994).................................................................................. 9

*\*Independent Producers Group v. Library of Congress*, 759 F.3d 100
(D.C. Cir. 2014)............................................................................ 19

*Int'l Union, Security, Police & Fire Professionals of Am. v. Faye*, 828
F.3d 969 (D.C. Cir. 2016) ................................................................ 3

*Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135
(2011)..................................................................................... 8

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*Kappelmann v. Delta Air Lines, Inc.*, 539 F.2d 165 (D.C. Cir. 1976) ...................... 23

*Lee v. Hartford Life & Accident Insurance Co.*, 928 F. Supp. 2d 51
(D.D.C. 2013) ................................................................................................ 24

*Live365, Inc. v. Copyright Royalty Board*, 698 F. Supp. 2d 25 (D.D.C.
2010) ............................................................................................................. 20

*Local Union No. 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381
U.S. 676 (1965) ............................................................................................ 22

*McCoy v. Synchrony Bank*, No. 2:15-CV-13310, 2015 WL 6386554
(S.D.W. Va. Oct. 21, 2015) ........................................................................... 7

*Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341
U.S. 246 (1951) ............................................................................................ 22

*\*NBC v. Copyright Royalty Tribunal*, 848 F.2d 1289 (D.C. Cir. 1988) ................... 20

*\*Ray Charles Foundation v. Robinson*, 795 F.3d 1109 (9th Cir. 2015) ................... 7

*\*Schnapper v. Foley*, 667 F.2d 102, 108 (D.C. Cir. 1981) ........................................ 23

*SoundExchange, Inc. v. Sirius XM Radio Inc.*, 65 F. Supp. 3d 150
(D.D.C. 2014) ............................................................................................... 23

*Tax Analysts v. IRS*, 214 F.3d 179 (D.C. Cir. 2000) ................................................. 9

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ........................................... 20

*\*United States v. Elrod*, 627 F.2d 813 (7th Cir. 1980) .............................................. 22

*\*United States v. Western Pacific Railroad*, 352 U.S. 59 (1956) ....................... 21, 25

*WTGD 105.1 FM v. SoundExchange, Inc.*, 88 F. Supp. 3d 580 (W.D.
Va. 2015) ...................................................................................................... 10

## STATUTES

17 U.S.C. § 106(6) ...................................................................................................... 3

17 U.S.C. § 114(d)(2) ................................................................................................. 4

17 U.S.C. § 114(e)(1) ................................................................................................. 5

*17 U.S.C. § 114(f) ........................................................................................... 3, 4, 5, 8

*17 U.S.C. § 114(f)(1) ................................................................ 5, 7, 11, 12, 14

*17 U.S.C. § 114(f)(2) ............................................................ 5, 6, 7, 11, 12, 14

*17 U.S.C. § 114(g)(2) .................................................................. 3, 4, 5, 6, 10

*17 U.S.C. § 114(g)(3) .................................................................... 3, 4, 5, 6, 7

17 U.S.C. § 114(j)(8) ........................................................................................ 14

17 U.S.C. § 114(j)(11) ...................................................................................... 14

17 U.S.C. § 501(b) .............................................................................................. 9

17 U.S.C. § 701 .................................................................................................. 8

17 U.S.C. § 702 .................................................................................................. 8

17 U.S.C. § 801(b) .............................................................................................. 8

17 U.S.C. § 801(b)(1) ..................................................................................... 8, 11

17 U.S.C. § 801(b)(5) .......................................................................................... 8

17 U.S.C. § 801(b)(7) .......................................................................................... 8

17 U.S.C. § 801(c) .............................................................................................. 8

*17 U.S.C. § 802(f)(1) ........................................................................... 14, 15, 16

*17 U.S.C. § 803 ............................................................................................... 11

17 U.S.C. § 803(a)(1) ....................................................................................... 16

*17 U.S.C. § 803(c)(4) ...................................................................................... 17

*17 U.S.C. § 803(d)(1) ...................................................................................... 19

*17 U.S.C. § 804(b) ..................................................................................... 11, 14

28 U.S.C. § 1331 ......................................................................................... 18-19

28 U.S.C. § 1338(a) .......................................................................................... 19

**OTHER AUTHORITIES**

37 C.F.R. Part 351 ........................................................................................... 11

37 C.F.R. § 380.4(a) ........................................................................... 5

*37 C.F.R. § 382.2 .............................................................................. 5

37 C.F.R. § 382.3 ................................................................................ 4

*37 C.F.R. § 382.3(a) .................................................................... 11, 13

37 C.F.R. § 382.4 ................................................................................ 5

37 C.F.R. § 382.4 ................................................................................ 6

37 C.F.R. § 382.11 .............................................................................. 5

37 C.F.R. § 382.13 .............................................................................. 5

37 C.F.R. § 383.3(a)(1) ................................................................. 11, 13

37 C.F.R. § 383.4 ......................................................................... 4, 5, 6

37 C.F.R. § 384.6 ................................................................................ 5

*Copyright Royalty Judges' Ability To Set Rates and Terms That Distin-
   guish Among Different Types or Categories of Licensors*, 80 Fed.
   Reg. 76,577 (Dec. 9, 2015) ........................................................... 15

*Designation as a Preexisting Subscription Service*, 71 Fed. Reg.
   64,639 (Nov. 3, 2006) ...................................................... 15, 16, 17, 24

*Determination of Rates and Terms for Preexisting Subscription Services
   and Satellite Digital Audio Radio Services*, 78 Fed. Reg. 23,054
   (Apr. 17, 2013) ............................................................................ 13

*Determination of Reasonable Rates and Terms for the Digital Perfor-
   mance of Sound Recordings and Ephemeral Recordings*, 67 Fed.
   Reg. 45,240 (July 8, 2002) .............................................................. 5

