# EXHIBIT 6

**[ORAL ARGUMENT HELD ON NOVEMBER 9, 2016]**

**No. 16-7041**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————

SOUNDEXCHANGE, INC.,

Plaintiff-Appellant,

v.

MUZAK LLC,

Defendant-Appellee.

—————————————

On Appeal from the United States District Court
for the District of Columbia

—————————————

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT
OF NEITHER PARTY**

—————————————

BENJAMIN C. MIZER
  *Principal Deputy Assistant Attorney
  General*

MARK R. FREEMAN
JENNIFER L. UTRECHT
  *Attorneys, Appellate Staff
  Civil Division, Room 7710
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 353-9039*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici.

Plaintiff/Appellant is SoundExchange, Inc. Defendant/Appellee is Muzak LLC.  The United States appears as *amicus curiae* upon invitation of this Court.

### B.    Rulings Under Review.

Plaintiff/Appellant seeks review of a March 7, 2016 Order of the district court dismissing its suit against Defendant/Appellee.  References and citations to the ruling appear in Plaintiff/Appellant's Brief.

### C.    Related Cases.

This case has not previously been before this Court or any other Court, and undersigned counsel is unaware of any other related cases within the meaning of this Court's rules.

*/s/ Jennifer Utrecht*
Jennifer Utrecht
Counsel for the United States

# TABLE OF CONTENTS

**Page(s)**

STATEMENT OF INTEREST AND SUMMARY OF ARGUMENT ...................... 1

STATEMENT OF THE CASE ........................................................................ 2

    A.    Statutory Background ............................................................. 2

    B.    Factual Background................................................................. 5

    C.    Prior Proceedings .................................................................. 6

ARGUMENT ........................................................................................ 8

I.      Neither the Copyright Royalty Board nor the Register of
Copyrights Has Authority to Resolve This Dispute Because
This Case Did Not Emerge from a Ratemaking Proceeding .............................. 9

II.    The Interim Ratemaking Procedure in Section 114(f) Is Not an
Appropriate Mechanism to Resolve the Issues in This Case ............................ 13

III.   Because Neither the Board nor the Register Can Adjudicate
This Dispute in This Posture, Referral Under the Doctrine
of Primary Jurisdiction Is Unwarranted ................................................ 17

CONCLUSION ...................................................................................... 19

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                          **Page(s)**

*ABC, Inc. v. Aereo, Inc.*,
    Nos. 12-cv-1540, 12-cv-1543,
    2014 WL 5393867 (S.D.N.Y. Oct. 23, 2014) ............................................... 13

*ABC, Inc. v. PrimeTime 24*,
    184 F.3d 348 (4th Cir. 1999) .................................................................... 12

*Arista Records, LLC v. Launch Media, Inc.*,
    578 F.3d 148 (2d Cir. 2009) ...................................................................... 12

*Atlantic Recording Corp. v. XM Satellite Radio, Inc.*,
    No. 10 Civ 3733,
    2007 WL 136186 (S.D.N.Y. Jan. 19, 2007) ................................................ 13

*CBS Broad., Inc. v. EchoStar Commc'ns Corp.*,
    265 F.3d 1193 (11th Cir. 2001) ................................................................ 12

*CBS Broad., Inc. v. FilmOn.com, Inc.*,
    No. 10 Civ. 7532,
    2014 WL 3702568 (S.D.N.Y. July 24, 2014) .............................................. 13

*Fox Television Stations, Inc. v. FilmOn X, Inc.*,
    150 F. Supp. 3d 1 (D.D.C. 2015) .............................................................. 12

*SoundExchange, Inc. v. Sirius XM Radio Inc.*,
    65 F. Supp. 3d 150 (D.D.C. 2014) ............................................................ 18

*United States v. Philip Morris USA Inc.*,
    686 F.3d 832 (D.C. Cir. 2012) ................................................................. 17

*United States v. Western Pac. R.R. Co.*,
    352 U.S. 59 (1956) .................................................................................. 17

*WPIX, Inc. v. ivi, Inc.*,
    691 F.3d 275 (2d Cir. 2012) ..................................................................... 12

---

\* Authorities upon which we chiefly rely are marked with asterisks.

