# MUNGER, TOLLES & OLSON LLP

RONALD L. OLSON
ROBERT E. DENHAM
CARY B. LERMAN
GREGORY P. STONE
BRAD D. BRIAN
GEORGE M. GARVEY
WILLIAM D. TEMKO
JOHN W. SPIEGEL
DONALD B. VERRILLI, JR. P.C.
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
KATHLEEN M. M'DOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
HENRY WEISSMANN
KEVIN S. ALLRED
JEFFREY A. HEINTZ
STUART N. SENATOR
JONATHAN E. ALTMAN
KELLY M. KLAUS
LISA J. DEMSKY
MALCOLM A. HEINICKE
JAMES C. RUTTEN
RICHARD ST. JOHN
ROHIT K. SINGLA
CAROLYN HOECKER LUEDTKE
KATHERINE M. FORSTER
BLANCA FROMM YOUNG
SETH GOLDMAN
GRANT A. DAVIS-DENNY
JONATHAN H. BLAVIN
DANIEL B. LEVIN
MIRIAM KIM
HAILYN J. CHEN
BETHANY W. KRISTOVICH
JACOB S. KREILKAMP
JEFFREY Y. WU
LAURA D. SMOLOWE
HEATHER E. TAKAHASHI
ERIN J. COX
BENJAMIN J. HORWICH
BRYAN H. HECKENLIVELY
ELAINE J. GOLDENBERG P.C.
GINGER D. ANDERS P.C.
MARGARET G. MARASCHINO
JOHN M. GILDERSLEEVE
ADAM B. WEISS
JEREMY A. LAWRENCE
ACHYUT J. PHADKE
ZACHARY M. BRIERS

KURUVILLA J. OLASA
JUSTIN P. RAPHAEL
ROSE LEDA EHLER
JOHN W. BERRY
ROBYN K. BACON
JORDAN D. SEGALL
JONATHAN KRAVIS P.C.
JOHN L. SCHWAB
EMILY C. CURRAN
L. ASHLEY AULL
WESLEY T.L. BURRELL
CRAIG JENNINGS LAVOIE
JENNIFER L. BRYANT
NICHOLAS D. FRAM
VINCENT LING
LAUREN BELL P.C.
VICTORIA A. DEGTYAREVA
JOHN B. MAJOR
RACHEL G. MILLER-ZIEGLER P.C.
FAYE PAUL TELLER
STEPHANIE G. HERRERA
JULIANA M. YEE
LAUREN C. BARNETT
NICK R. SIDNEY
SKYLAR B. GROVE
LAURA M. LOPEZ
COLIN A. DEVINE
DANE P. SHIKMAN
MAGGIE THOMPSON
SAMUEL H. ALLEN
ALLISON M. DAY
GIOVANNI S. SAARMAN GONZÁLEZ
SARA A. McDERMOTT
J. MAX ROSEN
ANNE K. CONLEY
DAVID W. MOREHEAD
ROWLEY J. RICE
LAUREN E. ROSS
BENJAMIN G. BAROKH
ABE DYK
MEGAN MCCREADIE
RAQUEL E. DOMINGUEZ
ARIEL TESHUVA
SHANNON GALVIN AMINIRAD
XIAONAN APRIL HU
CARRIE C. LITTEN
JAMES R. SALZMANN
SEAN P. BARRY
MICHAEL I. SELVIN
HUNTER V. ARMOUR
NATHANIEL F. SUSSMAN

OLIVER BROWN
PAUL E. MARTIN
MATTHEW MIYAMOTO
ANDREA LIM
REBECCA L. SCIARRINO
CORY M. BATZA
BRIAN R. BOESSENECKER
ROBERT E. BOWEN
RICHARD T. JOHNSON
GRACE DAVIS FISHER
LAUREN N. BECK
CALEB W. PEIFFER
GREGORY T. S. BISCHOPING
JAMIE GIGUIRI
STEVEN B. R. LEVICK
JANELLE KRUMMEN
WILLIAM M. ORR
GABRIEL M. BRONSHTEYN
JING JIN
ALEX C. WERNER
ROSIO FLORES ARRIAGA
JESSICA O. LAIRD
ERICA C. TOOCH
SARAH E. WEINER
EVAN MANN
ANDREW T. NGUYEN
NATALIE G. MOYCE
RACHEL M. SCHIFF
MIRANDA E. REHAUT
STEPHANY REAVES
LAUREN E. KUHN
J. KAIN DAY
GARRETT SOLBERG
TED RANG
ADAM W. KWON
JOSEPH M. GLYNN
SIMON K. ZHEN
CARSON J. SCOTT
CHRISTOPHER B. CRUZ
MATTHEW W. LINSLEY
ADEEL MOHAMMADI
TAYLOR L. BENNINGER
LORRAINE L. ABDULAHAD
CLARE KANE
SIDNEY M. EISNER
HELEN ELIZABETH WHITE
KATHLEEN FOLEY
ALISON A. DOYLE
FELIPE DE JESÚS HERNÁNDEZ
JASON D. WEISS
HENRY D. SHREFFLER

MILES W. UNTERREINER
LYNDSEY FRANKLIN
ANDREW DELAPLANE
ARIELLA PARK
LAURA R. PERRY
NATASHA GEILING
JOSEPH MANTEGANI
GRAHAM J. WYATT
WESLEY P. DEVOLL
LAUREN A. BILOW
ROMAN LEAL
KAYSIE GONZALEZ
AMANDA HARRIS
ALEXIS D. CAMPBELL
KYRA E. SCHOONOVER
WENDY O. XIAO
DANIEL KANE
ADITI NARESH GHATLIA
ALBERTO J. DE DIEGO HABELL
KYLE A. SCHNEIDER
PRISCILA E. CORONADO
CARL H. JIANG
JEREMY P. LARIN
BOBBY H. KIM
CLAIRE I. ROGERSON
EDUARDO A. GONZALEZ
GRACE ORDONEZ
LIAM GENNARI
CHARLES LAM
MICHAEL X. WEI
MAGGIE BUSHELL
REBECCA J. HANSEN
CONNOR HOGE
SARAH M. PFANDER
ELIZABETH ANASTASI
KEVIN HAN YANG

