# EXHIBIT B



**UNITED STATES COPYRIGHT OFFICE**
**LIBRARY OF CONGRESS**
**Washington, D.C.**                                            **Docket No. 2014-03**


Response to Request for Comments:  Music Licensing Study
Comments by the American Association of Independent Music ("A2IM") – May 23, 2014

The American Association of Independent Music ("A2IM") thanks the Copyright Office for this opportunity to share comments related to the Copyright Office's Music Licensing Study.

A2IM is a 501(c)(6) not-for-profit trade organization representing a broad coalition of over 325 Independently owned U.S. music labels. Billboard Magazine, using Nielsen SoundScan data, identified the Independent music label sector as 34.6 percent of the music industry's U.S. recorded music sales market in 2013 (and using the same source data by our computation, approximately 40 percent of digital recorded music revenues). Independent music labels release over 90 percent of all music released by music labels in the U.S., so related to this Notice of Inquiry our segment of the music industry will be heavily impacted.

While all of our members are small and medium-sized music enterprises (SMEs), our Independent music label community is the "big tent" as it is a very diverse group. A2IM's Independent community includes music labels of varying sizes within the SME definition and varying staffing levels across the United States, from Hawaii to Indiana to Florida, representing musical genres as diverse as our membership. All of our label members have one thing in common; they are small and medium-sized businesses operated by entrepreneurs with a love for music who are trying to make a living. Independent doesn't mean just small artists. For example, A2IM member labels have issued music releases by artists including Taylor Swift, Mumford & Sons, the Lumineers, Vampire Weekend, Adele, Paul McCartney and many others during the past two plus years. A2IM members also share the core conviction that the Independent music community plays a vital role in the continued advancement of cultural diversity and innovation in music, both at home and abroad.

For our members, whose livelihoods depend on the ability to invest in and create music and distribute and license copyrights in a free market, it is essential to have government partners helping to advance a worldwide enforceable regime for the protection of intellectual property. A copyright protection regime that enhances accountability at all levels of the distribution chain and that deals effectively with any unauthorized usages is essential for our community. Without this copyright protection, A2IM's members, as SME's, a key economic growth engine, will be unable to continue investing in the process of musical intellectual property development, investment that creates easily exportable IP products that improve the U.S. balance of trade, thus improving the U.S. economy and creating jobs at home in the U.S. .

In preparing this NOI response, the A2IM staff had discussions with the A2IM Board of Directors and had additional conversations with other A2IM members representing varying sized businesses with a variety of levels of staffing and business models, so as to properly represent our diverse community. Our views presented herein are based upon a consensus of our members thoughts with varying views noted.

The Current State of Music Licensing:

A2IM believes that the current state of music licensing no longer meets the intentions of Congress when it passed the Digital Performance Right in Sound Recordings Act of 1995 (DPRA)  and the Digital Millennium Copyright Act (DMCA) in 1978, and that the current system of music licensing is broken.

Of all the technological developments in recent history, the Internet represents the most potent platform for individual entrepreneurship and expression that our community has witnessed. Yet it also has produced tremendous uncertainty among those who earn their living from their copyrights, from artists to labels to songwriters to publishers and to all of the businesses (distributors, aggregators, manufacturers, etc.) that support our community and bring us to market. The Independent music community has experienced all sides of the Internet transformation and yet, despite the many unresolved questions surrounding the protection of intellectual property online, we remain optimistic that open Internet structures are our best means through which to do business, reach listeners and innovate in the digital realm.

The Internet has allowed our sector to compete on a more level playing field and take fuller advantage of new means of reaching audiences and doing business, via non-interactive internet-based services like Pandora, iHeart Radio, Sirius/XM and others, and the broader commerce opportunities presented by interactive on-demand services like Beats, Rdio, Rhapsody, Slacker, Spotify and many others. Additionally, we have developed Direct-To-Fan relationships with our fans to both promote our music and to generate sales. This ability to develop direct relationships with our customers by leveraging Internet-engendered technology has been a phenomenal development in our ability to bring more music to more people.