*Determination of Royalty Rates and Terms for Ephemeral Recording
   and Webcasting Digital Performance of Sound Recordings*, 81 Fed.
   Reg. 26,316 (May 2, 2016) ........................................................... 8-9

*Determination of Royalty Rates for Ephemeral Reproductions and Pub-
   lic Performance of Sound Recordings by a New Subscription Service*,
   80 Fed. Reg. 36,927 (June 29, 2015) ............................................... 13

*Digital Performance Right in Sound Recordings and Ephemeral Recordings for a New Subscription Service*, 72 Fed. Reg. 63,532 (Nov. 9, 2007) ........................................................................................ 16

*Digital Performance Right in Sound Recordings and Ephemeral Recordings for a New Subscription Service*, 70 Fed. Reg. 72,471 (Dec. 5, 2005) ........................................................................................ 16

*Notice and Recordkeeping for Digital Subscription Transmissions*, 63 Fed. Reg. 34,289 (June 24, 1998) .............................................................. 5

*The Register of Copyrights' and the Copyright Royalty Judges' Authority to Determine the Constitutionality of 17 U.S.C. 114(f)(5)*, 75 Fed. Reg. 26,278 (May 11, 2010) ................................................................ 8

*Scope of the Copyright Royalty Judges' Continuing Jurisdiction*, 80 Fed. Reg. 25,333 (May 4, 2015) ........................................................ 18, 24

U.S. Copyright Office, *Copyright and the Music Marketplace* (Feb. 2015), https://www.copyright.gov/policy/musiclicensingstudy/copyright-and-the-music-marketplace.pdf ...................................................... 6

**GLOSSARY**

PSS                    Preexisting subscription service(s)

## INTRODUCTION AND SUMMARY OF ARGUMENT

SoundExchange submits this brief in response to the Court's order dated November 16, 2016.  As explained in greater detail below, SoundExchange responds to the Court's questions as follows.

1.    The source of SoundExchange's cause of action is the Copyright Act. Section 114 directs that the rates and terms set by the Copyright Royalty Board "shall . . . be binding" on services making covered transmissions; envisions that a "non-profit agent" of copyright owners (here, SoundExchange) will receive and distribute royalty payments; and provides that this agent may undertake "enforcement" efforts. Meanwhile, the Board itself lacks enforcement authority, and does not provide a forum to adjudicate underpayment disputes.  The statute, therefore, necessarily authorizes the nonprofit agent to sue a service to collect the royalties payable to it. Otherwise, the sole means of "enforcement" by the agent would consist of cajoling and letter-writing.

2.    Neither the Board nor the Register of Copyrights has jurisdiction to entertain this dispute.  Section 114(f)(2)(C) authorizes procedures to determine reasonable rates and terms if a "new type" of new subscription service becomes operational at a time when appropriate rates cannot be set in a regularly-scheduled proceeding. Here, however, rates and terms have *already* been determined for the two classes of services at issue (PSS and equivalent new subscription services); the only question

1

is *which* set of rates and terms applies to Muzak's non-Dish services.  Nor, for purposes of Section 114(f)(2)(C), are Muzak's non-Dish services a "new type" of service.  The Register's jurisdiction to decide novel material questions of law, meanwhile, requires the question to arise in an underlying rate-setting proceeding.  Because no such proceeding would have been available to resolve this dispute, no referral would have been possible.  Finally, the Board's narrow continuing jurisdiction over prior rate-setting proceedings does not extend to this dispute.

3.      Even assuming that the Board or the Register would have had jurisdiction to resolve this dispute, the district court still had jurisdiction. Section 803(d) requires that review of a "determination" under subsection 803(c) take place in this Court, rather than in a district court.  But where no "determination" is being reviewed—as here—subsection 803(d) poses no bar to district court jurisdiction, nor is there any other bar to a district court's exercise of the same jurisdiction it would have over any other suit arising under the Copyright Act or other federal law.

4.      Finally, referral to the Board (or the Register) under the doctrine of primary jurisdiction would be improper.  For one thing, the Board lacks jurisdiction to address this dispute, so referral would not even be possible.  For another thing, even if the Board or Register *would* have jurisdiction, referral still would be improper.  This case involves interpretation of a statute, not regulations adopted by the Board, and it certainly does not entail the sorts of policy determinations that often

2

prompt referral to an agency.  In any event, the Register has already interpreted the relevant statutory language in a manner that forecloses Muzak's position here.  Referral would only inject a layer of unnecessary litigation into what should be a straightforward matter for resolution by this Court.

## ARGUMENT

## I.  THE SOURCE OF SOUNDEXCHANGE'S CAUSE OF ACTION IS THE COPYRIGHT ACT.

As detailed below, the Copyright Act authorizes SoundExchange to sue a service for underpayment of statutory license royalties.  It provides that statutory royalty rates and terms "shall. . . be binding" on services like Muzak, 17 U.S.C. § 114(f); it empowers a "nonprofit agent" (here, SoundExchange) to collect and distribute royalties for the entire music industry, *id.* § 114(g)(2), (3); and it specifically contemplates that the agent will undertake "enforcement" with respect to the rights implicated by the statutory license, *id.* § 114(g)(3)(C).[1]

The Act sets forth the framework for licensing of the rights at issue here.  Digital music services must obtain authorization if they wish to perform copyrighted sound recordings.  *See* 17 U.S.C. § 106(6) (granting copyright owner the exclusive

---

[1] Indeed, in the district court, Muzak did not even argue that SoundExchange lacked authority to bring suit.  The presence or absence of a valid cause of action, if arguable, is not a jurisdictional question.  *See Int'l Union, Security, Police & Fire Professionals of Am. v. Faye*, 828 F.3d 969 (D.C. Cir. 2016) (considering existence of implied cause of action as a merits question because plaintiff's claim was at least "arguable").