**Statutes:**

*Copyright Act, 17 U.S.C. § 101 *et seq.*................................................................ 2

   17 U.S.C. § 101 ........................................................................................... 2

   17 U.S.C. § 106 ........................................................................................... 2

   17 U.S.C. § 106(4) ....................................................................................... 2

   17 U.S.C. § 106(6) ....................................................................................... 3

   *17 U.S.C. § 114 .......................................................................................... 3

   17 U.S.C. § 114(a) ...................................................................................... 2

   17 U.S.C. § 114(d) ...................................................................................... 3

   17 U.S.C. § 114(d)(2) .................................................................................. 3

   *17 U.S.C. § 114(f) ..................................................................................... 3

   17 U.S.C. § 114(f)(1) ................................................................................. 16

   17 U.S.C. § 114(f)(1)(A) ........................................................................... 14

   17 U.S.C. § 114(f)(1)(B) ............................................................................. 4

   *17 U.S.C. § 114(f)(1)(C) .......................................................................... 14

   17 U.S.C. § 114(f)(2) ........................................................................... 14, 16

   17 U.S.C. § 114(f)(2)(A) ........................................................................... 14

   17 U.S.C. § 114(f)(2)(B) ......................................................................... 4, 14

   *17 U.S.C. § 114(f)(2)(C) .......................................................................... 14

   17 U.S.C. § 114(g) ...................................................................................... 6

   *17 U.S.C. § 114(j)(11) ........................................................................... 5, 7

   17 U.S.C. § 702 ........................................................................................ 12

   17 U.S.C. § 801 .......................................................................................... 8

   17 U.S.C. § 801(b)(1) .................................................................................. 3

   *17 U.S.C. § 802(f)(1)(B) .................................................................. 9, 11, 12

   *17 U.S.C. § 803 ........................................................................................ 9

   17 U.S.C. § 803(b)(2)(C) .......................................................................... 10

   17 U.S.C. § 803(c)(1) ................................................................................ 16

   17 U.S.C. § 803(c)(4) ................................................................................ 12

   17 U.S.C. § 803(d) ...................................................................................... 8

   17 U.S.C. § 804(a) .................................................................................... 10

   17 U.S.C. § 804(b)(3)(A) ............................................................................ 9

   17 U.S.C. § 804(b)(3)(B) ............................................................................ 9

Copyright Royalty and Distribution Reform Act of 2004,
   Pub. L. No. 108-419, 118 Stat. 2341
   (codified at 17 U.S.C. § 801 *et seq.*) ......................................................... 2

Digital Millenium Copyright Act,
    Pub. L. No. 105-304, 112 Stat. 2860 (1998) ..................................... 4

Digital Performance Right in Sound Recordings Act of 1995,
    Pub. L. No. 104-39, 109 Stat. 336 ..................................................... 3

**Regulations:**

37 C.F.R. § 380.4 ......................................................................................... 6

37 C.F.R. § 382.2 ......................................................................................... 6

37 C.F.R. § 382.11 ....................................................................................... 6

37 C.F.R. § 382.13 ....................................................................................... 6

**Legislative Materials:**

H.R. Rep. No. 104-274 (1995) ................................................................... 3

H.R. Rep. No. 105-796 (1998) (Conf. Rep.),
    *reprinted in* 1998 U.S.C.C.A.N. 639 ............................................... 5

**Other Authorities:**

Designation as a Preexisting Subscription Service,
    71 Fed. Reg. 64,639 (Nov. 3, 2006) ............................................... 11

Determination of Rates and Terms for Preexisting Subscription
    Services and Satellite Digital Audio Radio Services,
    78 Fed. Reg. 23,054 (Apr. 17, 2013) .............................................. 10

Determination of Rates and Terms for Preexisting Subscription
    Services and Satellite Digital Audio Services,
    73 Fed. Reg. 4,080 (Jan. 24, 2008) ................................................ 12

*Determination of Reasonable Rates and Terms for the Digital
    Performance of Sound Recordings,
    63 Fed. Reg. 25,394 (May 8, 1998) ........................................... 4, 14

Determination of Terms and Royalty Rates for Ephemeral
  Reproductions and Public Performance of Sound Recordings
  by a New Subscription Service,
  80 Fed. Reg. 36,927 (June 29, 2015).................................................................... 10

Digital Performance Right in Sound Recordings and
  Ephemeral Recordings,
  76 Fed. Reg. 13,026 (Mar. 9, 2011)..................................................................... 15

*Scope of the Copyright Royalty Judges' Continuing Jurisdiction,
  80 Fed. Reg. 25,333 (May 4, 2015)...................................................................... 18