OF COUNSEL

PATRICK J. CAFFERTY, JR.
PETER A. DETRE
BRADLEY R. SCHNEIDER
PETER E. GRATZINGER
ADAM R. LAWTON
SARAH J. COLE

SEE MTO.COM FOR
JURISDICTIONS OF ADMISSION

350 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-3426
TELEPHONE (213) 683-9100

———

560 MISSION STREET
SAN FRANCISCO, CALIFORNIA 94105-3089
TELEPHONE (415) 512-4000

———

601 MASSACHUSETTS AVENUE NW
SUITE 500E
WASHINGTON, D.C. 20001-5369
TELEPHONE (202) 220-1100

December 10, 2024

Writer's Direct Contact
(213) 683-9273
(213) 683-5171 FAX
Adam.Weiss@mto.com

**Via ECF**

The Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
500 Pearl St.
New York, NY 10007-1312

Re:    SoundExchange, Inc. v. Sirius XM Radio, Inc.,
       No. 1:24-cv-5491 (NRB)

Dear Judge Buchwald:

Pursuant to Local Civil Rule 7.1(d) and Sections 1 and 2 of Your Honor's Individual Practices, I write on behalf of the American Association of Independent Music, the American Federation of Musicians of the United States and Canada, the Recording Industry Association of America, and the Screen Actors Guild – American Federation of Television and Radio Artists to request leave to file a brief as *amici curiae* in support of plaintiff SoundExchange, Inc.'s opposition to defendant Sirius XM Radio, Inc.'s Motion for Judgment on the Pleadings.  *See* ECF Nos. 61, 70.  The proposed brief is attached as Exhibit A.  Counsel for Sirius has advised that Sirius does not consent to this request.

"A district court has broad discretion in deciding whether to accept an *amicus* brief."  *City of New York v. United States*, 971 F. Supp. 789, 791 n.3 (S.D.N.Y. 1997), *aff'd* 179 F.3d 29 (2d Cir. 1999).  "The primary role of the *amicus* is to assist the Court in reaching the right decision in a case affected with the interest of the general public."  *Russell v. Bd. of Plumbing Exam'rs*, 74

MUNGER, TOLLES & OLSON LLP

The Honorable Naomi Reice Buchwald
December 10, 2024
Page 2

F. Supp. 2d 349, 351 (S.D.N.Y. 1999).  Accordingly, district courts generally accept amicus briefs when a case has potential ramifications for *amici*'s interests or when *amici* have "unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *C & A Carbone, Inc. v. Cnty. of Rockland, N.Y.*, 2014 WL 1202699, at *3 (S.D.N.Y. Mar. 24, 2014) (citation omitted); *see, e.g.*, *Leslie v. City of New York*, 2023 WL 2612688 (S.D.N.Y. Mar. 23, 2023) (Buchwald, J.); *Planned Parenthood of N.Y.C., Inc. v. HHS*, 337 F. Supp. 3d 308 (2018) (Buchwald, J.).

*Amici* are trade organizations and labor unions that together represent the businesses and performers entitled by statute to the royalties at the heart of this important case.  *Amici* are therefore uniquely positioned to assist the Court in understanding how the royalty scheme Congress created in 17 U.S.C. § 114 works in practice.  In the attached brief, *amici* offer insight not only into the structure and history of Section 114 but also into the absurd on-the-ground consequences and serious practical harms for *amici*'s members that would follow if, as Sirius asserts, Section 114 does not give SoundExchange a cause of action to remedy underpayment.

This motion is filed eight days before Sirius's reply brief is due on December 18, 2024.  Sirius therefore will have a full opportunity to engage with *amici*'s arguments without delaying these proceedings.  *See, e.g.*, *C & A Carbone*, 2014 WL 1202699, at *4.

For the foregoing reasons, *amici* respectfully request that this Court grant leave to file the attached brief.

Respectfully submitted,

/s/ *Adam B. Weiss*
Adam B. Weiss

cc:    All counsel (via ECF)

Application granted.  *Amici* are granted
leave to file the attached brief.
**So ordered.**

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Dated: December 13, 2024
       New York, New York

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

SOUNDEXCHANGE, INC.,

                    *Plaintiff*,

      v.

SIRIUS XM RADIO, INC.,

                    *Defendant*.

Civil Action No. 1:24-cv-5491 (NRB)

**BRIEF OF *AMICI CURIAE* AMERICAN ASSOCIATION OF INDEPENDENT MUSIC, AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA, RECORDING INDUSTRY ASSOCIATION OF AMERICA, AND SCREEN ACTORS GUILD – AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S <u>MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ..................................................................................1

INTRODUCTION ........................................................................................................3

ARGUMENT ................................................................................................................4

I.    The Text, Structure, and History of the Copyright Act All Demonstrate That SoundExchange Has a Cause of Action to Remedy Underpayment ...................................4

II.    Construing Section 114 to Deny SoundExchange a Cause of Action for Underpayment Would Create Absurd Results ....................................8

III.    Sirius's Theory, if Accepted, Would Gravely Harm the Music Industry and the Public ..................................16

CONCLUSION..............................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alexander v. Sandoval,*
    532 U.S. 275 (2001)................................................................4

*Bruesewitz v. Wyeth LLC,*
    562 U.S. 223 (2011)................................................................7

*King v. Burwell,*
    576 U.S. 473 (2015)................................................................8

*Kirtsaeng v. John Wiley & Sons, Inc.,*
    579 U.S. 197 (2016)................................................................17

*Oxford Univ. Bank v. Lansuppe Feeder, LLC,*
    933 F.3d 99 (2d Cir. 2019)................................................................4

*Pub. Citizen v. U.S. Dep't of Justice,*
    491 U.S. 440 (1989)................................................................8

*Pugin v. Garland,*
    599 U.S. 600 (2023)................................................................8

*Robers v. United States,*
    572 U.S. 639 (2014)................................................................8