The recent growth in streaming allows listeners to discover new music and offers Independent music labels more access, resulting in more plays of Independent music label artists' than FM broadcast radio has ever provided. Web and Satellite radio continue to expand their listenership and non-on-demand streaming radio market audiences continue to grow, with market leaders like Pandora and Sirius/XM attributing their growth to consumer discovery of new Independent artists.

The music industry is unusual in many ways. Clearances for usage are often required from two copyright owners, the owner of the written music composition and the owner of the sound recording, while many other Intellectual Property ("IP") copyrights have only a single copyright owner. Music IP also has a far greater range of uses as opposed to solely one usage. The American music industry is integral to the United States economy and to its culture. The impact and importance of our community is vast, with a far-reaching effect on the U.S. economy and the global stage and should not be looked at in isolation. This is because music has an economic multiplier effect with usage in non-music businesses like hardware manufacturing (portable and home), musical instruments, live concerts, radio advertising, webcasting and satellite radio, live concerts, live music played at stores, clubs, restaurants, and synchronization usage by other media such as television, film, games, video, advertising, etc.

We believe that Congress passed the DPRA and DMCA legislation to support creators, services that use music and consumers of music with the goal of all parties in the music pipeline being treated on a fair and equitable basis in the digital world. The compulsory statutory license, with rate setting by the Copyright Royalty Board ("CRB"), is the appropriate mechanism to ensure fair treatment of creators/investors and their artists, with rates set after a fair court hearing of all economic factors. The CRB process supports A2IM's belief that each song is created equal and each copyright holder should be compensated equally for each song, and that size of the creator of the song performance or the economic power of the investor in the sound recording should be irrelevant. The only differentiation in pay should be based upon consumer demand for the music, e.g. the number of streams each receives, not the ownership company. That's the basis of the compulsory statutory license; each individual jazz song, blues song, pop song or classical song should all have the same basic single usage value.

On the digital service side, compulsory statutory licenses with set rates allow non-interactive services to receive blanket licenses to get equal, unfettered access to deliver a wide body of music to consumers over a variety of delivery medium choices.

Even though Independent labels are individually smaller entities than the three individual "so called" major record labels based upon copyright ownership, collectively the Independent labels are the largest music label industry segment. According to Billboard Magazine, Independent labels altogether were 34.6% of the market. Under U.S. anti-trust laws, collective negotiation of interactive-on-demand licenses by Independent music labels is limited, which, instead of promoting competition and thus allowing consumers greater choice and broader music service choices as barriers to music usage are lowered, reduces competitiveness of Independent labels and their artists. This lack of ability to collectively negotiate a group license also bars certain services from access to a wide swath of Independent music which they need to successfully launch in the market place. The non-interactive compulsory statutory licensing regime ensures equity and fairness for all copyright owners and allows greater music service marketplace access resulting in greater consumer choice.

We believe the realities of the music landscape do not match up with Congress' legislative intentions regarding music licensing. The three individual "so called" major record labels are circumventing the intended use of the Section #114 statutory license by adding non-interactive service functionality and demanding that services move to a directly negotiated license. These larger creator companies, represented by the Recording Industry of America ("RIAA"), including the duopoly of Universal Music and Sony Music, operate in a fashion whereby they tweak music services functionalities so that, in their opinion, these services no longer qualify for the compulsory statutory license. The goal of the "so called" major record labels is to exclude as many licenses from compulsory statutory licensing as possible and negotiate their own direct licenses from their position of greater economic strength.

This is evidenced by the May 16th 2013 article in Billboard Bulletin (page 3) where, when asked whether "labels" supported the compulsory licensing regime, Cary Sherman, the president of the Recording Industry Association of America, said, "We oppose compulsory licenses as a matter of principle, but we acceded to having a compulsory license as a pragmatic solution. And we would be okay with it as long as it reflects the fair market value of our work." This confirms that the RIAA is opposed to compulsory statutory licenses. This is because of the duopoly of Universal and Sony, who can then hold up technology companies and drain these companies of their resources via direct licenses, and thus stifle innovation and consumer access to all music other than their own and thus decrease other creator income, including artist and Independent label income. The road is littered with legitimate legal law-abiding technology companies that the RIAA and their constituents have forced out of business.