right "to perform the copyrighted work publicly by means of a digital audio trans-mission").  A service can obtain such authorization in one of two ways: it can nego-tiate separate licenses with individual copyright owners, or it can take advantage of the "statutory licens[e]," which guarantees access to all federally-protected commer-cially-released sound recordings.  *See id.* § 114(d)(2).  To rely on the statutory li-cense, a service must comply with rates and terms prescribed by the Copyright Roy-alty Board (consisting of three Copyright Royalty Judges).  The Board sets "reason-able rates and terms of royalty payments" in adversarial proceedings that take place at regularly scheduled intervals.  *Id.* § 114(f).  Although sound recording copyrights typically are owned by record companies, Section 114 also guarantees performing artists (*i.e.*, singers and musicians) a fixed percentage of statutory license royalties.  *Id.* § 114(g)(2)(B)-(D).

SoundExchange plays a specific, statutorily-defined role in the statutory li-censing scheme.  The Copyright Act authorizes a "nonprofit agent" to administer the statutory license for the entire music industry.  *See* 17 U.S.C. § 114(g)(2), (3).  SoundExchange is that agent.  *See, e.g.*, 37 C.F.R. § 383.4; *id.* § 382.3.  In this ca-pacity, SoundExchange collects royalties from all music services opting for the stat-utory license, and distributes those royalties to the thousands of performing artists

and copyright owners to whom they are due. *See* 17 U.S.C. § 114(f), (g)(2), (g)(3); 37 C.F.R. §§ 380.4(a), 382.2, 382.4, 382.11, 382.13, 383.4.[2]

Section 114(f) makes clear that the rates and terms set by the Board create legal obligations for licensees. Specifically, the Act provides that those rates and terms "*shall . . . be binding* on all copyright owners of sound recordings and entities performing sound recordings affected by this paragraph." 17 U.S.C. § 114(f)(2)(B) (emphasis added); *see id.* § 114(f)(1)(B); *see also* 37 C.F.R. § 384.6 (setting forth procedures for SoundExchange to audit licensees to verify their royalty payments).

In contrast with agencies that play an enforcement role, however, the Board does not have authority to enforce the "binding" rates and terms that it sets. Rather,

---

[2] A brief history helps explain SoundExchange's present role. In 1995, when Congress enacted the Digital Performance Right in Sound Recordings Act, the Copyright Act had no specific provision for collective administration of the statutory license. Congress assumed that services would pay copyright owners directly, or that collectives would be formed pursuant to voluntary agreements. *See* 17 U.S.C. § 114(e)(1). Finding this system unworkable, services successfully urged the creation of a collective entity to be officially designated on behalf of all statutory payees. In 1998, the Copyright Office designated the Recording Industry Association of America as the sole collective responsible for administration of the statutory license; and, in 2003, SoundExchange was created and adopted this role. *See Notice and Recordkeeping for Digital Subscription Transmissions*, 63 Fed. Reg. 34,289, 34,293-94 (June 24, 1998); *see also Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings*, 67 Fed. Reg. 45,240, 45,266 (July 8, 2002). In the meantime, in 2002, Congress wrote this collective into the statute, specifically providing that it could engage in "enforcement" as well as the collection and distribution of funds. 17 U.S.C. § 114(g)(2), (3).

the statute makes clear that Congress intended SoundExchange to have the power to enforce those rates and terms.  To this end, Section 114(g)(3)(C) provides that the "nonprofit agent designated to distribute receipts from the licensing of transmissions" (*i.e.*, SoundExchange) is authorized to deduct from the funds it collects the reasonable costs of "*enforcement* of rights with respect to . . . performances subject to licensing" under Section 114.  *Id.* § 114(g)(3)(C); *see also* U.S. Copyright Office, Copyright and the Music Marketplace at 48 (Feb. 2015), https://www.copyright.gov/policy/musiclicensingstudy/copyright-and-the-music-marketplace.pdf (explaining that SoundExchange may use unclaimed royalties "to engage in . . . enforcement activities").

The statutory provisions set forth above compel the conclusion that Congress intended for SoundExchange to be able to sue to enforce the statutory license's rates and terms—and, indeed, that the prospect of such a suit is integral to the statutory scheme.  First, the statute envisions that a nonprofit agent will collect and distribute royalties, and will "enforce[]" licensees' "binding" obligations.    17 U.S.C. § 114(g)(2), (3); *id.* § 114(f)(2)(B) (rates and terms "shall be . . . binding" on licensees); *see also* 37 C.F.R. § 383.4 (designating SoundExchange as "the sole Collective"); *id.* § 382.4(a) (requiring that payments be made "to the Collective").  As the designated collection and distribution agent, SoundExchange plays a role envisioned

by the statute and is one of its beneficiaries. *See El Paso Natural Gas Co. v. United States*, 750 F.3d 863, 889 (D.C. Cir. 2014).[3]

Second, "enforcement" of a "binding" obligation, 17 U.S.C. § 114(f)(1)(B), (f)(2)(B), (g)(3)(C), must refer to legal action against an entity that fails to pay or otherwise comply with statutory license provisions. *See, e.g., McCoy v. Synchrony Bank*, No. 2:15-CV-13310, 2015 WL 6386554, at *2 (S.D.W. Va. Oct. 21, 2015) (to be "binding," something must have "legal force to impose an obligation" (quoting *Black's Law Dictionary* (10th ed. 2014))). Thus, when Congress granted Sound-Exchange authority to use a portion of the funds it collects for "enforcement" of a "binding" obligation, it could not have envisioned only toothless methods, like sending strongly-worded letters. Instead, SoundExchange must have authority to "enforce[]" the "binding" rates and terms in a manner resulting in actual legal consequences for underpayment. *See Ray Charles Foundation v. Robinson*, 795 F.3d 1109 (9th Cir. 2015) (finding implied cause of action under Copyright Act's termination