## STATEMENT OF INTEREST AND SUMMARY OF ARGUMENT

The United States respectfully submits this brief in response to the Court's order of November 16, 2016, inviting the Copyright Royalty Board and the Register of Copyrights to file a joint brief "addressing their jurisdiction."  Per Curiam Order, *SoundExchange, Inc. v. Muzak*, No. 16-7041 (D.C. Cir. Nov. 16, 2016) ("November 16 Order").   In the government's view, this litigation was properly commenced in the district court.[1]

At issue in this case is a private dispute over the alleged underpayment of royalties for the public performance of copyrighted sound recordings.  The parties agree that appellee Muzak's performances are covered by one of the statutory licenses in the Copyright Act, but they disagree over *which* established statutory royalty rate applies to Muzak's particular performances.  Although the resolution of that question depends on the meaning of a statutory term ("preexisting subscription service") that the Copyright Royalty Board and the Copyright Office sometimes have reason to interpret in discharging their public responsibilities, it is not the function of either agency to arbitrate private disputes over whether particular business entities are entitled to pay particular rates for particular transmissions.  Such disagreements, like most questions of private liability under copyright law, are for resolution between the interested parties themselves, or if necessary with the assistance of courts.

---

[1] The government expresses no view on the source of appellant SoundExchange's cause of action.  *See* November 16 Order at 2.

## STATEMENT OF THE CASE

### A.    Statutory Background

The Copyright Act, 17 U.S.C. § 101 *et seq.*, confers on the owner of a copyright a set of exclusive rights in the copyrighted work.  *See generally* 17 U.S.C. § 106.  In certain cases, however, the Act limits the exclusivity of those rights by granting access to the copyrighted work to any person who satisfies conditions set by law, including payment of a royalty to the copyright owner.  The responsibility for setting the terms and rates of these statutory royalties is entrusted in the Copyright Royalty Board, a permanent panel of three judges who sit in staggered, six-year terms.  *See* Copyright Royalty and Distribution Reform Act of 2004, Pub. L. No. 108-419, 118 Stat. 2341 (codified at 17 U.S.C. § 801 *et seq.*).

This case involves the royalty rates previously set by the Copyright Royalty Board for the digital transmission of "sound recordings."  A sound recording is one of two copyrighted works found in musical recordings:  while the "musical work" copyright covers the underlying musical composition—the song notes and lyrics—the "sound recording" is what results when that musical work is performed by a particular artist and the ensuing "series of musical, spoken, or other sounds" is fixed in a recording medium.  17 U.S.C. § 101.

Prior to 1995, federal copyright law did not grant copyright owners the exclusive right to publicly perform sound recordings.  *See* 17 U.S.C. §§ 106(4), 114(a) ("The exclusive rights of the owner of copyright in a sound recording . . . do not

include any right of performance under section 106(4).").  As a consequence, copyrighted sound recordings could be broadcast over the radio without infringing the exclusive rights of the owner of the sound recording.  *Id.* § 114.  Only a license to perform the underlying musical work was required.

In 1995, however, Congress became concerned that emerging digital technologies threatened to "adversely affect sales of sound recordings and erode copyright owners' ability to control and be paid for use of their work."  H.R. Rep. No. 104-274, at 13 (1995).  Accordingly, Congress enacted the Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-39 § 2, 109 Stat. 336, 336 (1995), which granted owners of copyrighted sound recordings the exclusive right "to perform the copyrighted work publicly by means of a digital audio transmission," 17 U.S.C. §§ 106(6), 114(d).

In addition to creating an exclusive digital performance right for sound recordings, Congress created a new statutory license for certain types of digital music services—including, as relevant here, for noninteractive subscription-based digital audio transmissions, such as those provided at the time by appellee Muzak.  *See* 17 U.S.C. § 114(d)(2).  Congress further directed that the rates and terms of this license would be set by the Copyright Royalty Board's predecessor in adversarial proceedings that occur every five years.  *Id.* § 114(f).  Those rates, Congress instructed, must be calculated in a manner that would achieve four broadly stated statutory objectives.  *See id.* § 801(b)(1).

The first ratemaking proceeding for this new statutory license began in 1996. At its conclusion, the Copyright Royalty Board's predecessor determined that the "best way to achieve the four statutory objectives was to set a low rate favoring the Services" that transmitted the sound recordings. Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings, 63 Fed. Reg. 25,394, 25,406 (May 8, 1998).