*Soliman v. Subway Franchisee Advert. Fund Tr. Ltd.,*
    101 F.4th 176 (2d Cir. 2024)................................................................8

*United States v. Venturella,*
    391 F.3d 120 (2d Cir. 2004)................................................................8

*USV Pharm. Corp. v. Weinberger,*
    412 U.S. 655 (1973)................................................................8

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Article 1, § 8, cl. 8................................................................17

**FEDERAL STATUTES**

17 U.S.C. § 114................................................................ 2, *passim*

17 U.S.C. § 114(d)................................................................5

17 U.S.C. § 114(f)................................................................10

17 U.S.C. § 114(f)(3)(B)(i)................................................................11

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

17 U.S.C. § 114(g)(2) ................................................................................................10

17 U.S.C. § 114(g)(2)(A) ...........................................................................................10

17 U.S.C. § 114(g)(2)(B)-(D) ...............................................................................10, 16

17 U.S.C. § 114(g)(3) .........................................................................................5, 11, 17

17 U.S.C. § 114(g)(3)(C) ........................................................................................6, 10

17 U.S.C. § 115 ..................................................................................................7, 8, 13

17 U.S.C. § 115(d)(3)(C)(i)(VIII) ...............................................................................7

17 U.S.C. § 115(d)(3)(G)(ii) ........................................................................................7

17 U.S.C. § 115(d)(6)(C) ..............................................................................................7

17 U.S.C. § 115(e)(6)(A)(5) ........................................................................................7

17 U.S.C. § 411(a) .....................................................................................................11

17 U.S.C. § 501(b) .....................................................................................................10

Orrin G. Hatch–Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264,
§ 102(a)(4), 132 Stat. 3676 (2018) ................................................................7, 13

Small Webcaster Settlement Act of 2002, Pub. L. No. 107-321, § 5(a)(3), (b), (c),
116 Stat. 2780 (2002) .....................................................................................6, 7

**FEDERAL REGULATIONS**

37 C.F.R. § 370.4(c) ..................................................................................................12

37 C.F.R. § 380.4(d)(1) ...............................................................................................5

37 C.F.R. § 380.6(a) ..................................................................................................12

37 C.F.R. § 382.3(a) ..................................................................................................12

37 C.F.R. § 382.4(a) ..................................................................................................12

37 C.F.R. § 382.5(a)(1) ..............................................................................................12

37 C.F.R. § 382.5(d)(1) ................................................................................................5

**TABLE OF AUTHORITIES**
**(continued)**

37 C.F.R. § 382.7(a) ................................................................................12

37 C.F.R. § 382.21(a) ..............................................................................12

**LEGISLATIVE MATERIALS**

148 Cong. Rec. H7047 (daily ed. Oct. 7, 2002) .....................................15

H.R. Rep. No. 115-651 (2018) ...............................................................7, 8

H.R. Rep. No. 104-274 (1995) ................................................................10

S. Rep. No. 101-305 (1990) .....................................................................13

S. Rep. No. 104-128 (1995) .......................................................................6

S. Rep. No. 115-339 (2018) .....................................................................15

**OTHER AUTHORITIES**

2 Nimmer on Copyright § 7.16[A][1] (2024) .........................................11

2 Nimmer on Copyright § 8.22[D][2] (2024) ...........................................7

2 Nimmer on Copyright § 8.35[C] (2024) ................................................8

Amy X. Wang, *The $1 Billion Waiting for Artists Who Know Where to Look*,
    Rolling Stone (Mar. 27, 2019) .........................................................11

Ben Sisario, *Rise of SoundExchange Shows the Growth of Digital Radio
    Royalties*, N.Y. Times (Aug. 4, 2015) .............................................16

*Black's Law Dictionary* (12th ed. 2024) ..............................................5, 6

*Determination of Rates and Terms for Preexisting Subscription Services and
    Satellite Digital Audio Radio Services*,
    82 Fed. Reg. 56,725 (Nov. 30, 2017) .................................................9

*Determination of Reasonable Rates and Terms for the Digital Performance of
    Sound Recordings and Ephemeral Recordings*,
    67 Fed. Reg. 45,240 (July 8, 2002) ...............................................6,15

*Determination of Royalty Rates (SDARS III)*,
    83 Fed. Reg. 65,210 (Dec. 19, 2018) .............................................9, 18

**TABLE OF AUTHORITIES**
(continued)

*Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 72
    Fed. Reg. 24,084 (May 1, 2007) ............................................................12

Joseph Story, III *Commentaries on the Constitution of the United States* (1833) ........................17

Shyamkrishna Balganesh, *Copyright Infringement Markets*,
    113 Colum. L. Rev. 2277 (2013) .............................................................13

Travis M. Andrews, *In the Spotify Era, Many Musicians Struggle To Make A
Living*, Wash. Post (Feb. 4, 2023) .............................................................16

U.S. Copyright Off., *Copyright and the Music Marketplace* (Feb. 2015) ................................8, 13

U.S. Recorded Music Revenues by Format, U.S. Music Revenue Database,
    RIAA, https://www.riaa.com/u-s-sales-database/ ....................................16

*Webster's Third New International Dictionary* (2002) .................................................6

What We Do, SoundExchange, https://www.soundexchange.com/what-we-
do/#products-and-services ....................................................................16

## INTEREST OF *AMICI CURIAE*[1]

The American Association of Independent Music ("A2IM") is a 501(c)(6) nonprofit trade organization representing a broad coalition of over 550 independently owned U.S. music labels across 35 states. A2IM's members are small and medium-sized music enterprises. A2IM's membership includes music labels of varying sizes within that category across the United States, representing musical genres as diverse as its membership. Independent does not mean just small artists. For example, A2IM member labels have issued music releases by artists including Taylor Swift, Adele, and Tim McGraw. Stars like Phoebe Bridgers, Fontaines D.C., and Shemekia Copeland are releasing music on indie labels today. Some indie artists' tracks are distributed by major recording companies, but independent labels own the sound recordings and retain the right, as labels, to license the recordings and collect revenues stemming from noninteractive digital performances in the United States.