The mechanism that the RIAA and the "so called" major record label duopoly use is their market clout; whereby they force internet services who want just the smallest element of service interactive functionality, no matter how slight, to move from the compulsory statutory licenses to directly negotiated licenses. Then, when negotiating these direct licenses with these services, the RIAA's constituents extract compensation in excess of their true copyright ownership market share. Thus, they leave less for other Independent creators and all artists, as much of this excess compensation is not shared with the artists signed to their music labels or the Independent music labels for which they do not own the copyrights and only do distribution, and for those label's Independent artists.

For example the Billboard Magazine article on 2013 market share dated January 15th, 2014 shows Universal Music with a 38.9% market share based upon distribution (which is in of itself an over-stated percentage of distribution share as some labels Universal distributes do not use Universal for 100% of their distribution) but only a 28.5% market share based upon copyright ownership.  ***Copyright ownership is the only appropriate market share definition***. Distribution is now a service commodity, just like independent radio promotion, independent publicity, etc. There are many music distributors including good Independent music distributors. As reported in Billboard Magazine in 2013, iTunes & Amazon Digital now represent over 44.5% of U.S. recorded music sales, and these services offer direct deals ("access") to Independent music labels, allowing these music labels to bypass distributors. Streaming services such as Spotify, Rdio, Beats, etc. likewise offer direct deals to Independent music labels via Merlin, a global Independent music rights organization. Close to 60% of overall revenues are now digital. In the physical goods market place (Compact Discs and Vinyl) music labels often need to buy-in via cooperative advertising to get their music into Target, Wal-Mart, Best Buy, etc., and every label's money is green. The only reason for an Independent music label to work hand-in-hand with a "so called" major record label is to garner radio play, which is done in large part via Independent radio promotion. Even then an Independent label band like Mumford & Sons can break out without a "so called" major record label's support.

From our discussions with internet service providers and retailers we have learned that Universal Music then "requests" both preferential promotional opportunity allocations at the fallacious 38.9% level and deal terms at the fallacious 38.9% market share level as well, while not sharing, except in infrequent circumstances, those promotional terms and resulting profits with the Independent music labels that Universal distributes, that Universal incorrectly include in its claim of a gross 38.9% share of the U.S. Recorded music market place.

This false marketplace usage definition of concentration by Universal also results in barring market entry for new services needing these direct licenses to be competitive in the marketplace. Thus Universal's business practices can circumvent the intent of the compulsory statutory licenses, as a result of digital services needing a small additional amount of interactive functionality to be marketplace competitive. This results in many services being required to seek direct licenses, ensuring that artists lose compensation and that Universal will receive music label compensation in excess of their correct copyright ownership share. As Lucien Grange, Chairman of Universal Music Group, noted in his February 16th Billboard Magazine Power interview:

"Power is about who calls who and whose call you take. That's power. Power is a combination of the ability to write checks, the ability to make things happen, the ability to block things—political power, the ability to testify and the requirement to testify at a Senate hearing and have five commissioners against

zero in favor of what you said. Power is the ability to buy and sell businesses. Power is the ability to stop new services. Power is the ability to create new services. That's power."

A2IM was created to advocate and to ensure both access and equitable treatment for our music label members <u>and their artists</u>. It is wrong for Independent music labels to accept discounted rates from digital services, after the "so called" major record labels have done direct licenses which earn them compensation that is out of proportion with their real market share percentages. These fallacious market share percentages created by the "so called" major record labels create an unlevel, unfair playing field for A2IM members and the music services forced to pay these compensation amounts. In the digital space there needs to be overall equity for all participants, including music labels, artists and service providers. Universal's antiquated and fallacious method of measuring market share, based upon what entity distributes the recordings rather than who owns the copyright in the master recording, is at the root of the problem. Independents are facing a "criminal disparity" in earnings, despite owning masters for more music than any single "so called" major record label group and despite releasing music that earned half of the 2014 GRAMMY Awards™. Independents are often wrongly viewed as small players, and as a result, in the current licensing landscape, they end-up being grossly underpaid.