---

[3] In evaluating the existence of a private right of action, courts consider "(1) whether the plaintiff is one of the class for whose benefit the statute was enacted; (2) whether some indication exists of legislative intent, explicit or implicit, either to create or to deny a private remedy; (3) whether implying a private right of action is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law." *El Paso Natural Gas*, 750 F.3d at 889 (quoting *Tax Analysts v. IRS*, 214 F.3d 179, 185-86 (D.C. Cir. 2000)). The analysis in text is directed towards the first three of these factors. As to the fourth, enforcement of federally established rates and terms is not a cause of action traditionally left to the states.

provisions, because "the statutes plainly accord authors and statutory heirs the ability to terminate prior grants and recapture copyright ownership for works that were not made for hire"). Section 114 of the Act thus "displays an intent to create not just a private right but also a private remedy," *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)—namely, "enforcement" by SoundExchange, the sole collective for receipt of all statutory license royalties.[4]

Third, Congress delegated only a limited set of functions to the Board itself. *See* 17 U.S.C. § 801(b) (enumerating functions). As relevant here, the statute authorizes the Board to determine rates and terms, and to take various auxiliary steps. *See* 17 U.S.C. § 801(b)(1), (5), (7), (c). *id.* § 114(f). It does not authorize the Board to take any action to enforce the rates and terms it sets.[5] *See Determination of Roy-*

---

[4] That there is only one entity empowered to enforce the requirement to pay royalties to SoundExchange, moreover, means that there is no threat of excessive litigation—a conclusion that comports with the "narrow scope that [courts] must give the implied private right of action." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 144 (2011).

[5] Although Congress has given the Copyright Office and the Board certain other powers unrelated to Section 114, none of these grants of authority is relevant here. *See, e.g.*, 17 U.S.C. §§ 701, 702 (giving the Register various administrative responsibilities); 17 U.S.C. §§ 801(b) (empowering the Board to handle certain types of proceedings unrelated to this dispute). The Copyright Act does not give the Register or the Board general adjudicatory authority. *See, e.g.*, *The Register of Copyrights' and the Copyright Royalty Judges' Authority to Determine the Constitutionality of 17 U.S.C. 114(f)(5)*, 75 Fed. Reg. 26,278, 26,280 (May 11, 2010) (no Board

*alty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings*, 81 Fed. Reg. 26,316, 26,401 n.228 (May 2, 2016) (assuming that underpayment disputes would be commenced in "a court of competent jurisdiction," not before the agency).  This case thus differs significantly from ones in which courts have declined to find private rights of action that are not expressly stated.  *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385 (2015) (no private right of action where HHS Secretary has enforcement power); *Sandoval*, 532 U.S. at 288-89 (no private right of action where federal agency has enforcement power); *Gov't of Guam v. Am. President Lines*, 28 F.3d 142, 147 (D.C. Cir. 1994) (finding no evidence "to suggest that Congress intended to imply an additional remedy to the express administrative remedy it provided . . . in the Shipping Acts"); *Tax Analysts v. IRS*, 214 F.3d 179, 186 (D.C. Cir. 2000) (no private right of action where "Congress provided an enforcement mechanism of IRS-imposed civil fines and penalties").

Finally, without a right to sue for royalty underpayment, the only recourse for a music service's underpayment of royalties would be a copyright infringement suit.  But infringement suits can be brought only by the owners of exclusive rights under copyright.  *See* 17 U.S.C. § 501(b); *Authors Guild Inc. v. HathiTrust*, 755 F.3d 87

---

or Register authority under the Copyright Act to adjudicate constitutionality of Webcaster Settlement Act).

(2d Cir. 2014). They cannot be brought by SoundExchange, which does not have exclusive rights to the copyrights in the sound recordings covered by the statutory license. *See WTGD 105.1 FM v. SoundExchange, Inc.*, 88 F. Supp. 3d 580, 585-86 (W.D. Va. 2015) (finding no case or controversy between SoundExchange and service seeking to make exempt transmissions, where dispute involved a claim of infringement rather than a breach of the statutory license). Accordingly, infringement suits cannot be the type of "enforcement" by the "nonprofit agent" that Congress contemplated in Section 114.[6]

## II. NEITHER THE COPYRIGHT ROYALTY BOARD NOR THE REGISTER OF COPYRIGHTS WOULD HAVE JURISDICTION TO ENTERTAIN THIS DISPUTE.

### A. The Copyright Royalty Board Lacks Authority To Entertain This Dispute, And Section 114(f)(2)(C) Does Not Provide Otherwise.

Section 114(f) authorizes the Board to set rates and terms of royalty payments for certain types of services, including both "preexisting subscription services"

---

[6] As a practical matter, moreover, infringement suits by one or more copyright owners could not easily remedy underpayment of royalties at the "binding" rates and terms. Because copyright owners can bring infringement suits only with respect to the specific sound recordings they own, infringement suits by particular owners could not redress underpayments on an industrywide basis—the very basis upon which licensees are required to make payments in the first place. Recording artists, for their part, typically cannot sue for infringement at all, because they typically do not own copyrights. Yet they, too, are entitled to a substantial share of royalties, separate from the share designated for copyright owners. *See* 17 U.S.C. § 114(g)(2)(D) (entitling recording artists to 45 percent of royalty distributions).