Shortly thereafter, Congress enacted the Digital Millennium Copyright Act, which, among other things, altered the standard used to calculate reasonable royalty rates for the digital performance of sound recordings under the statutory license. Instead of using the four objectives stated in Section 801(b)(1), Congress directed that the rates set for this statutory license should reflect those rates that "would have been negotiated in the marketplace between a willing buyer and a willing seller"—a standard far more favorable to copyright owners. 17 U.S.C. § 114(f)(2)(B); Digital Millennium Copyright Act, Pub. L. No. 105-304 § 405(a), 112 Stat. 2860, 2896 (1998).

In creating this higher standard, however, Congress allowed certain "preexisting subscription services" to continue to pay rates that were set under the four-factor standard that previously governed. See 17 U.S.C. § 114(f)(1)(B). Congress defined the term "preexisting subscription service" to mean any

> service that performs sound recordings by means of noninteractive audio-only subscription digital audio transmissions, which was in existence and was making such transmissions to the public for a fee on or before July 31, 1998.

4

*Id.* § 114(j)(11); *see also* H.R. Rep. No. 105-796, at 81 (1998) (Conf. Rep.), *reprinted in* 1998 U.S.C.C.A.N. 639, 657 (identifying the three "preexisting subscription services" as "DMX (operated by TCI Music), Music Choice (operated by Digital Cable Radio Associates, and the DiSH Network (operated by Muzak)").

Thus, in modern ratemaking proceedings, the Copyright Royalty Board uses different standards to set rates and terms for the two types of noninteractive subscription services that transmit sound recordings: for noninteractive subscription services that postdate the Digital Millennium Copyright Act, known as "new subscription services," the Board uses the willing buyer/willing seller standard; for preexisting subscription services, the Board uses the four statutory objectives codified in Section 801(b)(1). In practice, this means that preexisting subscription services pay royalties at substantially lower rates.

## B.    Factual Background

In 1996, the appellee, Muzak LLP, began operating a subscription music service called DishCD. JA12. The DishCD service provided subscribers to EchoStar's Dish satellite-television network with a series of music-only channels. *Id.* In doing so, Muzak became one of the first companies to use the statutory license created for companies that transmit sound recordings digitally. Because Muzak has continued to provide this subscription-based service to its customers from that time until the present, it continues to pay the preexisting subscription service rate for those transmissions. *See* 17 U.S.C. § 114(j)(11) (definition of preexisting subscription

5

service).  Muzak's competitors, by contrast, must pay the higher "new subscription service" rate for their equivalent transmissions to customers of multichannel video programming distributors like Dish.

In 2011, Muzak was purchased by Mood Media Corporation.  JA12.  Mood Media also acquired Muzak's competitor, DMX, a company that, since 2010, provided music to the multichannel video programming distributor DirecTV through its subscription service, "SonicTap."  JA13.  Prior to its acquisition, DMX paid the higher "new subscription service" rate for its transmissions.  *Id.*  After Mood Media acquired both companies, however, Muzak acquired the right to provide DMX's consumer offerings.  JA13–14.  Subsequently, Muzak informed SoundExchange of its intention to pay the lower preexisting subscription service rate for *all* of its transmissions to multichannel video program distributors.  JA19.  Thus, since May 2014, Muzak has been paying royalties for the offerings it acquired from DMX at the lower, grandfathered royalty rates, rather than the new subscription service rate that DMX originally paid.  *Id.*

## C.    Prior Proceedings

In April 2015, SoundExchange—the nonprofit entity designated by the Copyright Royalty Board to collect and distribute digital performance royalties, *see* 37 C.F.R. §§ 380.4, 382.2, 382.11, 382.13; *cf.* 17 U.S.C. § 114(g)—sued Muzak under the Copyright Act in the United States District Court for the District of Columbia, claiming that Muzak had underpaid royalties for those consumer offerings it had

6

obtained from DMX.  According to SoundExchange, Muzak's newly acquired

transmissions did not qualify for the preexisting subscription license, and accordingly,

Muzak needed to pay for those transmissions under the higher, new subscription

service rate.  JA 15–16.  The district court dismissed the complaint, concluding that,

under 17 U.S.C. § 114(j)(11), Muzak as a business entity was entitled to the

preexisting subscription service rate for all of the disputed transmissions.  JA69, 75–

79; *SoundExchange, Inc. v. Muzak, LLC*, 167 F. Supp. 3d 147, 151–52 (D.D.C. 2016).