The American Federation of Musicians of the United States and Canada ("AFM") is the largest union in the world representing professional musicians, with over 70,000 members in the United States and Canada. Musicians represented by AFM record music for sound recordings, movie soundtracks, commercials, and television and radio programming, as both featured and session musicians. AFM works to protect the economic interests of musicians and to give them a voice in cultural and policy debates that affect them at home and abroad.

The Recording Industry Association of America ("RIAA") is a 501(c)(6) nonprofit trade organization that supports and promotes the creative and financial vitality of recorded music and the people and companies that create it. The RIAA's several hundred members—ranging from

---

[1] No party or counsel for any party authored this brief in whole or in part, and no person other than *amici* or their counsel made any monetary contribution intended to fund the preparation or submission of this brief.

small artist-owned labels to global music businesses—make up this country's most vibrant and innovative music community. RIAA members create, manufacture, and/or distribute sound recordings representing the majority of all legitimate recorded music consumption in the United States, and own copyrights and/or other exclusive rights in sound recordings embodying the performances of some of the most popular and successful recording artists of all time. In support of its members, the RIAA works to protect the intellectual property rights of artists and music labels.

The Screen Actors Guild – American Federation of Television and Radio Artists ("SAG-AFTRA") is a national labor union representing approximately 160,000 recording artists and vocalists, as well as actors, announcers, broadcasters, and other media professionals. SAG-AFTRA exists to secure the strongest protection for media artists in sound recordings, motion pictures, television, and most other forms of media, including all forms of digital media.

*Amici* and their members have a powerful interest in the proper resolution of this case. Defendant Sirius XM Radio Inc. ("Sirius") advances an unprecedented interpretation of 17 U.S.C. § 114 that could lead to the systematic underpayment of copyright owners and artists. That interpretation would work a grave harm to *amici*'s members who, by statute, receive the vast majority of licensing proceeds under Section 114, whether directly from Plaintiff SoundExchange, Inc., or through the AFM & SAG-AFTRA Intellectual Property Rights Distribution Fund. The harm would be particularly acute for indie record companies and the many artists who may not be household names but whose livelihoods depend on statutory royalties.

In short, *amici* represent the businesses and performers who bring American music to life. Without just compensation for their recorded performances, there would be no sound recording industry as we know it.

## INTRODUCTION

Section 114 of the Copyright Act requires Sirius to pay royalties to copyright owners and performers in exchange for the right to transmit sound recordings.  Rather than requiring Sirius to negotiate individual licenses with a multitude of copyright owners, who might refuse to issue such licenses, Congress allowed it to benefit from a blanket compulsory license and pay only SoundExchange—thus obviating the need for licensing negotiations.  And rather than requiring Sirius to distribute payments to half a million individual copyright owners and performers, Congress placed that burden on SoundExchange.  Congress thus designed a scheme that would substantially reduce transaction costs by allowing a collective to act on behalf of copyright owners and performers.

Now, long after Congress built this scheme of collective administration and payment, Sirius asks this Court to hold that Congress chose not to give SoundExchange a cause of action to collect any underpayments of royalties by statutory licensees like Sirius.  That is a remarkable argument.  The text, structure, and history of the statute all strongly support the conclusion that SoundExchange has a cause of action to remedy underpayment.  Indeed, the statute at issue *expressly refers* to SoundExchange's power to enforce the royalty rights of the copyright owners and performers it represents.  And Sirius's theory, if accepted, would have absurd on-the-ground consequences, effectively allowing Sirius to evade royalty payments that Congress has clearly required Sirius to make while allowing Sirius to continue performing any of millions of sound recordings.  That result, in turn, would destabilize a vast segment of the music industry.  The Court should deny Sirius's effort to enjoy the great benefits of the statutory scheme without bearing its concomitant burdens.

3

**ARGUMENT**

## I.    The Text, Structure, and History of the Copyright Act All Demonstrate That SoundExchange Has a Cause of Action to Remedy Underpayment

Congress gave SoundExchange a cause of action to recover unpaid royalties.  As SoundExchange explains, *see* ECF No. 70 ("SoundExchange Br.") at 7-23, that conclusion follows from a straightforward application of the Second Circuit's three-part test for assessing whether Congress intended to provide a private right of action.  And the same is true if this Court assesses whether a private right of action exists by using more general tools of statutory interpretation that are discussed and applied in recent Supreme Court decisions.

In determining whether Congress has created a private cause of action to enforce federal law, "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  No magic words are necessary; even where a statute does not "expressly state[]" that a party has a right of action, the statute may "presuppose[]" one. *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 105 (2d Cir. 2019); *see id.* at 106 (Congress may intend to create an implied cause of action even where Congress has expressly provided for a cause of action elsewhere in a statute).  Ultimately, "'[s]tatutory intent . . . is determinative.'"  *Id.* at 104 (quoting *Sandoval*, 532 U.S. at 286).  The inquiry "begins with the text and structure of the statute," *Sandoval*, 532 U.S. at 288 n.7, and also considers legislative history, *see Oxford Univ. Bank*, 933 F.3d at 107.

That inquiry reveals that Congress intended to give SoundExchange a cause of action to remedy underpayment.  To start, Section 114 "presupposes" such a cause of action.  *Oxford Univ. Bank*, 933 F.3d at 105.  The statute creates a compulsory license for noninteractive satellite radio service providers (*e.g.*, Sirius) and webcasters (*e.g.*, Pandora) that digitally transmit copyrighted

sound recordings.  17 U.S.C. § 114(d).  That license allows Sirius to transmit any artist's sound recording.  *See id.* § 114(f)(3)(B).  At the same time, the statute gives copyright owners and artists—who often are not copyright owners—individual rights to royalties based on rates set by the Copyright Royalty Board ("CRB").  *Id.* § 114(f)(1)(B), (g)(2).  To facilitate the collection of royalties from licensees like Sirius and the corresponding distribution of royalties to copyright owners and artists, the statute authorizes the CRB to designate a nonprofit collective responsible for "collection, distribution, and calculation of [statutory] royalties."  *Id.* § 114(g)(3).  The CRB has designated Plaintiff SoundExchange to carry out that responsibility.  *See, e.g.*, 37 C.F.R. §§ 380.4(d)(1), 382.5(d)(1).  The statute thus creates a scheme of collective licensing, rate setting, collection, and distribution.