This portion of the licensing marketplace is the primary issue for our A2IM Independent music label members. It cuts directly to the core of A2IM's mission, which is ensuring a fair marketplace for Independents. One of the most reliable aids to our efforts to achieve this fair marketplace is the institution of the CRB, its decisions and the statutory rates that result from them, since the statutory licensing regime establishes that the value of every creator's sound recording is equal. As we believe that Independent copyrights are worth as much as the copyrights of the "so called" major record labels, we thus ardently support the expansion of the statutory compulsory rate regime and recommend doing so by narrowing the definition of "interactive service" to cover only those services that truly offer a full on-demand interactive experience.

In responding to the detailed questions included in the Request for Comments NOI: Music Licensing Study we have not repeated issues covered in our above introduction.

**Questions #1 thru #7- Musical Works**:

A2IM represents music labels who are the investors in the creation of sound recordings. That said we believe that over one-third of our music label members also have ownership interests in and are involved in the exploitation of musical works. As a result, a large number of A2IM members are involved in both the creation of and the use of written compositions.

The National Music Publishers Association ("NMPA") and the Performance Rights Organizations ("PRO's") ASCAP, BMI and SEASC have been advocating for an overhaul of the musical works licensing process, stating that the songwriters and publishers that they represent are not receiving fair compensation for their work. A2IM as an organization has the utmost respect for these creator colleagues and the individuals and companies they represent. That said we believe the current system of mechanical licensing under section 115 using compulsory statutory licensing rates is afair system to use for compensating songwriters and publishers.

Music labels are the major investors in the music creation process. Music labels sign artists and incur at-risk capital to support artists with advances and funding of the recording of sound performances. Music labels then incur the costs to market and promote the artist's music and employ both internal staff, with

high fixed costs, and pay external staff to cover the areas of publicity, advertising, marketing, radio and video promotion, etc. Most label's artist signings are not ultimately profitable and overall music label profit margins in the aggregate are very low.

Contrast this with publishers. Many publishers sign songwriters and give advances only after either a songwriter is established or after a music label has agreed to sign the songwriter/ recording artist for recordings because they know at that point that the above music label investment process will commence. Publisher's investments in songwriters are modest to non-existent, except for established proven writers who have already achieved success, and their marketing budgets are low. As a result, the bottom line for Publishers is high. Based upon public releases for ASCAP and BMI, Publishers had revenues from music performances of almost $1.9 billion for their most recently reported fiscal years. If you add an estimate for SESAC, which does not disclose revenues, we believe the number should exceed $2 billion. Both ASCAP and BMI have disclosed overhead rates before distributions of under 14%, in the aggregate about 13%. The balance of 87% is distributed, which means that there are profits of over $1.7 billion from PRO performance sources. The publishers then additionally have their revenue streams from sales, synchronization licensing and other sources.

The above data, we believe, confirms that the publishers make considerably more profits than the sound recording owners, and we believe the net profits earned by the creator community should be the criteria considered, not the gross amounts received which the NMPA erroneously keeps emphasizing. Let me assure you that there is no expense waste or high salary creep in our community. The Section 115 compulsory statutory mechanical licensing process, using CRB rates, is working for all parties. There is no need for a blanket licensing process for mechanical licenses for songs used in the sale of recorded music. Any elimination of statutory rates for these recurring standard usages will tip the profit scales further in favor of the publishers. We do believe that use of musical works for audio/visual synchronizations and other non-standard usages of written compositions for television, games, advertisements, toys, etc. should continue to be negotiated on a direct license basis.

**Question # 8: Please assess the current need for and effectiveness of the Section 112 and Section 114 statutory licensing process**:

As detailed in our above introduction, we do not believe that the current system of licensing under Sections 112 and 114 is working, but A2IM is a staunch supporter of statutory licenses under a revised Section #114, where any changes would work to provide more equal and fair treatment for music labels as well as provide improved access and efficiency for licensees.