(PSS) and "new subscription services." *See* 17 U.S.C. § 114(f)(1)(A), (B) (addressing PSS); *id.* § 114(f)(2)(A), (B) (addressing new subscription services). These rate-setting matters are elaborate, trial-type proceedings that occur at regular intervals.[7] By statute, each proceeding extends over a two-year period with numerous interim milestones. *See* 17 U.S.C. § 114(f)(1), (2); 17 U.S.C. § 803 (setting forth procedures for proceedings, including publication of notice in the Federal Register, opportunity for petitions to participate, three-month voluntary negotiation period, filing of written direct and rebuttal cases, written discovery and depositions, and presentation of evidence at a hearing); 37 C.F.R. Part 351 (Board rules for the conduct of proceedings). The proceedings establish detailed rate regulations for each license category, with each covering a five-year period. *See, e.g.*, 37 C.F.R. § 382.3(a) (PSS rate schedule); 37 C.F.R. § 383.3(a)(1) (new subscription services rate schedule).

The statutory provisions cited above do not provide a mechanism for resolving underpayment disputes, including this one. They authorize the Board to "determine reasonable rates and terms of royalty payments" for the statutory license. 17 U.S.C. § 114(f)(1)(A); *id.* § 114(f)(2)(A); *see also id.* § 801(b)(1). But they do not permit

---

[7] The Copyright Royalty Board hears rate-setting matters for each broad category of service once every five years, and these proceedings are staggered so that rates and terms for different categories are litigated in different years. 17 U.S.C. § 804(b).

the Board to adjudicate disputes over rate schedules that have already been set, including disputes over which rate schedules applies to a particular service. Nor, as explained above, does the Board have authority to enforce the rates that it sets.

Section 114(f)(2)(C) likewise does not authorize the Board to resolve this dispute. That section allows for the initiation of an additional rate-setting proceeding—not on the five-year cycle envisioned by Section 114(f)(2)(A) and (B)—when "a new type of eligible . . . new subscription service on which sound recordings are performed is or is about to become operational." 17 U.S.C. § 114(f)(2)(C); *see id.* (absent agreement by the parties, rate-setting procedures shall be "for the period beginning with the inception of such new type of service and ending on the date on which the royalty rates and terms for eligible nonsubscription services and new subscription services, as the case may be, most recently determined under subparagraph (A) or (B) and chapter 8 expire").[8] That provision is inapplicable here, for two reasons.

First, there is no need to "determine reasonable rates and terms of royalty payments" (the undertaking that Section 114(f)(2)(C) envisions, by virtue of incorporating "[t]he procedures under subparagraph (A) and (B)") for Muzak's non-Dish

---

[8] Section 114(f)(1)(C)— which applies to preexisting subscription services, rather than new subscription services—contains a parallel rate-setting provision applicable to a "new type of" preexisting subscription service. The analysis set forth in text applies equally to the question of whether Section 114(f)(1)(C) could apply in these circumstances.

services.  The Board determines rates and terms for particular classes of services, not for individual services.  And here, it has already done so both for PSS and for equivalent new subscription services.  *See* 78 Fed. Reg. 23,054 (setting royalty rates for PSS through 2017); 80 Fed. Reg. 36,927 (setting royalty rates for new subscription services through 2020); *see also* 37 C.F.R. §§ 382.3(a); 37 C.F.R. § 383.3(a)(1). The only question in this case is *which* set of rates and terms applies to Muzak's non-Dish services.[9]

Second, even assuming that *some* circumstances might bring classification decisions within the scope of Section 114(f)(2)(C), this case presents no such circumstances.  Section 114(f)(2)(C) envisions procedures only when a "new type" of new subscription service becomes operational—and Muzak's non-Dish services are not a "new type" of service under either party's view.[10]  SoundExchange's position is

---

[9] Although this Court's supplemental briefing order appears to equate resolution of this dispute with a "determin[ation] [of] the appropriate rate due to appellant," SoundExchange respectfully submits that this premise does not reflect the statutory rate-setting scheme.  "Determination" of rates, as explained above, refers to the process by which the Board establishes a rate schedule applicable to a particular class of services.  Such a determination might set the rate as, for instance, a particular percentage of revenues, a particular amount per performance, or a particular amount per subscriber.  What is at issue here is *which* of the already-determined rate schedules applies to Muzak's non-Dish offerings.

[10] A "new type" of service is a concept distinct from the term "new subscription service."  The former addresses the rare circumstance in which an existing rate structure does not appropriately address a new type of service, so that a rate for that type of service must be set for the remainder of the then-current five-year rate period.

that these services are the same subscription services that DMX previously offered, and that they should continue to be subject to new subscription service rates.  *See* SoundExchange Br. 15-17.  Muzak's position is that its non-Dish transmissions should be subject to PSS rates because they are the same subscription service it has long offered, or because they are equivalent to the service it offers over Dish.  *See* Muzak Br. 16-18.  Put differently, although the parties dispute whether Muzak must pay at the PSS rate or at the new subscription services rate, there is no dispute that the "type" of service Muzak offers is not "new."  The Board has already determined the relevant rates, and the only question is *which* rate applies here.

### B.     The Register Of Copyrights May Not Resolve This Dispute.

The Register of Copyrights also lacks authority to resolve this dispute.  Section 802(f)(1)(B)(i) provides that, where the Board confronts "a novel material question of substantive law," it "shall request a decision of the Register of Copyrights, in writing, to resolve such novel question."  17 U.S.C. § 802(f)(1)(B)(i).  This provision is inapplicable here, for two reasons.

---

*See id.* §§ 114(f)(1)(C), (2)(C), 804(b)(3)(C).  The latter, by contrast, refers to a category of services that are "new" relative to the grandfathered preexisting subscription services. *See id.* § 114(j)(8), (11).