This appeal followed.

    This Court held oral argument on November 9, 2016.  At the argument, the

Court asked about the procedural posture of this case.  In particular, the Court

inquired whether this dispute should initially have been presented to the Copyright

Royalty Board.  The Court subsequently ordered supplemental briefing from the

parties and invited the Copyright Royalty Board and the Register of Copyrights to file

a joint brief "addressing their jurisdiction."  November 16 Order.

## ARGUMENT

Neither the Copyright Royalty Board nor the Register of Copyrights has any direct role in the adjudication of cases such as this one—that is, private royalty-payment disputes under the copyright laws.  The function of the Copyright Royalty Board is to establish the generally applicable rates and terms for statutory licenses under the Copyright Act and, for certain statutory licenses, to make related distributions of collected royalty fees.  *See generally* 17 U.S.C. § 801.  The Board does so through public, adversarial, on-the-record proceedings, subject to the legal guidance and review of the Register of Copyrights, and publishes its determinations in the Federal Register.  Final determinations of the Board are subject to direct review in this Court.  *See id.* § 803(d).

Ratemaking proceedings before the Copyright Royalty Board do, on occasion, require the Board and the Register to decide whether particular entities have a cognizable interest in the scope or operation of a particular statutory license.  If the question in this case had arisen in that posture, the Board could properly have addressed it (or, if appropriate, referred it to the Register of Copyrights for decision).

This case, however, does not arise from a ratemaking or distribution proceeding.  Nor does it otherwise implicate the statutory authority or responsibilities of the Board or Register.  Rather, this case arises as an ordinary, private dispute over whether a particular business is entitled to take advantage of a previously established royalty rate for particular uses of copyrighted works.  It is not the function of either

8

agency to arbitrate disputes of that kind—and if they did so, they might have time for little else.  Likewise, because this case does not involve a "new type of . . . service" that did not exist prior to the most recent relevant ratemaking proceeding, the interim ratemaking procedures that Congress provided in 17 U.S.C. § 114(f)(1)(C) and § 114(f)(2)(C) do not provide a mechanism for resolving the parties' dispute.  Finally, because the legal issue in dispute is not one that either agency could address in this posture, referral under the doctrine of primary jurisdiction would be inappropriate.

## I.   Neither the Copyright Royalty Board nor the Register of Copyrights Has Authority to Resolve This Dispute Because This Case Did Not Emerge from a Ratemaking Proceeding

The Copyright Royalty Board performs an important, but limited, role in the administration of the Copyright Act.  As relevant to the issues in this dispute, once every five years, the Copyright Royalty Judges preside over adversarial proceedings designed to determine the appropriate rates and terms of royalty payments for noninteractive subscription digital audio transmission services.  *See generally* 17 U.S.C. § 803; *id.* § 804(b)(3)(A), (B).  On the basis of the administrative record assembled in those proceedings, the Judges establish the reasonable rates and terms for the statutory license.  In doing so, they may consult with the Register of Copyrights "on any matter other than a question of fact," and they must request a written decision from the Register of Copyrights resolving any "novel material question of substantive law concerning an interpretation" of the Copyright Act.  *Id.* § 802(f)(1)(B).

The dispute in this case does not concern the appropriate rates or terms for a given statutory license.  The Board has already set the appropriate rates and terms for both preexisting subscription services and new subscription services under the Section 114 statutory licenses discussed by the parties.  The Board most recently determined the appropriate rates for "preexisting subscription services" in April 2013, *see* Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 78 Fed. Reg. 23,054 (Apr. 17, 2013) (setting rates for preexisting subscription services from January 1, 2013 to December 31, 2017), and for "new subscription services" in June 2015, *see* Determination of Terms and Royalty Rates for Ephemeral Reproductions and Public Performance of Sound Recordings by a New Subscription Service, 80 Fed. Reg. 36,927 (June 29, 2015) (setting rates for new subscription services from January 1, 2016 to December 31, 2020).  The dispute in this case concerns, rather, *which* of these two established statutory rates applies to particular digital transmissions made by appellee Muzak.