Fittingly, then, the statute also contemplates collective enforcement for underpayment of the compulsory license rate—and it does so expressly.  Under Section 114, SoundExchange may deduct from its distributions to copyright owners and artists the costs it incurs not only in calculating, collecting, and distributing royalties but also in "the settlement of disputes relating to the collection and calculation of the royalties" and "the licensing and enforcement of rights" established in Section 114.  17 U.S.C. § 114(g)(3).  Congress thus anticipated a collective that would have the right to "collect" royalties through "enforcement."  *Id.*

Sirius acknowledges that the statute contemplates that SoundExchange will "enforce[]" royalty rights, yet argues that Congress used the term "enforcement" to refer to activities other than lawsuits, such as negotiations with licensees, audits of licensees, and efforts to "bring[] awareness of potential underpayments to copyright holders."  ECF No. 62 ("Sirius Br.") at 15.  But those activities are at most *precursors* to enforcement; the activities do not *constitute* "enforcement" because they do not "compel[] compliance with" the statutory license.  *Black's Law*

*Dictionary* (12th ed. 2024) (defining "enforcement"); *see Webster's Third New International Dictionary* 751 (2002) (defining "enforcement" as "the compelling of the fulfillment (as of a law or order)"). By using the term "enforcement of rights" and allowing SoundExchange to recoup its own enforcement costs, Congress plainly intended SoundExchange's authority to extend to actual enforcement rather than simply to activities that, at most, allow SoundExchange to *learn* of underpayment. *See* 17 U.S.C. § 114(g)(3)(C).

The structure and legislative history of Section 114 and its surrounding provisions also support the conclusion that SoundExchange has the right to bring a lawsuit to satisfy its "enforcement" responsibilities. In 1995, when creating the statutory license in Section 114, Congress recognized that, given the sheer volume of copyright owners, collective negotiations over the royalties due under that license would be "important to help effectuate" the license, S. Rep. No. 104-128, at 28 (1995), thereby "eliminat[ing] the usual transaction costs associated with negotiating separate licenses with each of the copyright owners," *Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings*, 67 Fed. Reg. 45,240, 45,245 (July 8, 2002). But it soon became clear that difficulties would arise even once rates were set: "[a]s a practical matter," services like Sirius could not realistically "identify, locate and pay each individual [c]opyright [o]wner whose works it performed." 67 Fed. Reg. at 45,266. The Copyright Office therefore appointed SoundExchange "to receive and distribute all royalties," thereby "maximiz[ing] administrative efficiencies" for copyright owners, performers, and licensees alike. *Id.* at 45,266-67. Shortly thereafter, in 2002, Congress revised Section 114 to codify that approach, specifying the procedures under which a collective would distribute royalties and, in particular, deduct from its receipts costs incurred in "enforc[ing]" rights. Small Webcaster Settlement Act of 2002, Pub. L. No. 107-321, § 5(a)(3),

(b), (c), 116 Stat. 2780, 2784 (2002).  Congress thus recognized SoundExchange's enforcement power precisely when it recognized SoundExchange's critical role in reducing the transaction costs Section 114 would otherwise create.  *See* 2 Nimmer on Copyright § 8.22[D][2] & n.350 (2024).

Sirius suggests that the subsequent legislative history of a *different* provision that governs *different* rights held by *different* participants in the music ecosystem—Congress's 2018 amendments to 17 U.S.C. § 115 providing an express cause of action in certain limited circumstances for the collective responsible for administering licenses for nondramatic musical works, *see* Orrin G. Hatch–Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264, § 102(a)(4), 132 Stat. 3676, 3706 (2018)—illustrates that Congress for some unexplained reason intentionally omitted a cause of action in Section 114.  *See* Sirius Br. 9.  That is backwards.  Congress's 2018 amendments to Section 115 say nothing about Congress's intent in *earlier* enacting Section 114 and amending that statute (more than a decade before making the Section 115 amendments) to recognize SoundExchange's enforcement power, as "post-enactment legislative history by definition could have had no effect on the [original] congressional vote." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011) (citation omitted).  In addition, the provision Sirius cites is inapposite, as it addresses a distinct scheme to collect "administrative assessment[s]" from entities that do not operate under a compulsory license.  17 U.S.C. § 115(d)(6)(C).  To the extent that Section 115 addresses a collective's role in enforcing royalty rights, that provision— like Section 114—provides an implicit yet unmistakable right of action.  *See id.* § 115(d)(3)(C)(i)(VIII), (d)(3)(G)(ii), (e)(6)(A)(5).

That congruity is intentional.  As the committee report accompanying the 2018 bill explained, SoundExchange had by that time "gained widespread industry support with its efforts to efficiently distribute webcasting royalties to copyright owners and artists."  H.R. Rep. No. 115-

651, at 16 (2018); *see* U.S. Copyright Off., *Copyright and the Music Marketplace* 6-7 (Feb. 2015) ("One of the few things that seems to be working reasonably well in our licensing system is the statutory license regime under sections 112 and 114."). Congress therefore sought to "duplicate[]" SoundExchange's efficiency in administration—as well as the "culture of transparency" it had fostered—through "the new mechanical licensing collective." H.R. Rep. No. 115-651, at 16; *accord* 2 Nimmer on Copyright § 8.35[C] (2024). Accordingly, there is no reason why Congress would have wanted to treat the collectives described in Sections 114 and 115 differently with respect to the enforcement of royalty rights.