Under the current law, only non-interactive digital music services can use the statutory license, but in today's marketplace, the line between interactive and non-interactive services is increasingly getting blurred. The revenues from online music streaming are growing rapidly as consumers move from an ownership model to an access for consumption/listening model. As streaming services innovate and add features in response to consumer demands, the law must adjust to this consumer behavior. Allowing more services to operate within the statutory license will improve the efficiency of music licensing for both services and the ultimate consumers. This change will also allow artist and music label creators to obtain a fairer share of the overall music creator compensation as opposed to the direct licensing system whereby the RIAA and the "so called" major record labels are navigating toward a total direct licensing marketplace. What they desire is marketplace where these "so called" major record labels can earn a disproportionate share of overall compensation in excess of their true market share. **A2IM**

**believes that the definition of "interactive service" should be narrowly defined to cover those services that truly offer a full on-demand interactive experience.**

In addition to the concerns previously expressed in our introduction (and as outlined later in this response document for most of the below topics) the areas that we believe require revision or inclusion in the copyright revisions being contemplated and that are priority areas for A2IM's constituents include:

- Increased laws and enforcement at the source related to Internet Service Providers, search engines, payment processors, etc. to protect copyright owners. This should include granting explicit enforcement rights to SoundExchange, including specific remedies up to and including termination of a license for services that repeatedly fail to act in compliance with license terms
- Elimination of the Copyright office registration filing requirement to be able to litigate for statutory damages and a re-emphasis on the need for statutory damages to ensure copyright owners are compensated for infringements.
- Re-looking at the current DMCA process and the burdens of DMCA's notice & take-down procedures that are not being fairly shared and the current whack-a-mole process which is beyond the resources that are available for the SME creator investors we represent.
- The establishment of a sound recording performance right at broadcast radio. In addition to needing domestic performance income this also impacts on our members international business revenues as our performance royalties sit overseas and remain captive to the fact that, unlike other industrialized nations, we don't compensate performers for terrestrial airplay. Without this legal reciprocity right those royalties are not available to U.S. based companies without foreign domiciles.
- Bringing pre-1972 recordings within the scope of #112/#114 licenses

**Question # 9: Please assess the effectiveness of the royalty rate setting process and standards applicable to the various types of services subject to statutory licensing under Section 114**:

All compulsory statutory licenses should ensure that sound recording creators receive fair market value for their work and be subject to a willing buyer-willing seller standard. We generally support the current rate setting process used by the CRB, which allows for the collective negotiation of rates by the sound recording creator community. We feel strongly that all licenses should be subject to the willing-buyer/willing-seller rate standard and feel that the 801(b) standard used for satellite rate setting is unfair to creators and does nothing to benefit consumers.

**Question #10: Do any recent developments suggest that the music marketplace might benefit by extending federal copyright protection to pre-1972 sound recordings? Are there reasons to continue to withhold such protection? Should pre-1972 sound recordings be included within the Section 112 and 114 statutory licenses?:**

Pre-1972 sound recordings should be included within the Section #112 and #114 statutory licenses. The services that are using these pre-1972 recordings by relying on the statutory licenses should compensate creators for those usages. In many cases the revenue from sales of these sound recordings has become insignificant, as has income from other sources like touring for aging artists, so that now the only income earned by music labels and their artists for these heritage artists is coming from public performances (which right is currently not compensated) and digital streams. The marketplace is

transforming from a purchase to access model based upon consumer demand, so the laws to compensate music labels and artists should evolve to meet this new consumer model.

**Question # 11.** <u>Is the distinction between interactive and non-interactive services adequately defined for purposes of eligibility for the Section 114 license</u>?:

We addressed this earlier in our response. We would add that SoundExchange as the sole administrator of the sound recording license should be responsible for determining whether services are eligible to use the SoundExchange statutory license.

**Question # 12.** <u>What is the impact of the varying rate setting standards applicable to the Section 112, 114, and 115 statutory licenses, including across different music delivery platforms? Do these differences make sense</u>?

We addressed earlier that having two different rate standards under Sections #112 and #114 is unfair to creators. The standard of willing buyer/willing seller should be the sole standard, and Satellite Radio services, for example, should not receive a subsidy from creators.