First, the procedural predicate for referral is absent. Section 802(f)(1)(B)(i) does not give the Register freestanding jurisdiction to resolve legal questions. Instead, a question can be referred to the Register only if it "arise[s] in the course of" an existing proceeding before the Board. 17 U.S.C. § 802(f)(1)(A)(ii); *see id.* § 802(f)(1)(B) (envisioning referral "*[i]n any case* in which a novel material question of substantive law concerning an interpretation of those provisions of this title *that are the subject of the proceeding* is presented" (emphasis added)); *see also Designation as a Preexisting Subscription Service*, 71 Fed. Reg. 64,639, 64,639 (Nov. 3, 2006) (noting that the Board may request a decision of the Register "[i]n any case in which a novel question of law concerning an interpretation of a provision of the Copyright Act is *presented in a ratesetting proceeding*" (emphasis added)). Indeed, Section 802(f)(1)—of which Section 802(f)(1)(B) is a part—is headed "In making determinations." Here, at the time of this lawsuit, no rate-setting proceeding was ongoing before the Board—nor, as explained above, would Section 114(f) have permitted initiation of such a proceeding to resolve this dispute. *See Copyright Royalty Judges' Ability To Set Rates and Terms That Distinguish Among Different Types or Categories of Licensors*, 80 Fed. Reg. 76,577 (Dec. 9, 2015) (finding referral improper where not sufficiently related to pending rate proceeding).

The Register's 2006 decision concerning PSS eligibility contrasts sharply with the circumstances giving rise to the present dispute, and underscores the need

for an underlying rate-setting proceeding as a precondition of referral.  In 2006, a rate-setting proceeding for PSS was ongoing before the Board, and a threshold question arose regarding whether DMX and Sirius Satellite Radio were entitled to participate.  *See Digital Performance Right in Sound Recordings and Ephemeral Recordings for a New Subscription Service*, 72 Fed. Reg. 63,532 (Nov. 9, 2007); 71 Fed. Reg. 64,639; *Digital Performance Right in Sound Recordings and Ephemeral Recordings for a New Subscription Service*, 70 Fed. Reg. 72,471 (Dec. 5, 2005).  The Board referred that question to the Register, who resolved it.  *See* 71 Fed. Reg. at 64,639.  Here, by contrast, the dispute between the parties did not arise in a rate-setting proceeding, so referral to the Register would not have been possible.[11]

Second, even setting aside that fundamental procedural obstacle, the question this case presents is not novel.  Section 802(f)(1)(B)(ii) defines a "novel question of law" as one "that has not been determined in prior decisions, determinations, and

---

[11] In January 2016, the Board invited petitions to participate in *Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and "Preexisting" Subscription Services* ("*SDARS III*"), the proceeding that will determine rates and terms for satellite radio services and PSS for the 2018-2022 rate period.  Trial is scheduled for April 2017, with the Board scheduled to issue a rate determination towards the end of 2017.  That proceeding would not be a proper setting to resolve the question at issue here: this dispute arises not from the rate-setting for 2018-2022, but from Muzak's underpayments during the 2013-2017 rate period.  Indeed, the Board did not call for petitions to participate in the *SDARS III* proceeding until January 2016, well after this litigation had commenced.  Muzak, for its part, has formally withdrawn from participation in *SDARS III*.

rulings described in section 803(a)." 17 U.S.C. § 802(f)(1)(B)(i); *see id.* § 803(a)(1) (listing determinations including "prior determinations and interpretations . . . of . . . the Register of Copyrights"); *see* 71 Fed. Reg. at 64,639 (citing definition). Here, the Register has already addressed whether Muzak's non-Dish services are eligible for PSS rates. Specifically, in 2006, she held that the universe of PSSs was limited to, inter alia, "Muzak (provided over the Dish Network)," and further explained that Muzak could benefit from PSS rates "so long as it provided its services over the Dish Network." *See id.* at 64,646-47. Whether Muzak can pay PSS rates for services *not* provided over the Dish Network is therefore not a novel question.

## C. The Board's Continuing Jurisdiction Does Not Apply Here.

Finally, the Board would not have continuing jurisdiction to resolve this dispute by way of reopening a prior rate determination. Section 803(c)(4) gives the Board "continuing jurisdiction" to amend its written determinations only in two narrow respects: (1) "to correct any technical or clerical errors in the determination"; and (2) "to modify the terms, but not the rates, of royalty payments in response to unforeseen circumstances that would frustrate the proper implementation of such determination." 17 U.S.C. § 803(c)(4) (emphasis added). Neither of these categories of continuing jurisdiction applies here, for SoundExchange's lawsuit poses a legal question regarding the meaning of the Copyright Act, not any aspect of any rate

determination.  Answering this question, moreover, cannot be characterized as correction of a "technical" or "clerical" error.  It also cannot be characterized as a modification of the "terms" of royalty payments: this dispute concerns *how much* Muzak should pay, not the terms on which it must make payment.

This case differs significantly from the dispute addressed in *Scope of the Copyright Royalty Judges' Continuing Jurisdiction*, 80 Fed. Reg. 25,333 (May 4, 2015).  There, the Register concluded that the Board's continuing jurisdiction gave it authority to clarify the regulations adopted in an earlier proceeding—specifically, the technicalities of the definition of "gross revenues" used in calculating satellite radio royalties.  *See id.* at 25,335 (concluding that "the CRJs' power to 'correct any technical . . . errors' in determinations encompasses the power to resolve ambiguity in the meaning of regulations adopted pursuant to those determinations").  The instant dispute, by contrast, involves a question of statutory interpretation, not the meaning of any regulation.