As the Court noted in its November 16 Order, the Copyright Royalty Board has, on occasion, found it necessary to determine the scope of a particular statutory license in order to properly conduct the ratemaking proceedings over which it presides.  These questions arise, for example, when parties dispute which business entities have the requisite "significant interest" in a royalty rate to participate in the ratemaking proceeding.  *See* 17 U.S.C. §§ 803(b)(2)(C), 804(a).  When such questions present novel or important issues of statutory construction under the Copyright Act,

10

the Board refers them to the Register of Copyrights for decision, as it must do with any novel question of copyright law that arises during ratemaking proceedings. *See id.* § 802(f)(1)(B). That is what occurred during the 2006 ratemaking proceedings to which the Court referred in its November 16 Order. *See* Designation as a Preexisting Subscription Service, 71 Fed. Reg. 64,639 (Nov. 3, 2006).

The Copyright Royalty Board has no cause to address such questions, however, outside of the context of the ratemaking and distribution proceedings otherwise within its statutory purview. It is not, and has never been, the role of either the Copyright Royalty Board or the Register of Copyrights to adjudicate private disputes, like the current one, over whether a particular business entity is entitled to pay royalties under a particular statutory license for particular uses of copyrighted works.

Indeed, the Copyright Act does not contemplate any role for the Copyright Royalty Board in the adjudication of such private disputes. The Act specifies only one circumstance in which the Board may act outside of the context of a pending ratemaking or distribution proceeding: at any point after a final determination has been issued, the Board "may issue an amendment . . . to correct any technical or clerical errors in the determination or to modify the terms, but not the rates, of royalty payments in response to unforeseen circumstances that would frustrate the proper

implementation of such determination." 17 U.S.C. § 803(c)(4).[2] Because this case

does not involve an amendment to an issued ratemaking determination, this provision

provides no basis for the Board to address the dispute at issue here. And because the

Board has no statutory basis to adjudicate this private dispute, it cannot refer the

question to the Register of Copyrights under 17 U.S.C. § 802(f)(1)(B).[3]

The government therefore agrees that the interpretative question in this case

was appropriately presented to a district court, rather than to the Board or the

Register. Indeed, it is not uncommon for copyright owners and copyright users

litigate over the applicability of statutory licenses under the Copyright Act, and the

federal courts have frequently resolved such disputes. *See, e.g.*, *WPIX, Inc. v. ivi, Inc.*,

691 F.3d 275, 278–85 (2d Cir. 2012); *Arista Records, LLC v. Launch Media, Inc.*, 578

F.3d 148, 151–52, 157–64 (2d Cir. 2009); *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*,

265 F.3d 1193, 1198–1204 (11th Cir. 2001); *ABC, Inc. v. PrimeTime 24*, 184 F.3d 348,

351–55 (4th Cir. 1999); *Fox Television Stations, Inc. v. FilmOn X, LLC*, 150 F. Supp. 3d

---

[2] The "terms" to which the statute refers are the non-monetary terms of the statutory license. These typically concern matters such as the manner and timing of royalty payments, the treatment of late payments, and recordkeeping and reporting requirements. *See, e.g.*, Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Services, 73 Fed. Reg. 4,080, 4,100–01 (Jan. 24, 2008).

[3] Although the Copyright Office might be able to resolve the dispute through an exercise of its rulemaking authority, 17 U.S.C. § 702, by issuing a regulation of general applicability that defines the type of services that constitute preexisting subscription services under the Act, the Office has no regular practice of issuing opinions regarding whether a *specific* entity falls within the scope of a particular license.

1, 6–7 (D.D.C. 2015); *ABC, Inc. v. Aereo, Inc.*, Nos. 12-cv-1540, 12-cv-1543, 2014 WL 5393867, at *2, *3–6 (S.D.N.Y. Oct. 23, 2014); *CBS Broad., Inc. v. FilmOn.com, Inc.*, No. 10 Civ. 7532, 2014 WL 3702568, at *4–5 (S.D.N.Y. July 24, 2014); *Atlantic Recording Corp. v. XM Satellite Radio, Inc.*, No. 10 Civ. 2733, 2007 WL 136186 (S.D.N.Y. Jan. 19, 2007). Each of those cases, like this one, turned on the interpretation of provisions of the Copyright Act that the Board and Copyright Office also occasionally have reason to interpret in discharging their responsibilities under the Copyright Act. But because it is not the function of either agency to adjudicate such private disputes, each of those cases—like this one—was properly filed in federal court.