## II.    Construing Section 114 to Deny SoundExchange a Cause of Action for Underpayment Would Create Absurd Results

Sirius suggests that arguments concerning the consequences of its statutory interpretation are impermissible "policy" considerations. Sirius Br. 20-21. That is incorrect. It is a basic canon of statutory interpretation that statutes should be interpreted to avoid "absurd results." *United States v. Venturella*, 391 F.3d 120, 126-27 (2d Cir. 2004). Moreover, because statutes are designed to "cure specific ills," *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 453 (1989), courts routinely consider whether the consequences of a particular interpretation would undermine the statute's purpose, *see, e.g.*, *King v. Burwell*, 576 U.S. 473, 488 & n.1 (2015); *Robers v. United States*, 572 U.S. 639, 644 (2014); *Soliman v. Subway Franchisee Advert. Fund Tr. Ltd.*, 101 F.4th 176, 183 (2d Cir. 2024). In other words, courts should not attribute "a self-defeating purpose to the Congress." *USV Pharm. Corp. v. Weinberger*, 412 U.S. 655, 665 (1973); *accord, e.g.*, *Pugin v. Garland*, 599 U.S. 600, 607 (2023).

Here, Sirius's interpretation would have absurd results and would undermine Congress's purposes given that the appropriate payment of royalties under Section 114 functions as a practical matter *because of* enforcement by SoundExchange. Congress enacted and later amended Section

8

114 to create a functional license and royalty collection and distribution system.  If Sirius were correct that Section 114 does not authorize SoundExchange to enforce rights to royalty payments by bringing suits to remedy underpayment, Congress's efforts could be seriously undermined, as the statute would not only impose vast transaction costs whenever payment disputes arise but also encourage licensees like Sirius to shirk royalty payments.  That is so because, under Sirius's approach, there would be no viable means of enforcement either by the government or by those who are not owners of a right under a copyright, and copyright owners would face substantial practical obstacles to enforcement.

1.  *No viable government enforcement.*  Sirius does not suggest that the CRB or the Copyright Office could enforce the right to collect statutory royalties—and both entities have expressly stated that they lack any ability to do so.  *See Determination of Royalty Rates (SDARS III)*, 83 Fed. Reg. 65,210, 65,263 (Dec. 19, 2018); *Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services*, 82 Fed. Reg. 56,725, 56,727 (Nov. 30, 2017).  Notably, Sirius itself has previously explained that the CRB lacks any such authority.  *See* SoundExchange Br. 16 & n.13.

2.  *No viable enforcement by those who are not owners of a right under a copyright*.  Sirius also does not suggest that, absent enforcement by SoundExchange through court actions like this lawsuit, there would be any viable way for people who are entitled to royalties but who are not owners of a right under a copyright to enforce their entitlement to be paid the full amount of royalties that they are owed.

Sirius's only suggestion for an alternative means of enforcement is that "copyright holders" and "owners" who possess the copyrights in works that Sirius digitally performs can "protect their *own* interests" in litigation by "su[ing]" for "underpayments."  Sirius Br. 15, 21-22.  But as

SoundExchange explains, *see* SoundExchange Br. 17, many of those entitled to statutory royalties are not copyright owners. Indeed, only *half* of the royalties provided for in Section 114 go to copyright owners as such. *See* 17 U.S.C. §§ 501(b), 114(g)(2)(A). The other half go to featured artists and nonfeatured musicians and vocalists, *id.* § 114(g)(2)(B)-(D), who usually are not copyright owners themselves, *see* H.R. Rep. No. 104-274, at 23-24 (1995).

Sirius does not suggest that those artists, musicians, and vocalists would have any recourse if Sirius decided to significantly underpay the royalties that were owed—which cannot be what Congress intended in awarding those individuals a substantial portion of the royalties for digital performances or in establishing complex rate-setting proceedings before the CRB. *See* 17 U.S.C. § 114(f), (g)(2). Absent any rights under a copyright, an underpaid artist *cannot* bring a copyright infringement suit as a means of trying to obtain money owed in royalties, *see id.* § 501(b)—even assuming that such a suit is a viable means of collecting royalties and that an artist had the resources to sue in the first instance. *See* pp. 11-13, *infra*. Moreover, under Sirius's interpretation, Section 114 itself offers no relief to such an artist. Sirius's argument presumes that Section 114 contains no private right of action *at all*, which means that an artist would be just as disabled from suing under that provision as SoundExchange itself would be. And, in any event, whatever rights individual artists may have, Section 114 expressly contemplates enforcement *by SoundExchange*. *See* 17 U.S.C. § 114(g)(3)(C).

3. *Obstacles to enforcement by copyright owners.* Sirius's suggestion that copyright owners can protect their own interests by suing for underpayment is a vague and unworkable one. It is unclear whether Sirius means that copyright owners could do so by bringing copyright infringement suits, *see* Sirius Br. 8, or whether Sirius means that there is some other, unspecified

statutory cause of action that such owners could use to try to obtain unpaid royalty amounts.  In either event, Sirius's suggestion is problematic.

a. *Copyright infringement suits.*  There would be a host of complex and challenging issues associated with a regime in which copyright infringement actions were treated as the only potential remedy for underpayment of royalties under Section 114.  Sirius's approach would therefore undermine the predictability and effective functioning of a statutory licensing scheme that has been integral to the proliferation of online radio services and the success of the music industry more broadly.

First, copyright infringement suits are generally available only where a copyright owner has registered the work at issue.  *See* 17 U.S.C. § 411(a).  But registration is not a condition of owning a copyright, *see* 2 Nimmer on Copyright § 7.16[A][1] (2024), and Section 114 requires royalty payments even on unregistered works, *see* 17 U.S.C. § 114(f)(3)(B)(i).  Thus, copyright infringement suits are no substitute for SoundExchange enforcement for those copyright owners who do not register their works.

Second, many copyright owners would be unaware that they had been underpaid royalties at all and therefore would have no reason to know that they could or should bring an infringement suit.  SoundExchange devotes considerable resources to identifying those who are entitled to royalties, in part because individuals and entities who have that entitlement often do not realize that they may receive a distinct revenue stream under the statutory license.  *See* Amy X. Wang, *The $1 Billion Waiting for Artists Who Know Where to Look*, Rolling Stone (Mar. 27, 2019), https://www.rollingstone.com/pro/features/soundexchange-michael-huppe-sxsw-810131/.    But SoundExchange is funded by deductions from the royalties it collects.  *See* 17 U.S.C. § 114(g)(3).  If the threat of SoundExchange enforcement of royalty payments were removed, then Sirius would

have greater incentive to significantly underpay royalties, which in turn would deprive SoundExchange of the funds it uses to undertake the complex task of identifying those who should receive royalties.