**Question # 13.** <u>How do differences in the applicability of the sound recording public performance right impact music licensing?</u>

The U.S. is the only one of the 40 OECD Countries that does not have a performance right for public broadcast radio performances. For the over-the-air traditional AM/FM broadcast radio dial, Independents have made significant inroads in airplay, and we thank terrestrial radio for the increased access. But we still don't have a performance right that would ensure music creators get paid when their sound recordings are broadcast on over-the-air radio. This must change. AM/FM broadcasters make billions selling ads to folks who tune in for our music while our sound recording creators get nothing. That's unfair. A2IM are members of the musicFIRST coalition, along with featured artists, backing musicians and vocalists, artist managers and others working toward making this legislation happen in the U.S.

In addition, this lack of a broadcast performance right impacts our international business, as our royalties overseas remain captive to the fact that, unlike other industrialized nations, we don't compensate performers for terrestrial airplay. So without this legal reciprocity right, our royalties are, in effect, not available to U.S. independent music labels and their artists. If we allow radio or internet services to force zero rates or below market rates on us, to subsidize their business models, we will have allowed the gift wrapping to take on much greater value than the treasure that is in the box, the music! Our artist's music that fuels AM/FM radio and every other platform that features music must be compensated.

A2IM's members also believe in parity for all members of the music community. The lack of a sound recording performance right is unfair to the digital transmission music services (both interactive and non-interactive) who already support sound recording owners with compensation. We believe that allowing terrestrial broadcast stations to continue to pay nothing may undermine the critical structures that are now emerging which may lead us towards a fair and equitable music industry. So we believe that some form of rate parity between terrestrial and digital broadcasters must be a goal of any music licensing revisions contemplated by the U.S. Congress, however we stress that this parity should not be

established by discounting what is already being paid on the digital side, as we contemplate a music marketplace which will become increasingly more digital and less terrestrial over time.

**Question #14. How prevalent is direct licensing by musical work owners in lieu of licensing through a common agent or PRO? How does direct licensing impact the music marketplace, including the major record labels and music publishers, smaller entities, individual creators, and licensees**?

As outlined earlier, direct licensing by the three "so called" major labels is the greatest risk to the financial viability of all other creators. This will ultimately cause other smaller creators to seek direct licenses which will then undermine the entire music licensing system, thus preventing digital services from launching. This will result in limited consumer access and choice.

**Question #15. Could the government play a role in encouraging the development of alternative licensing models, such as micro-licensing platforms? If so, how and for what types of uses?**

As we noted earlier, under U.S. anti-trust laws, collective negotiation of interactive-on-demand licenses by Independent music labels is limited, which, instead of promoting competition and thus allowing consumers greater choice and broader music service choices as barriers to music usage are lowered, reduces competitiveness of Independent labels and their artists. Government might be able to encourage collective licensing by relaxing antitrust policy which we believe would lead to pro-competitive effects. Independents could then compete more easily with the "so called" major labels. We encourage consideration of implementation of an expedited business review process to provide an exemption for certain voluntary collective licensing efforts which could promote more efficient licensing uses of copyrighted works.

**Question #16.  In general, what innovations have been or are being developed by copyright owners and users to make the process of music licensing more effective?**

As noted above, A2IM members are unable to negotiate collectively under current U.S. anti-trust laws. Some Independents on a global basis have formed the Netherlands based Merlin organization, a global music rights agency which has aggregated the copyrights of 251 worldwide members, including 61 from the United States, representing 823,900 music sound recording tracks. Merlin has signed licensing agreements on behalf of its members with approximately twenty leading music services, including AT&T, Beats, Deezer, Slacker, Rdio, Spotify, VEVO and many others. Merlin handles the collection, processing and payment cycle for their members, ensuring the correct copyright owners are paid. In the area of settlement talks related to copyright infringements Merlin represents a much larger community then enumerated above.

**Question #17.  Would the music marketplace benefit from modifying the scope of the existing statutory licenses?**

As highlighted earlier in this response:

In question #8—A2IM supports the expansion of the definition of a compulsory statutory license by changing the definition of an "interactive service" to be more narrowly defined to cover those services that truly offer a full on-demand interactive experience.

In question #10—A2IM supports the inclusion of Pre-1972 sound recordings within the Section #112 and #114 statutory licenses.

In question #13—A2IM supports the creation of a Performance Right Act to enact a performance royalty for Broadcast Terrestrial radio

In question #15—A2IM supports the amendment of anti-trust restrictions related to certain licenses to allow for collective licensing which will in fact improve Independent music label competitiveness with the three "so called" major labels.