## III.    REGARDLESS OF WHETHER THE BOARD OR REGISTER WOULD HAVE HAD JURISDICTION TO RESOLVE THIS DISPUTE, THE DISTRICT COURT HAD JURISDICTION.

This case arises under federal law and, in particular, arises under the Copyright Act.  Jurisdiction consequently existed in the district court.  *See* 28 U.S.C.

§ 1331 (federal question jurisdiction); *id.* § 1338(a) (copyright question jurisdiction). That is true regardless of whether the Board or Register might have had jurisdiction to address the dispute between the parties.

First, the review procedures of 17 U.S.C. § 803(d)(1) would not have deprived the district court of jurisdiction. A rate-setting determination by the Board is, of course, directly reviewable only by this Court, in a challenge brought "by any aggrieved participant . . . who fully participated in the proceeding and who would be bound by the determination." 17 U.S.C. § 803(d)(1). Section 803(d) forecloses district court review of a subsection (c) "determination." But that is the full extent of this Court's direct statutory jurisdiction with respect to the Board. *Indep. Producers Grp. v. Librarian of Congress*, 759 F.3d 100, 105 (D.C. Cir. 2014) ("Congress was explicit that this court has statutory jurisdiction only to review a 'determination' by the Royalty Judges."); *see id.* (determination must be "under subsection (c)" of Section 803 (quoting 17 U.S.C. § 803(d))). Here, SoundExchange could not have come straight to this Court because there is no subsection (c) determination by which it is "aggrieved," as required by Section 803(d)(1).

Precisely because review was unavailable here under Section 803(d), that provision did not limit SoundExchange's ability to pursue this dispute in the district court. Despite barring district court review of a subsection (c) "determination," Sec-

tion 803(d) does not foreclose district court actions that otherwise implicate decisions made by the Board, or that concern issues that might come before the Board. *See NBC v. Copyright Royalty Tribunal*, 848 F.2d 1289, 1295-96 (D.C. Cir. 1988) (noting that Section 803(d) "leaves the parties [with claims outside of that review] free to litigate their . . . claims in an appropriate forum," and pointing to both state court and copyright question jurisdiction under 28 U.S.C. § 1338(a) as examples); *cf. Live365, Inc. v. Copyright Royalty Board*, 698 F. Supp. 2d 25, 32 (D.D.C. 2010) (exercising jurisdiction over an Appointments Clause challenge to the Board because such a challenge is not an appeal from a "determination" of the Board, even though the challenge targeted a particular ongoing rate proceeding).

Second, there is no other reason to conclude that, even assuming that the Board or Register could entertain this dispute, their ability to do so deprived the district court of jurisdiction here. The statute offers no reason to think that agency jurisdiction over such a dispute would be exclusive of district court jurisdiction to address a royalty underpayment claim. *Compare, e.g.*, *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). At most, the existence of agency jurisdiction here could warrant consideration of whether the matter should be referred to the Board as a matter of primary jurisdiction, with judicial proceedings stayed in the interim.[12] But

---

[12] For the reasons discussed below, referral would be improper here.

even referral under that doctrine would not mean that the district court lacked jurisdiction in the first instance. *See, e.g.*, *Comcast Corp. v. FCC*, 600 F.3d 642, 648 (D.C. Cir. 2010) ("The question of whether an issue is within [an] agency's primary jurisdiction is different from the question of whether the agency actually has exclusive statutory jurisdiction to resolve an issue." (quoting 2 Richard J. Pierce, Jr., *Administrative Law Treatise* § 14.1, at 1162 (5th ed. 2010) (bracket in original)); *Allnet Comm'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n,*, 965 F.2d 1118, 1120 (D.C. Cir. 1992).

## IV.   REFERRAL UNDER THE DOCTRINE OF PRIMARY JURISDICTION WOULD BE IMPROPER.

The doctrine of primary jurisdiction is a narrow one, applying only when adjudicating a claim "would require the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956).  Here, referral to the Board or the Register under that doctrine would be improper because, among other things, (1) the Board and Register lack jurisdiction to address this dispute; (2) this dispute involves a pure question of statutory interpretation; and (3) the Register already has interpreted the provision at issue in a manner foreclosing Muzak's claim of broad PSS eligibility.

First, as explained in Part II above, neither the Board nor the Register would have jurisdiction to resolve this dispute.  This hurdle alone makes invocation of primary jurisdiction impossible.  Indeed, "[w]here no administrative remedy exists, the doctrine of primary jurisdiction does not apply."  *United States v. Elrod*, 627 F.2d 813, 818 (7th Cir. 1980); *see id.* ("Uncertainty as to the scope of [the agency's] administrative authority thus militates against initial resort to the agency here."); *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 254 (1951) ("[W]e know of no case where the court has ordered reference of an issue which the administrative body would not itself have jurisdiction to determine in a proceeding for that purpose."); *Local Union No. 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 687 (1965) (rejecting primary jurisdiction argument "because of the absence of an available procedure for obtaining a Board determination"); *Allied Air Freight, Inc. v. Pan Am. World Airways, Inc.*, 393 F.2d 441, 448 (2d Cir. 1968) (declining to invoke primary jurisdiction when the agency was "unable to give the relief which appellant seeks" because it "ha[d] no power to award damages for unfair competitive practices").

Even if referral to the Board or Register were possible, moreover, it still would not be appropriate in this case.  SoundExchange's claim against Muzak calls upon the Court to interpret the language of the Copyright Act—not to interpret technical

regulations or to make policy judgments about specialized issues.[13]  Courts routinely interpret the Act without suggesting that doing so lies outside the realm of judicial expertise.  *See, e.g., Arista Records, LLC v. Launch Media, Inc.*, 578 F.3d 148, 154 (2d Cir. 2009) (interpreting meaning of "interactive service" in Section 114(j)); *Schnapper v. Foley*, 667 F.2d 102, 108 (D.C. Cir. 1981) (interpreting provision addressing registration of government-commissioned works); *Fox Television Stations, Inc. v. FilmOn X LLC*, 150 F. Supp. 3d 1, 6 (D.D.C. 2015) (analyzing whether service operated "cable systems" within the meaning of § 111).