## II. The Interim Ratemaking Procedure in Section 114(f) Is Not an Appropriate Mechanism to Resolve the Issues in This Case

In its November 16 Order, the Court requested further briefing on the question whether the Copyright Royalty Board could have had authority to adjudicate this dispute if the parties petitioned for a *new* ratemaking procedure under 17 U.S.C. § 114(f)(1)(C) or § 114(f)(2)(C). Those provisions do not provide an appropriate mechanism for the Board to address the issues in this case.

Sections 114(f)(1)(C) and 114(f)(2)(C) authorize the Copyright Royalty Board to engage in interim ratemaking proceedings—that is, proceedings to establish royalty rates before the next regularly scheduled proceeding occurs. In general, the Board must determine reasonable rates and terms of royalty payments for transmissions by "preexisting subscription services" and "new subscription services" every five years.

17 U.S.C. § 114(f)(1)(A), (B); *id.* § 114(f)(2)(A), (B).  In conducting these quinquennial proceedings, the Board must "distinguish among the different types of digital audio transmission services" that are in operation at the time of the proceedings.  *Id.* § 114(f)(1)(A). This requirement reflects Congress's understanding that particular royalty rates may be reasonable for certain categories of services operating under the statutory license at a particular time (for example, for-profit businesses), yet unreasonable for others (for example, nonprofit services).

Sections 114(f)(1)(C) and 114(f)(2)(C) provide a way for parties to initiate a new ratemaking proceeding when a "new type of . . . service"—*i.e.*, one that was not in existence during the last regularly scheduled proceeding—"is or is about to become operational," and thereby allow the Board to set interim rates for that new service pending the next regular ratemaking cycle.  17 U.S.C. § 114(f)(1)(C), (f)(2)(C).  Put simply, these provisions allow the Board to determine the appropriate interim rate for a new type of digital music service that did not previously exist and for which a rate has not been previously set.  *See* 63 Fed. Reg. at 25,409 (explaining that these provisions allow "another rate-setting proceeding upon the filing of a petition" when "a new type of digital audio service . . . emerges before the next regularly scheduled rate adjustment proceeding").

No party contends that this case involves a "new type" of service for which the Copyright Royalty Board has not previously established an appropriate rate.  None of

14

the disputed transmissions by Muzak is "new" in type.  Muzak has been making the relevant transmissions to Dish Network customers for nearly twenty years, and the transmissions that it is making to other multichannel video programming distributors were previously made by DMX since as early as 2010.  All of the service "type[s]" in this case predate the most recent round of ratemaking proceedings.  As noted above, the Board last determined the appropriate rates for new subscription services and preexisting subscription services in 2015 and 2013, respectively.

Rather, SoundExchange and Muzak disagree over which of these two *already established* rates applies to the consumer offerings that have recently been acquired by Muzak.  That is not the sort of problem that Congress intended the interim ratemaking authority in Sections 114(f)(1)(C) or 114(f)(2)(C) to address.  The Board has already done its job:  it has set the governing rates for both "preexisting subscription services" and "new subscription services."  The interim ratemaking authority in Section 114(f) is not a mechanism for individual copyright users to obtain the Board's advice about which of those established rates applies to its specific business offerings. [4]

---

[4]  Participants in regularly scheduled ratemaking proceedings sometimes ask the Copyright Royalty Board to determine that their service is not the "same type" of service as another in order to argue that their service deserves a separately established (and lower) rate.  *See, e.g.*, Digital Performance Right in Sound Recordings and Ephemeral Recordings, 76 Fed. Reg. 13,026, 13,038 (Mar. 9, 2011) (describing how one party urged the Board "to recognize and set rates for two types of services" within the broader noncommercial webcaster statutory license: "small noncommercial

Indeed, Congress could not have intended the Copyright Royalty Board to adjudicate private disputes, like the present one, regarding a particular business's entitlement to invoke particular statutory licenses. Eligibility for a statutory license is valuable for copyright users because a copyright owner cannot withhold authorization for the uses it covers. If the Board entertained petitions for advisory rulings that particular business activities qualify for particular statutory licenses, it might have time for little else. Yet the regularly scheduled ratemaking and distribution proceedings that the Copyright Royalty Board conducts consume nearly all of its limited institutional resources. Not only does the Copyright Act require the Board to conduct such proceedings on a cyclical basis for a host of different statutory licenses, but it also requires the Copyright Royalty Judges to issue their detailed determinations for each proceeding on a strict timeline. *See, e.g.*, 17 U.S.C. § 803(c)(1). For these reasons, neither the Board nor the Copyright Office has understood the Copyright Act to allow private parties to seek administrative adjudication of disputes like the present one.