Individual copyright holders—particularly individuals or small entities—are very ill suited to undertake that task themselves. By regulation, licensees like Sirius report usage information not to individual copyright owners but to SoundExchange. *See* 37 C.F.R. §§ 370.4(c), 382.3(a), 382.4(a). Copyright owners therefore may not realize without SoundExchange's assistance that services are using their recordings. Moreover, as a satellite digital radio service, Sirius pays royalties as a percentage of its revenue. *See* 37 C.F.R. § 382.21(a). That model is notorious for creating "measurement difficulties" and "difficult questions for purposes of auditing and enforcement," including because the way that Sirius's payment obligation is measured is not directly tied to the right being licensed. *Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 72 Fed. Reg. 24,084, 24,089 (May 1, 2007), *aff'd in relevant part*, *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 760 (D.C. Cir. 2009) (per curiam); *see also* Dana A. Scherer, Cong. Rsch. Serv., R43984, *Money for Nothing: Music Licensing in the 21st Century* 19-20 & n.130 (2018). Under that system, a copyright owner's share of royalties depends on how much Sirius uses other copyright owners' works. But again, only SoundExchange receives that information. *See* 37 C.F.R. § 382.5(a)(1). As a result, copyright owners and artists—who at least arguably have no right to audit Sirius, *see* 37 C.F.R. §§ 380.6(a), 382.7(a)—have no meaningful visibility into Sirius's usage and accounting. Thus, if Sirius's interpretation of Section 114 were correct, Sirius could underpay royalties and the appropriate rightsholders might simply never know about it.

Third, many copyright owners would lack the resources to conduct any such audits or to bring their own suits. Many of *amici*'s members are small companies or private individuals who typically cannot afford individualized audits or litigation, particularly where they stand to win only minimal amounts as a result. *See, e.g.*, Shyamkrishna Balganesh, *Copyright Infringement Markets*, 113 Colum. L. Rev. 2277, 2285 (2013) (discussing high costs of litigating copyright suits); S. Rep. No. 101-305, at 10, 12 (1990) (noting deterrent effect of cost of litigation on smaller entities, including an instance in which "[a] company that licenses performance rights for musical compositions withdrew an infringement suit . . . because it was too expensive to contest"). Indeed, before Congress amended Section 115 to allow a collective to audit and sue licensees, *see* Music Modernization Act § 102(a)(4), artists often chose not to litigate underpayment of royalties under Section 115 because of the high costs of audits and litigation. *See* U.S. Copyright Off., *Copyright and the Music Marketplace* 108 & n.563 (Feb. 2015). And in this context, copyright owners would know that Sirius, as a defendant, would have all the resources necessary to draw out litigation.

Fourth, those problems with individualized litigation could not necessarily be overcome by some groups of copyright owners banding together in some way. To be sure, in an effort to make the kind of litigation that Sirius suggests economically feasible, most plaintiffs presumably would seek to consolidate suits or pursue class actions. But those devices would have uncertain prospects of success and would likely involve only a subset of those entitled to royalties. Nor is there any realistic prospect that all copyright owners could somehow coordinate with each other. And multi-plaintiff litigation would result in a poor facsimile of the scheme Congress designed in Section 114 by shifting to copyright owners and courts the costs of coordination, administration, and enforcement now borne by SoundExchange.

Finally, all of those issues would result in tremendous unpredictability for copyright owners hoping to recover unpaid royalty amounts or to ascertain whether they were underpaid (or never paid) royalties in the first place.  That type of uncertainty makes it difficult or impossible for copyright owners—who may depend on those royalties—to adequately undertake business planning and make informed business decisions.

b. *Other, unspecified cause of action*.  To the extent that Sirius is suggesting that copyright owners could assert a cause of action other than copyright infringement to claim that they were underpaid digital-performance royalties that they are owed under Section 114, Sirius makes no effort to explain how such a suit could work—and there are numerous potential obstacles to any such suit.

As an initial matter, Sirius never identifies the statutory cause of action those copyright owners could invoke to pursue such underpayment claims.  Sirius argues broadly that Section 114 "emphatically does not provide the powerful right to initiate a federal lawsuit."  Sirius Br. 10-11.  But if Section 114 does not create a private cause of action for *anyone* to bring suit to collect underpaid royalties, including copyright owners, it is unclear where in the U.S. Code such a cause of action might exist.

In addition, even if there were a statutory cause of action for copyright owners other than an action for copyright infringement, virtually all of the same problems described above with respect to copyright infringement suits would arise.  As explained above, *see* pp. 11-13, *supra*, individual copyright owners would be uncertain if they had been underpaid (or unpaid) in the first instance; many would lack the resources to sue; devices for consolidating suits would be far from perfect and significantly worse than the system that exists now; and copyright owners would face considerable uncertainty, which would itself harm copyright owners' businesses and operations.

*     *     *

Given all those challenges, casting aside the existing scheme for enforcing royalties under Section 114 would have one all-but-certain result: providing Sirius with substantially greater opportunities to shirk its statutorily mandated royalty obligations. Even if some individual copyright owners could bring actions to remedy underpayment, Sirius would have little incentive to pay royalties given practical obstacles to enforcement. And Sirius would have no meaningful incentive, beyond the fear of legislation, to pay royalties either to copyright owners who have not registered their works or the huge body of artists who are entitled to royalties under Section 114 but do not own rights under a copyright.