**Question #18. How have developments in the music marketplace affected the income of songwriters, composers, and recording artists?:**

The transformation of the music industry marketplace during this century has brought dramatic change. Publisher income, and the amounts paid for publishing catalogs, have increased and the growth in the publicly-reported income of the PRO's has been equally dramatic. On the sound recording side, the decline in sound recording revenues has been devastating. There has been a decline on a current dollar basis of 65% since 1999. This has had a dramatic effect on the income of both music labels, the primary monetary financial investors who also invest their sweat equity as well, and their recording artists.

**Question #19. Are revenues attributable to the performance and sale of music fairly divided between creators and distributors of musical works and sound recordings?**

No, as discussed earlier, the sound recording owners, the primary financial investors, earn significantly lower profits and additionally invest more time and receive less passive income when compared to the publishers. The service provider terms are all over the lot, but these services in many cases are benefiting from stock appreciation, which, for the most part, is not available to A2IM's music label members. Funds from the sale of and performance of sound recordings have generally not been fairly divided between the creators of recordings and the services that use them.

**Question #20. In what ways are investment decisions by creators, music publishers, and record labels, including the investment in the development of new projects and talent, impacted by music licensing issues?**

Music licensing has extensive influence on music label investment decisions. Licensing income has become a major source of income when our members develop their business plans. Any inequitable treatment from music services and any inequitable allocations to Independent creators—at less than our correct copyright ownership market share—weigh heavily in creating those business plans. As previously discussed, overall music label revenues have plummeted by over 65% in constant dollars in this century. As a result, less is available for investment in both the music creation and marketing process, thus reducing consumer choices.

**Question #21. How do licensing concerns impact the ability to invest in new distribution models?**

The advantage of the non-interactive streaming statutory license which SoundExchange collects on behalf of rights holders is that it gives equal access and the same financial terms to all the different classes (web, satellite, cable, etc.) of non-interactive services, and it compensates all sound recording creators equally on the same terms.

For interactive on-demand services, companies such as Universal Music can either block market entry or, if the service does launch, require a level of compensation in excess of Universal's true ownership market share. Independent music labels and their Independent artists are early adopters of new services that promote greater customer choice and thus reduce unlicensed acquisition of copyrights. Due to the "so called" major label duopoly and the misleading statistics published by their RIAA trade organization, smaller creators are proposed to be treated as lesser by music services. Many Independents will not participate in new services on that basis.

Why would a company invest in a new or existing music service model if confronted with these multiple operational and financial challenges? Expansion of the compulsory statutory licensing definition and allowing broader effective collective licensing would help to make it easier for new music services to launch.

**Question #22.  Are there ways the federal government could encourage the adoption of universal standards for the identification of musical works and sound recordings to facilitate the music licensing process?**

A major concern for Independent music labels is not just contractually getting their correct proportionate share of revenues based upon actual copyright ownership. A second challenge is ensuring that the accounting received is correct and that Independents are actually getting paid for all of their copyright repertoire. The U.S. Copyright Office and the CRB must ensure that all services using sound recordings within their services be required to use an International Standard Recording Code (i.e. "ISRC" codes) and an International Standard Name Identifier (i.e. "ISNI" codes) to identify all recordings, and such services should also be required to incorporate these codes into the metadata of the recordings they use in order to achieve more accurate accounting and distribution of sound recording royalties.

Additionally, a group needs to be created to set standards and help create and maintain copyright ownership databases under the auspices of the U.S. Copyright Office, and not under the auspices or control of the RIAA and the "so called" major labels, to ensure high standards are maintained on a fair and equitable basis.

The American Association of Independent Music ("A2IM") again thanks the Library of Congress United States Copyright Office for this opportunity to provide these comments, and we look forward to participating further in discussions concerning these important issues raised by the U.S. Copyright Office.

Respectfully submitted,

*[signature]*

_____

Richard Bengloff
President
American Association of Independent Music ("A2IM")
132 Delancey Street- Second Floor
New York, New York 10002
646-692-4877 Ext 1
www.a2im.org