The district court's decision in SoundExchange's underpayment case against Sirius XM in no way supports a different conclusion.  That case involved a dispute as to the meaning of the Board's technical *regulations*, which the district court concluded were "ambiguous and do not, on their face, make clear whether Sirius XM's approaches [to calculating revenue] were permissible."  *SoundExchange, Inc. v. Sirius XM Radio Inc.*, 65 F. Supp. 3d 150, 155 (D.D.C. 2014); *see also id.* at 156 (noting

---

[13] Referral on primary jurisdiction grounds can be appropriate in two narrow circumstances: where an issue requires "the expert and specialized knowledge of the agencies," or where there is a need for "uniformity [of outcomes] which would obtain if initially a specialized agency passed on certain types of administrative questions," *Kappelmann v. Delta Air Lines, Inc.*, 539 F.2d 165, 169 (D.C. Cir. 1976) (quotation marks omitted); *see Allnet Commc'n Serv., Inc.*, 965 F.2d at 1120.  Neither of these grounds applies here.  SoundExchange's underpayment claim requires this Court not to make policy, but to interpret statutory language in a manner consistent with the position that the agency has previously taken.  Further, any risk of non-uniform outcomes is minimal because Muzak is one of only two remaining PSS.

that the Board "heard weeks of testimony and reviewed scores of exhibits submitted by these two parties" in two prior proceedings that determined the rates and terms at issue); 80 Fed. Reg. at 25,335.  Because of the nature of the parties' dispute, the district court referred the matter to the Board under the doctrine of primary jurisdiction.  This case, by contrast, does not involve the interpretation of *any* regulations, let alone ambiguous ones.  Instead, it requires the Court to interpret the statutory definition of "preexisting subscription service."[14]

The inappropriateness of referral here is underscored by the fact that the Register has already interpreted Section 114(j)(11).  The Register ruled in 2006 that "the universe of preexisting subscription services" is "limited by law to only *Muzak (provided over the DiSH Network)*, Music Choice, and DMX."  71 Fed. Reg. at 64,647 (emphases added); *see also id.* at 64,646 (concluding that Muzak may benefit from PSS status only "so long as it provide[s] its music offerings over the DiSH Network"); SoundExchange Br. 30-36; SoundExchange Reply Br. 14-20.  In light of the

---

[14] SoundExchange believes that the referral of its underpayment case against Sirius XM to the Board was erroneous.  Courts often resolve private parties' disputes about the meaning of a regulation, even when an agency might also have occasion to do so.  *See, e.g.*, *Lee v. Hartford Life & Acc. Ins. Co.*, 928 F. Supp. 2d 51, 54-57 (D.D.C. 2013); *Etheridge v. FedChoice Fed. Credit Union*, 789 F. Supp. 2d 27, 36-39 (D.D.C. 2011).  In any case, the referral decision in *SoundExchange v. Sirius XM* is fully inapposite here, for the reasons discussed above.

2006 ruling, referral here would be unnecessarily time-consuming and wasteful.[15]
*See W. Pac. R.R.*, 352 U.S. at 69 (stressing that "there would be no need to refer [a] matter of construction to the [agency] if that body, in prior releases or opinions, has already construed the particular tariff at issue or has clarified the factors underlying it.").

## CONCLUSION

For the foregoing reasons, as well as those in SoundExchange's opening and reply briefs, jurisdiction is proper and the district court's decision should be reversed.

January 3, 2017                                 Respectfully submitted,

                                                /s/ David A. Handzo
                                                David A. Handzo
                                                Joshua M. Segal
                                                Emily L. Chapuis
                                                Devi M. Rao
                                                JENNER & BLOCK LLP
                                                1099 New York Avenue, N.W.
                                                Washington, D.C. 20001
                                                (v) (202) 639-6000
                                                (f) (202) 639-6066
                                                dhandzo@jenner.com
                                                jsegal@jenner.com

---

[15] If anything, referral of this matter despite the Register's 2006 ruling would create undesirable incentives for services using the statutory license. Such a result would incentivize services to adopt aggressive and dubious approaches to payments, regardless of past rulings—knowing that any enforcement procedures would be costly and cumbersome for SoundExchange.

echapuis@jenner.com
drao@jenner.com

*Counsel for SoundExchange, Inc.*

**CERTIFICATE OF COMPLIANCE**

I, David A. Handzo, in reliance on the word count of the word processing system used to prepare this brief, certify that the foregoing brief contains 6,211 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), and thus complies with the word limit in the Court's supplemental briefing order.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in Times New Roman 14-point font, a proportionately spaced typeface, using Microsoft Word 2013.

January 3, 2017                                    /s/ David A. Handzo
                                                   David A. Handzo
                                                   JENNER & BLOCK LLP
                                                   1099 New York Avenue, N.W.
                                                   Washington, D.C. 20001
                                                   (202) 639-6000

**CERTIFICATE OF SERVICE**

I, David A. Handzo, hereby certify that on this 3rd day of January, 2017, a true and correct copy of the foregoing was filed with the Clerk of the United States Court of Appeals for the D.C. Circuit via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

<u>/s/ David A. Handzo</u>
David A. Handzo
JENNER & BLOCK LLP
1099 New York Avenue, N.W.
Washington, D.C. 20001
(202) 639-6000