---

webcasters" and "very small noncommercial webcasters"). Such disputes, unlike the current one, fall within the Board's regular responsibility to distinguish among the "types" of services in existence at the time of a ratemaking proceeding. *See, e.g.*, 17 U.S.C. § 114(f)(1), (2).

16

### III.    Because Neither the Board nor the Register Can Adjudicate This Dispute in This Posture, Referral Under the Doctrine of Primary Jurisdiction Is Unwarranted

The Court's November 16 Order also directed the parties to address whether the case should be referred to the Copyright Royalty Board or the Register of Copyrights under the doctrine of primary jurisdiction. Because neither the Board nor the Register could properly address the legal issue in this case in the posture in which it arises here, referral under the doctrine of primary jurisdiction would be inappropriate.

"The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 63 (1956). It applies "where a claim is originally cognizable in the courts," but "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Id.* at 64; *see also United States v. Philip Morris USA, Inc.*, 686 F.3d 832, 837 (D.C. Cir. 2012).

For the reasons already explained, it is not the role of either the Copyright Royalty Board or the Register of Copyrights to adjudicate private disputes, like this one, over whether a particular business entity is entitled to pay royalties under a particular statutory license for particular uses of copyrighted works. Although the Board and the Register sometimes address similar questions in the context of

17

ratemaking and other proceedings under the Copyright Act, there is no such administrative proceeding here. Consequently, there is no basis for referral under the doctrine of primary jurisdiction.

The decision in *SoundExchange, Inc. v. Sirius XM Radio Inc.*, 65 F. Supp. 3d 150 (D.D.C. 2014), cited in this Court's November 16 Order, illustrates the point. That case, unlike this one, involved an interpretative dispute that the district court concluded was within the Copyright Royalty Board's "continuing jurisdiction" under 17 U.S.C. § 803(c)(4) to correct errors in prior determinations. *See* 65 F. Supp. 3d at 156–57.[5] Thus, the issue was one that could properly be presented to the Board for resolution in the exercise of its ordinary authority under the Copyright Act. By contrast, this dispute does not fall within the Copyright Royalty Board's continuing jurisdiction to amend its prior determinations, nor is there any other proper basis for action by the agencies.

---

[5] The Copyright Royalty Board subsequently referred the question whether it could exercise continuing jurisdiction in *Sirius XM* to the Register of Copyrights. The Register ultimately determined that the Board could exercise continuing jurisdiction over the question referred to it by the district court in that case because the resolution of an ambiguity in the Board's regulations fell within its authority to issue an amendment to a prior ratemaking determination in order to "correct any technical . . . errors" in that determinations. *See* Scope of the Copyright Royalty Judges' Continuing Jurisdiction, 80 Fed. Reg. 25,333, 25,334 (May 4, 2015). In contrast, as already mentioned, *see supra* Part I, this case does not involve a request to amend a previously issued ratemaking determination or to clarify the Board's existing regulations.

## CONCLUSION

For the foregoing reasons, the government agrees that this litigation was

properly commenced in the district court.

Respectfully submitted,

BENJAMIN C. MIZER
*Principal Deputy Assistant Attorney*
*General*

MARK R. FREEMAN
*/ s/ Jennifer L. Utrecht*
JENNIFER L. UTRECHT
*Attorneys, Appellate Staff*
*Civil Division, Room 7710*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, D.C. 20530*
*(202) 353-9039*
*Jennifer.L.Utrecht@usdoj.gov*

January 3, 2017

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a).  I certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Garamond, a proportionally spaced font.  I further certify that, according to the count of Microsoft Word and excluding the parts of the brief exempted under Rule 32(f), this brief contains 4,467 words, which is within the word limit set by the Court's November 16 Order.


                                          _/s/ Jennifer Utrecht_____
                                          Jennifer Utrecht
                                          Counsel for the United States

A1

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2017, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.  I further certify that paper copies of this brief were hand delivered to the Clerk's office by 12:00 noon on Tuesday, January 3, 2017, as required by the Court's November 16 Order.


*/s/ Jennifer Utrecht*

Jennifer Utrecht
Counsel for the United States

A2