Congress did not and could not have intended that result. In enacting and amending Section 114, Congress struck a careful balance. On one hand, it dramatically reduced transaction costs for services like Sirius by creating a blanket compulsory license with enormous breadth and allowing them to pay royalties to just one collective. *See* S. Rep. No. 115-339, at 4 (2018) ("Song-by-song licensing negotiations increase the transaction costs to the extent that only a limited amount of music would be worth engaging in such licensing discussions."); 67 Fed. Reg. at 45,266 ("[I]t would be impractical for a [service like Sirius] to identify, locate and pay each individual [c]opyright [o]wner whose works it performed."). On the other hand, Congress gave copyright owners and musicians a right to royalties without imposing on them the burden of negotiating licenses or chasing down payment. *See* 148 Cong. Rec. H7047 (daily ed. Oct. 7, 2002) (statement of Rep. Conyers) (explaining that Section 114 "ensures the musicians, vocalists, and artists receive their royalties from digital music directly from the collection agent" rather than services or record labels); *see id.* (statement of Rep. Berman) (similar). That was intended as a win-win trade, even if Sirius "benefit[s] most from the reduction in transaction costs." S. Rep. No. 115-339, at 6. But

15

now, Sirius wants to unwind the bargain, taking all of the benefits of minimal transaction costs in obtaining a massively valuable blanket license without the burdens of efficient enforcement.  That is not the scheme Congress designed, and this Court should not impose it.

## III.  Sirius's Theory, if Accepted, Would Gravely Harm the Music Industry and the Public

Allowing Sirius to evade royalties would come at tremendous cost to the music industry. To start, SoundExchange itself is funded by deductions from royalty payments.  If Sirius and other statutory licensees like it were given latitude to avoid those payments, SoundExchange could not perform the vital services that it provides to the industry, which include not only collecting and distributing royalty payments but also assisting artists, labels, producers, and publishers through a wide range of technological solutions, education, and advocacy.  *See* What We Do, SoundExchange,  https://www.soundexchange.com/what-we-do/#products-and-services  (last visited Dec. 6, 2024).

The royalties recovered and administered by SoundExchange are also vital to the music industry more generally.  Over the last ten years, SoundExchange distributions have accounted for between five and twelve percent of total U.S. recorded music revenue—roughly $1 billion per year.  *See* U.S. Recorded Music Revenues by Format, U.S. Music Revenue Database, RIAA, https://www.riaa.com/u-s-sales-database/ (last visited Dec. 6, 2024); *see also* Ben Sisario, *Rise of SoundExchange Shows the Growth of Digital Radio Royalties*, N.Y. Times (Aug. 4, 2015), https://www.nytimes.com/2015/08/05/business/media/rise-of-soundexchange-shows-the-growth-of-digital-radio-royalties.html.

As noted, that money flows not only to copyright owners but also directly to performers. *See* 17 U.S.C. § 114(g)(2)(B)-(D).  If Sirius's interpretation were accepted, those performers would stand to lose a very meaningful part of their livelihoods.  *See* Travis M. Andrews, *In the*

*Spotify Era, Many Musicians Struggle To Make A Living*, Wash. Post (Feb. 4, 2023), https://www.washingtonpost.com/arts-entertainment/2023/02/04/spotify-grammys-songwriters-payment-musicians/.

As to both copyright owners and performers, interrupting the flow of royalties for digital performance rights would have harmful consequences not only in the here and now but also in the future. Lack of adequate payment undermines the incentive to engage in artistic creation and threatens the very existence of creative content and the "useful Arts" that the Constitution directs Congress to promote. U.S. Const. art. 1, § 8, cl. 8. Reducing industry revenue by significant amounts thus would harm not only those who would otherwise engage in that creation but also the general public that seeks to enjoy the fruits of creators' labor. *See generally Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 204 (2016) (to accomplish the fundamental copyright-law objective to "enrich[] the general public through access to creative works" it is critical to "encourag[e] and reward[]" those "creations") (citation omitted); Joseph Story, III *Commentaries on the Constitution of the United States* 49 (1833) ("depredation and piracy" mean there is "little inducement to prepare elaborate works for the public").[2]

All of the harm that would arise from loss of the revenue obtained through SoundExchange-enforced royalties would be compounded by the fact that copyright owners and performers have reasonably relied for so long on receiving that money. For more than twenty years, SoundExchange and statutory licensees have operated on the understanding that Section 114 gives SoundExchange the right to "enforce[]" the statutory royalty scheme. 17 U.S.C. § 114(g)(3). Courts have routinely allowed SoundExchange to exercise that right, *see*

---

[2] In addition, limited enforcement under Section 114 would incentivize services that currently fall outside the scope of the statutory license to adjust their products to fall within the statutory license, potentially decreasing the availability of interactive services and reducing consumer choice.

SoundExchange Br. 14-15 (collecting cases), and neither Sirius nor any other service has seriously challenged it.  To the contrary, Sirius has previously *acknowledged* that the right exists.  *See* 83 Fed. Reg. at 65,263 (noting that Sirius proposed a statute of limitations for disputed audit findings that would apply unless SoundExchange "initiated a legal action").

Sirius now seeks to eliminate that right without acknowledging that such a radical change would lead to absurd results.  And there is no reason to think that absent enforcement by SoundExchange a statutory licensee would continue to discharge its statutory payment duty.  Indeed, as if to prove that point, Sirius in this very case has resisted compliance with an audit—one of the devices that Sirius insists can be used to "address instances of unauthorized use or non-payment."  Sirius Br. 15; *see* ECF No. 1 at ¶¶ 57-62.  In the face of statutory text that clearly contemplates a cause of action for SoundExchange, statutory history that confirms the centrality of SoundExchange's enforcement rights, and the absurd results that would follow from accepting Sirius's argument, this Court should not accept the novel and deeply harmful approach that Sirius proposes.

## CONCLUSION

Sirius's motion for judgment on the pleadings should be denied.

DATED: December 10, 2024

Respectfully submitted,

/s/ *Adam B. Weiss*
Adam B. Weiss
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100

Elaine J. Goldenberg
Daniel J. Kane
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, DC 20001
Telephone: (202) 220-1100

*Attorneys for Amici Curiae*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on December 10, 2024, a true and correct copy of the foregoing document was served on all counsel of record through the Court's ECF system.

<u>*/s/ Adam B. Weiss*</u>
Adam B. Weiss
*Attorney for Amici Curiae*