UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

SOUNDEXCHANGE, INC.,

                Plaintiff,

        - against -

SIRIUS XM RADIO INC.,

                Defendant.

-----------------------------------X

**MEMORANDUM AND ORDER**

24 Civ. 5491 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff SoundExchange, Inc. ("SoundExchange"), an independent nonprofit organization, has filed this lawsuit under the Copyright Act (the "Act"), see 17 U.S.C. § 114 ("Section 114" or "§ 114"), against Sirius XM Radio Inc. ("Sirius"), a broadcasting corporation that provides satellite and online radio services. See ECF No. 1 ("Compl."). Section 114 governs the use of copyrighted sound recordings and creates a statutory "collective," a role currently occupied by SoundExchange. § 114(g). In this position, SoundExchange is responsible for administering the Act's licensing and royalty components. Id. In the instant lawsuit, SoundExchange asserts that Sirius failed to pay approximately $10 million in royalties to music artists in 2018. See Compl. Sirius has moved for a judgment on the pleadings pursuant to Federal Rules of Civil Procedure 12(c), ECF No. 61

("Mot."), on a threshold issue, namely, that SoundExchange cannot bring suit because Section 114 does not authorize SoundExchange to litigate royalty disputes, see ECF No. 62 ("Def's Br."). For the reasons below, Sirius's motion is granted.

**PROCEDURAL HISTORY**

SoundExchange originally filed this action on August 16, 2023, in the Eastern District of Virginia. See SoundExchange, Inc. v. Sirius XM Radio Inc., No. 23 Civ. 1083 (PTG) (WBP) (E.D. Va. Aug. 16, 2023), ECF No. 1. On September 22, 2023, Sirius moved to dismiss or, in the alternative, transfer venue. ECF Nos. 16, 17. On July 15, 2024, District Judge Patricia Tolliver Giles granted Sirius's motion and transferred the action to this District. ECF No. 33.

Following transfer, on August 12, 2024, Sirius filed an answer with counterclaims. ECF No. 47. A week later, Sirius requested a pre-motion conference concerning a proposed motion for judgment on the pleadings, which is the subject of this Memorandum and Order. See ECF No. 48. SoundExchange opposed both Sirius's request for leave and the substantive arguments upon which it was based.[1] See ECF No. 50. On September 12, 2024, the Court granted

---

[1]     Separately, SoundExchange filed a letter on September 16, 2024, requesting a pre-motion conference seeking leave to file a motion to dismiss Sirius's counterclaims on the grounds that Sirius lacked a private right of action under

-2-

Sirius leave to make its motion.  See ECF No. 52.  Sirius filed
its opening memorandum on October 28, 2024, see Def's Br., and
plaintiff's opposition memorandum was submitted on November 26,
2024, see ECF No. 70 ("Opp. Br.").  On December 10, 2024, an amicus
brief was filed by several music and artist advocacy groups in
support of SoundExchange's opposition to Sirius's motion.[2]  ECF
No. 72-1 ("Amicus").  Sirius filed a reply brief on December 20,
2024.  See ECF No. 79 ("Reply").

    Additionally, on May 20, 2025 -- roughly five months after
defendant's motion was fully briefed and within days of when the
Court originally intended on filing this Memorandum and Order --
the parties filed a joint letter requesting a stay to facilitate
settlement discussions.  ECF No. 81.  After a conference with the
parties on May 22, 2025, the Court entered a forty-five-day stay.
ECF No. 82.  On July 7, 2025, the parties filed a letter conveying
their inability to reach a settlement, as well as their lack of
interest in extending the stay.  ECF No 83.  Accordingly, we
address Sirius's motion for judgment on the pleadings.

---

Section 114 to bring those counterclaims.  See ECF No. 53.  In response, Sirius
voluntarily dismissed its counterclaims without prejudice on October 22, 2024,
see ECF No. 59, and the Court entered that dismissal on October 23, 2024, see
ECF No. 60.

[2]    These groups include the American Association of Independent Music, the
American Federation of Musicians of the United States and Canada, the Recording
Industry Association of America, and the Screen Actors Guild – American
Federation of Television and Radio Artists.

**FACTS**

**A. Overview of the Copyright Act**

The Copyright Act of 1976 provides the framework for copyright law and is contained in Title Seventeen of the United States Code. It has fifteen substantive sections that include, <u>inter alia</u>, the subject matter and scope of copyright, <u>see</u> §§ 101-22, copyright ownership and transfer, <u>see</u> §§ 201-05, copyright notice and registration, <u>see</u> §§ 401-12, and copyright infringement and remedies, <u>see</u> §§ 501-13.  <u>See</u> 1 Nimmer on Copyright § A.01 (2025).

Specifically at issue here is Section 114, which governs the relationship between statutory license holders (e.g., radio companies) and owners of copyrighted sound recordings (e.g., artists) -- who are represented by SoundExchange, the statutory "collective" -- in which licensees pay royalties to the collective for the right to lawfully broadcast sound recordings to the public. <u>See</u> § 114; <u>see also</u> 2 Nimmer on Copyright § 8.05 (2025); <u>see also</u> <u>Intercollegiate Broad. Sys. v. Copyright Royalty Bd. & Librarian of Cong.</u>, 796 F.3d 111, 114 (D.C. Cir. 2015) (a statutory license "permit[s] entities other than the copyright owner to use and perform the copyrighted sound recordings without the copyright holder's permission" in exchange for "royalty fees [paid] to the copyright owner as required by the statute").

**B. Overview of the Parties**

1. <u>SoundExchange</u>

SoundExchange is the independent nonprofit organization currently designated by the Copyright Royalty Board to serve as the statutory "collective" established under Section 114.  <u>See</u> Compl. ¶ 14; <u>see also</u> 17 U.S.C. § 114(g).  As the "collective," SoundExchange is charged with administering the licensing regime for sound recordings, <u>see</u> 17 U.S.C. § 114(e)(1); 37 C.F.R. §§ 380.4, 380.7, 382.1, and collecting and distributing the royalties generated thereunder, <u>see</u> 17 U.S.C. § 114(e)(1), (g); 37 C.F.R. § 380.4.[3]

2. <u>Sirius XM</u>

Defendant Sirius is a corporation whose "flagship product is [a] satellite digital audio radio service, known in the applicable federal regulations as 'SDARS[,]'" which "delivers music via satellite to specialized radio devices."  <u>See</u> Compl. ¶ 2.  Sirius's

---

[3]     There are a few organizations, known collectively as "Performing Rights Organizations" ("PROs"), including the American Society of Composers, Authors, and Publishers ("ASCAP"), Broadcast Music Inc. ("BMI"), and Society of European Stage Authors and Composers ("SESAC"), that are similar in function to SoundExchange in that they are tasked with the collection and distribution of royalty payments, however, these PROs are private organizations -- not statutory creations like SoundExchange.  They can bring lawsuits to enforce the rights of their members.  <u>See e.g.</u>, <u>Broad. Music, Inc. v. DMX Inc.</u>, 683 F.3d 32 (2d Cir. 2012); <u>Broad. Music, Inc. v. Weigel Broad. Co.</u>, 488 F. Supp. 2d 411, 411 (S.D.N.Y. 2007), <u>aff'd</u>, 340 F. App'x 726 (2d Cir. 2009); <u>Am. Soc. of Composers, Authors, & Publishers by Bergman v. Pataki</u>, 930 F. Supp. 873 (S.D.N.Y. 1996); <u>Soc'y of Eur. Stage Authors & Composers v. New York Hotel Statler Co.</u>, 19 F. Supp. 1 (S.D.N.Y. 1937).

satellite radio service transmits more than 135 channels of music, sports, news, talk, comedy, entertainment, and weather to approximately 34 million subscribers nationwide. See ECF No. 18 ("Brooker Decl.") ¶¶ 3-4. In addition to its legacy satellite radio product, Sirius has "expanded its business to include a webcasting offering" that "transmits audio over the internet to any internet-connected device via streaming." Compl. ¶ 3. Sirius operates both its radio broadcasting and streaming services pursuant to a statutory license afforded by the Copyright Act. Id. ¶ 4. "Within the scope of the statutory license, Sirius XM can digitally transmit any sound recording that has ever been commercially released . . . without fear of infringing copyright." Id. In exchange for its license, Sirius pays SoundExchange "royalties for the use of copyright owners' valuable original content." Id.

## C. The Current Dispute

As previewed above, see supra at 1, SoundExchange brings this copyright action against Sirius, alleging that it has failed to comply with its royalty payment obligations under Section 114. We ultimately grant defendant's motion on the threshold issue of whether SoundExchange is authorized by statute to bring this lawsuit, and consequently, we do not offer an analysis or opinion

on the merits of the underlying claims.  Thus, it suffices for the instant purposes to characterize SoundExchange's claims -- two causes of action brought under Section 114 and related regulations -- as directed against Sirius for allegedly underpaying licensing royalties to copyright owners in 2018.[4]

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed──but early enough not to delay trial──a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  A court deciding such a motion applies the same standard it would on a motion to dismiss under Rule 12(b)(6).  <u>Eastman Kodak Co. v. Henry Bath LLC</u>, 936 F.3d 86, 93 (2d Cir. 2019) (citation omitted). On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, <u>see</u>

---

[4]    Broadly speaking, SoundExchange first alleges that Sirius has been taking advantage of the different royalty structures applicable to its satellite radio and streaming businesses by offering the two products as a bundle.  SoundExchange contends that this bundling is effectively lowering the revenue basis on Sirius's satellite radio offerings, which therefore depresses the base upon which royalties are calculated, resulting in an underpayment of roughly $150 million to copyright owners.  Compl. ¶¶ 6—10; 63-67; <u>see also</u> 17 U.S.C. § 114(f)(1)(B), 37 C.F.R. § 382.21(a).  Second, SoundExchange alleges that it hired Adeptus Partners LLC ("Adeptus") to perform an audit of Sirius's 2018 royalty payments, and that Adeptus found evidence of Sirius's alleged royalty underpayment.  Since then, Sirius has allegedly failed to remit the royalties SoundExchange believes it owes. Compl. ¶¶ 11-13, 68-72; <u>see also</u> 37 C.F.R. §§ 380.6(g) and 382.7(g).

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and those "[f]actual allegations must be enough to raise a right of relief above the speculative level," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citation omitted).

## DISCUSSION

The ensuing discussion is structured as follows.  First, our textual analysis of Section 114 highlights that the statutory section does not provide SoundExchange with an express right of action.[5]  Second, we study whether a right of action should be implied in Section 114 and find that doing so is neither warranted nor appropriate.  Third, we review and reject plaintiff's extra-statutory arguments, for they are devoid of the necessary legal reinforcement to support a right of action in Section 114 for SoundExchange.

**A. Express Right of Action**

1. Express Rights of Actions, Generally

Supreme Court precedent is unequivocal: the existence of a private right of action must be clear on the face of the statute

---

[5]    The phrase "right of action" is primarily used to describe an individual's ability to bring legal action while the phrase "enforcement rights" is commonly used in the context of government agencies commencing lawsuits.  Despite the variation in terminology across different legal contexts, we use the nomenclature of "right of action" interchangeably with "enforcement rights."

that a party is relying on to enforce.  See Alexander v. Sandoval,

532 U.S. 275, 286–87 (2001).  As Justice Scalia noted:

> [P]rivate rights of action to enforce federal law must
> be created by Congress.  The judicial task is to
> interpret the statute Congress has passed to determine
> whether it displays an intent to create not just a
> private right but also a private remedy.  Statutory
> intent on this latter point is determinative.  Without
> it, a cause of action does not exist and courts may not
> create one, no matter how desirable that might be as a
> policy matter, or how compatible with the statute.
> Raising up causes of action where a statute has not
> created them may be a proper function for common-law
> courts, but not for federal tribunals.

Id. at 286–87 (internal citations and quotations omitted).

Courts "therefore begin . . . [the] search for Congress's

intent with the text and structure" of the statutory text, id. at

288, with a specific focus on any explicit "'rights-creating'

language," id. (quoting Cannon v. Univ. of Chicago, 441 U.S. 677,

693, n.13 (1979) ("Not surprisingly, the right- or duty-creating

language of the statute [is] . . . the most accurate indicator of

the propriety of implication of a cause of action.")).   In

reviewing the text, if "a statute does not include this sort of

explicit . . . language, [a court] rarely impute[s] to Congress an

intent to create a private right of action."  Id.

   2. Textual Analysis of Section 114

As discussed above, see supra at 4-5, the "collective" is a

statutory creation governed by Section 114, and it exists to

facilitate the copyright royalty scheme.  It is undisputed that Section 114 lacks an explicit provision extending SoundExchange a right of action or the power to otherwise bring an action to litigate a royalty dispute.[6]  See Def's Br. at 7-11; Opp. Br. at 7-8.  The absence of an explicit grant of litigation authority is not perceived as the mere "product of inadvertence or oversight" by Congress but instead is presumed to be an "intentional" decision by the legislature to withhold such authority.  Cervantes-Ascencio v. U.S. I.N.S., 326 F.3d 83, 86 (2d Cir. 2003).  Thus, "absent substantial evidence" that Congress intended to confer a right of action, courts are not "to 'add terms or provisions where Congress has omitted them.'"  Id. (quoting Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 168 n.16 (1993)).

The presumption that Congress deliberately omitted a right of action in a statute is even stronger where, as here, other sections of the same statute contain express rights of action.  In fact, one need not look any further than Section 115, the neighboring provision to the at-issue statute.  Section 115 expressly confers

---

[6]    While SoundExchange does not explicitly concede that Section 114 lacks an express right of action, its opposition brief begins with an analysis under Oxford Bank.  See Opp. Br. at 16; see also Oxford Bank v. Lansuppe Feeder, LLC, 933 F.3d 99 (2d Cir. 2019).  This is significant because the three-factor Oxford Bank analysis is only triggered upon a judicial finding "that none of the statutory provisions at issue explicitly provid[e] a cause of action."  Oxford Bank, 933 F.3d at 104.

litigation authority upon an entity known as the "Mechanical Licensing Collective" ("MLC"), which is similar to SoundExchange in Section 114.  Specifically, Section 115's MLC governs licensing and royalty distribution for "nondramatic musical works," see 17 U.S.C. § 115(d), but unlike SoundExchange in Section 114, Section 115 grants the MLC express "[l]egal enforcement" authority to pursue a "Federal court action" and "commence an action in an appropriate district court of the United States for damages and injunctive relief" in the event a licensee fails to adhere to its reporting and payment obligations.  Id. §§ 115(6)(A)-(C)(i) (emphasis added).

In addition, other sections of Section 115 also address the MLC's ability to litigate royalty disputes with licensees. Specifically, Section (C) outlines the "[a]uthorities and functions" of the MLC, expressly authorizing it to "[e]ngage in legal and other efforts to enforce rights and obligations." Id. § 115(C)(i)(VIII).

Moreover, as discussed further below, see infra at 23, Section 501 of the Copyright Act also expressly confers a right of action to certain individuals and entities to combat infringement.  See §§ 501(b), (d).

In light of these examples, there is a dearth of evidence, let alone "substantial evidence," for us to infer that Congress's omission of any legal authority for SoundExchange in Section 114 was anything but deliberate.  Cervantes-Ascencio, 326 F.3d at 86.  And, absent such evidence, it would be wholly improper for a court to "add terms or provisions where [C]ongress has omitted them." Sale, 509 U.S. at 169.  Thus, the text of the Copyright Act clearly lacks an express conferral of a right of action upon SoundExchange.

**B. Implied Rights of Action**

   1. Implied Rights of Actions, Generally

When Congress has not explicitly created a statutory right of action, the next step in the analysis is to determine whether one can nevertheless be implied.  Oxford Univ. Bank, 933 F.3d 99, 104 (2d Cir. 2019) ("Oxford Bank").  However, as noted earlier, a court "cannot ordinarily conclude that Congress intended to create a right of action when none was explicitly provided."  Olmsted v. Pruco Life Ins. Co. of N.J., 283 F.3d 429, 433 (2d Cir. 2002) (internal quotations and citations omitted).  This creates a "strong presumption against creating private rights of action," Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 117 (2d Cir. 2007), placing "a heavy burden on the plaintiffs to demonstrate otherwise," Olmsted, 283 F.3d at 433; see also Bellikoff, 481 F.3d

at 116 ("[Where] no provision of [a statute] explicitly provides a private right of action[,] . . . we begin with the presumption that Congress did not intend one."); Victorian v. Miller, 813 F.2d 718, 721 (5th Cir. 1987) ("To establish an implied private right of action under a federal statute, a plaintiff bears the relatively heavy burden of demonstrating that Congress affirmatively contemplated private enforcement when it passed the relevant statute.").

This general approach has been applied in prior copyright cases: "The fact that a plaintiff's ideal relief is not specified in [a provision of the Copyright Act] does not give the courts license to grant such relief simply upon application by the plaintiff. In copyright law, remedies not provided are remedies not intended." Xerox Corp. v. Apple Computer, Inc., 734 F. Supp. 1542, 1549 (N.D. Cal. 1990) (emphasis added). Thus, absent an express right of action, a court will only imply one where the statutory text and structure "yield a clear manifestation of congressional intent to create a private cause of action." Lopez v. Jet Blue Airways, 662 F.3d 593, 596 (2d Cir. 2011).

2. Implication of a Right of Action

The parties agree that Oxford Bank provides the appropriate analytical framework for determining whether to imply a right of

action in this context. Def's Br. at 7-8, Opp. Br. at 7-8; see also Bellikoff, 481 F.3d 110 (relying on a three-factor framework to determine if a right of action should be implied); Olmsted, 283 F.3d 429 (same). Oxford Bank sets out a three-factor test:

> (1) whether the "provision[] allegedly violated" contains "rights-creating language" focused on the "individuals protected";
>
> (2) whether Congress "provided an alternate means of enforcing the relevant provisions"; and
>
> (3) whether "Congress expressly provided a cause of action" elsewhere in the statute.

Oxford Bank, 933 F.3d at 104.[7]

a. Rights-Creating Language

The first factor in Oxford Bank examines whether the at-issue statute contains "rights-creating language." Id. Rights-creating language "explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff in the case," Cannon, 441 U.S. at 690 n.13, or identifies "the class for whose especial benefit the statute was enacted," id. at 688 n.9 (quoting Tex. & Pac. Ry. Co. v. Rigsby, 241 U.S. 33, 39 (1916)). "[E]ven where a statute is phrased in . . . rights-creating terms, a plaintiff

---

[7]    We note that while Oxford Bank remains the governing law of this Circuit, the Supreme Court recently granted certiorari in FS Credit Opportunities Corp. v. Saba Capital Master Fund, Ltd., No. 24-345, in which the Court will, inter alia, assess whether Oxford Bank was properly decided. See 2025 WL 1787708 (June 30, 2025); see also ECF Nos. 84, 85.

suing under [the] implied right of action still must show that the statute manifests an intent to create not just a private right but also a private remedy." Gonzaga Univ. v. Doe, 536 U.S. 273, 284 (2002) (quoting Sandoval, 532 U.S. at 286).

As discussed above, see supra 8-12, Section 114 lacks any rights creating language as to SoundExchange. Even if it could be so interpreted, Section 114 does not "manifest[] an intent to 'create . . . a private remedy.'" Gonzaga, 536 U.S. at 284 (quoting Sandoval, 532 U.S. at 286). Rather, Section 114 outlines the "[s]cope of exclusive rights in sound recordings," namely, by granting artists and record companies that create sound recordings a mechanism, through an intermediary "collective," to license those rights for public dissemination of their copyrighted works. § 114(g)(2).

Subsection (g)(3) provides:

A nonprofit collective designated by the Copyright Royalty Judges to distribute receipts from the licensing of transmissions [namely, SoundExchange] . . . may deduct from any of its receipts, prior to the distribution of such receipts to any person or entity entitled thereto . . . the reasonable costs of such collective incurred . . . in—

(A) the administration of the collection, distribution, and calculation of the royalties;

(B) the settlement of disputes relating to the collection and calculation of the royalties; and

-15-

> (C) <u>the licensing and enforcement of rights</u> with respect to the making of ephemeral recordings and performances subject to licensing under section 112 and this section, including those incurred in participating in <u>negotiations or arbitration proceedings</u> under section 112 and this section. . .

§ 114(g)(3) (emphases added).

Both SoundExchange and <u>amici</u> seize on the reference to the permissibility of deducting costs from licensing and royalty enforcement efforts in subsection (C) to suggest that such language necessarily implies that SoundExchange can enforce artists' rights via legal action. For at least three reasons, we find plaintiff and <u>amici</u>'s arguments unpersuasive.

First, we reject the contention that the sole reference to "enforcement" constitutes a full-throated grant of litigation authority to the collective to commence an action in a U.S. District Court. Enforcement is not synonymous with litigation, and in an array of legal contexts, "enforcement" can generally refer to the power to initiate audits and regulatory proceedings, issue violation notices or cease and desist orders, suspend regulatory licenses, and impose restrictions on activities, amongst others. So, without further clarification from Congress as to what "enforcement" might mean in this context, it would be

inappropriate for this Court to attempt to define the boundaries of the collective's enforcement authority.

Second, it is significant that Section 114's single mention of "enforcement" is clarified by reference to "negotiations or arbitration proceedings," not litigation.  § 114(g)(3)(c).  The maxim expressio unius est exclusio alterius suggests that the clear expression of terms, here "negotiations" and "arbitration," excludes other similar yet unmentioned terms, i.e., litigation. Brennan-Centrella v. Ritz-Craft Corp. of Pennsylvania, 942 F.3d 106, 111 (2d Cir. 2019) ("As a matter of statutory construction, we presume that the legislature follows the principle of expressio unius est exclusio alterius—that is, mention of one impliedly excludes others. Applying this canon of construction, it would be strange for the statute to mention specifically several remedies . . . while leaving [another related remedy] to implication.") (internal citations and marks omitted).  Relatedly, the express mention of arbitration is often interpreted as precluding litigation.  For example, in other legal areas, especially contract law, the mention of arbitration is a common basis for a court to dismiss a lawsuit: "Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the

statutory rights at issue." <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 628 (1985).

Third, the singular reference to "enforcement" is essentially made in an accounting context, specifically in a list of the types of "costs"[8] SoundExchange can deduct from its royalty distributions. It is unlikely that Congress, had it wanted to confer litigation authority upon the collective, would have done so by hiding this power in a provision governing accounting protocols. <u>See Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund</u>, 583 U.S. 416, 431 (2018) ("Congress does not hide elephants in mouseholes.") (internal quotation marks omitted).

Ultimately, the foregoing offers compelling evidence that Congress deliberately considered the scope of SoundExchange's enforcement power and intentionally opted not to include litigation authority as an arrow in its quiver.

---

[8]    There is also insight to be gleaned from Congress's use of "costs" in the statute. Notably, Section 114 specifically denotes that the collective can deduct from its receipts the "costs" associated with "participating in negotiations or arbitration proceedings," making no reference to costs or fees associated with engaging attorneys or litigation. Congress could have easily added "costs incurred in litigation" or "costs and attorney's fees" to the list of permissibly deductible costs. This is relevant because there is clear caselaw standing for the proposition that unless a statute specifically provides for "attorney's fees," the mention of "costs," without further clarification, "has never been considered to authorize an award of attorney's fees." <u>Peter v. Nantkwest, Inc.</u>, 589 U.S. 23, 24 (2019). Thus, we find the absence of further clarifying language in Section 114 to be a clear signal that the statutory drafters did not envision the collective engaging in litigation-related activities.

b. <u>Alternative Enforcement Methods</u>

The second factor under <u>Oxford Bank</u> studies whether the at-issue statute "provide[s] an alternate means of enforcing the relevant provisions." <u>Oxford Bank</u>, 933 F.3d at 104. Section 114 contemplates SoundExchange engaging in a number of "enforcement" activities other than initiating lawsuits in federal court. First, as referenced in the preceding section, it is highly significant that Section 114's reference to costs incurred in the collective's "enforcement of rights" enumerates costs "incurred in participating in <u>negotiations</u> or <u>arbitration proceedings</u>" but not costs incurred in litigation. 17 U.S.C. § 114(g)(3)(C) (emphasis added). This suggests that the statutory drafters envisioned a collective capable of enforcing sound recording rights via negotiation and arbitration. Again, understood in light of <u>expressio unius est exclusio alterius</u>, <u>see</u> <u>supra</u> at 17, a clear message is sent by the omission of any language around litigation-related enforcement.

Moreover, Section 114 also contemplates SoundExchange undertaking other forms of non-litigation enforcement, further supporting the conclusion that Congress did not intend to confer upon the collective a private right of action. For example, SoundExchange is authorized to enforce its authority by

-19-

negotiating voluntary licenses with digital platforms, see §
114(e)(1), and monitoring digital music providers to ensure
compliance with statutory licensing requirements, see id. at §§
114(e)(2), (g)(3)(A)-(C).

In addition, SoundExchange possesses various regulatory
mechanisms to address the unauthorized use of sound recordings or
the nonpayment of royalties thereon, including: (1) investigating
the payment history and compliance of statutory licensees by
"audit[ing] a Licensee's payments of royalties to the Collective,"
37 C.F.R. §§ 380.6(a), 382.7(a); and (2) sending notices to
copyright holders[9] whose works are entitled to royalty payments,
see §§ 114(f), (g)(5). Notably, these enforcement mechanisms have
statutory predicates under Section 114. Furthermore, we emphasize
that, while SoundExchange possesses an enforcement hammer with its
affirmative powers, it also has the tools to promote voluntary
compliance with the statutory licensing regime, namely via the
threat of potentially costly and invasive audits, arbitrations,
etc., for non-compliant licensees.

At bottom, Congress's conferral of several enforcement
methods other than litigation counsels against implying a right of
action for SoundExchange.

---

[9]     Copyright owners, by statue, have the ability to sue in an individual
capacity to enforce their copyright. See 17 U.S.C. § 501(b)

c. Express Rights of Actions in the Copyright Act

The final factor in the implied rights analysis considers whether Congress has "expressly provided a cause of action" elsewhere in the Copyright Act. Oxford Bank, 933 F.3d at 104. This factor stems from the fundamental principal that "Congress has demonstrated that it knows how to create a cause of action . . . when it wishes to do so." Hernandez v. Mesa, 140 S. Ct. 735, 752 (2020) (Thomas, J. and Gorsuch, J., concurring); see also Touche Ross & Co. v. Redington, 442 U.S. 560, 572 (1979) (explaining that explicit private rights of action in other sections of a statute shows that "when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly"). Thus, when another section of the same at-issue statute contains an express right of action, it "suggests that [the] omission of an explicit private right to enforce other sections was intentional." Olmsted, 283 F.3d at 433.

With this in mind, we return to Section 115 of the Copyright Act, which endows the Mechanical Licensing Collective with the authority to challenge a noncompliant licensee by "commenc[ing] an action in an appropriate district court of the United States for damages and injunctive relief." §§ 115(6)(A)-(C)(i). This section is particularly salient because the legally-empowered MLC serves

a functionally equivalent role to that of the collective under Section 114.  This is powerful evidence that Congress's omission of legal authority for SoundExchange was intentional.[10]

---

[10]    We acknowledge plaintiff's argument that Congress adopted a right of action in Section 115 sixteen years after it drafted Section 114's enforcement provision.  See Pl's Br. at 21-22.  Plaintiff raises this argument to suggest that "Congress's adoption of language in [Section 115] in 2018 cannot shed any light on what Congress intended in 2002 when it adopted the enforcement language in Section 114."  Id. at 21.  This argument is unpersuasive for at least two reasons.

First, it ignores the fact that Sections 114 and 115 were both amended in October of 2018.  Orrin G. Hatch–Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264, § 102, 132 Stat. 3676, 3706-07 (2018) (codified at 17 U.S.C. § 115(d)(6)(C)); Small Webcaster Settlement Act of 2002, Pub. L. No. 107-321 § 5, 116 Stat. 2780, 2784 (codified at 17 U.S.C. § 114(g)(3)).  Thus, if, at that time, Congress was able to extend litigation authority to the MLC, there is no reason it could not have made a comparable modification to the legal authority of Section 114's collective.

This is especially significant in light of the fact that an amicus in this case, the American Association of Independent Music, submitted a response to a Notice of Inquiry from the Copyright Office in 2015 that specifically expressed concern about Section 114's lack of "a right to terminate a license that fails to account for and pay for royalties."  U.S. Copyright Off., Copyright and the Music Marketplace (Feb. 2015) ("2015 Report").  The Copyright Office expanded on this issue in the published version of the 2015 Report, stating that the absence of legal authority in Section 114 for the collective "undermine[d] the ability of SoundExchange to police noncompliant licenses." See id. at 181.  Accordingly, the Copyright Office recommended that Section 114 "be amended to include a termination provision akin to that in Section 115," id., which, as discussed above, see supra at 10-11, does provide for legal enforcement power.  It is indisputable that this 2015 Report was available to Congress in 2018 when it amended Sections 114 and 115 in 2018 and declined to adopt the proposed termination provision, thus undercutting plaintiff's timing-based argument.

Second, defendant offers an additionally persuasive response to plaintiff's sequencing argument by noting that "[u]nder the Copyright Act of 1976, copyright owners . . . could provide notice of default for anyone failing to pay royalties."  ECF No. 79 ("Reply Br.") at 11.  This "[n]otice of default" provision still exists in Section 115, and, critically, it states that any post-default "royalty that has not been paid" is "actionable as [an] act[] of infringement under section 501 and fully subject to the remedies provided by sections 502 through 506," § 115(2)(J), which include, inter alia, the right to seek an injunction in federal court, see § 502, as well as damages, see § 504, and costs and attorney's fees, see § 505.  It is clear that Congress -- as far

-22-

Congress further demonstrated its capacity to create rights of action in Section 501 of the Copyright Act, which, as highlighted earlier, see supra at 11, addresses "[i]nfringement of copyright." Unlike Section 114, Section 501 clearly extends legal enforcement rights to copyright owners: "The legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." § 501(b). The section further identifies specific entities that "shall . . . have standing to sue," including primary transmitters and broadcast stations. § 501(d). Congress easily could have, but did not, designate SoundExchange as one of the entities permitted under Section 501 to initiate legal action. By omitting Section 114's "collective" from the list, Congress sent a clear signal that SoundExchange is not empowered to initiate legal action under the Copyright Act.

********

In summary, the application of the three-factor analysis under Oxford Bank does not provide any basis to imply a right of action for SoundExchange under Section 114 of the Copyright Act.

---

back as 1976 -- knew how to extend robust litigation authority to copyright owners. Thus, plaintiff's attempt to undermine Section 115's conferral of legal authority by invoking the temporal sequencing of Sections 114 and 115 is wholly unavailing.

**C. SoundExchange's Additional Arguments**

SoundExchange, as well as <u>amici</u>, rely on several additional, extra-textual arguments to bolster their position. First, SoundExchange asserts that, as a matter of policy, efficient functioning of the statutory licensing regime requires the collective to possess some legal enforcement rights. Second, SoundExchange points to its involvement in past lawsuits as evidence that it has standing to sue in this case. Third, SoundExchange invokes the legislative history related to Section 114 to suggest that a right of action was contemplated by Congress. Finally, SoundExchange concedes that while it might not possess a private right of action under Section 114, it nevertheless should be able to sue under an associational standing theory. These arguments are addressed <u>seriatim</u>.

    1. <u>Policy-Based Arguments</u>

First, plaintiff and <u>amici</u> make a policy-based argument, namely, that if this Court were to find that SoundExchange lacks a right of action, it will lead to "an unwieldly," "unworkabl[e]" regulatory regime, <u>see</u> Opp. Br. at 18, that "would have absurd results," <u>see</u> <u>Amicus</u> at 8. Regardless of the merits of SoundExchange and <u>amici</u>'s policy argument, "[i]t is not the province of the courts . . . to rewrite" a statute for policy

reasons, for "only the 'Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing [policy] interests.'" Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc., 351 F.3d 1229, 1238 (D.C. Cir. 2003) (quoting Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417, 431 (1984)).[11] Thus, we do not opine on whether SoundExchange's policy arguments are reasonable, practical, or beneficial, as we are powerless to rely on any such arguments to rewrite the statute.

2. SoundExchange's Prior Litigation History

SoundExchange's argument that it has standing to sue here because it has sued in the past fails on the law and on the facts. To begin, SoundExchange cites no case directly holding that it has standing. Moreover, the law is clear that even if "questions of

---

[11]    We note that the principle of judicial deference to the legislature is as strong as ever in the wake of the Supreme Court's recent decision in Loper Bright Enters. v. Raimondo. See 603 U.S. 369, 391 (2024) ("Loper").

For the forty years before Loper, courts applied the Chevron doctrine to issues of statutory ambiguity in the context of administrative law. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (2984). Chevron broadly permitted courts to rely on reasonable agency interpretations of statutes administered by the agency that were potentially unclear. Id.

However, Loper overruled Chevron and held that district courts, rather than deferring to an agency's statutory interpretation, must exercise their own independent judgment in deciding whether an agency has acted within its statutory authority. Loper, 603 U.S. at 413. Thus, while the administrative law context of Loper differs from the instant case -- we note that SoundExchange appears to occupy a liminal space wherein it is an independent non-profit but also a statutory creation -- the main takeaway from Loper nevertheless applies in that only a clear delegation of authority must be found in a statute before a court can find that such authority exists as a matter of law.

jurisdiction have been passed on in prior decisions sub silentio, [a] Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us." Hagans v. Lavine, 415 U.S. 528, 533 n.5 (1974); see also King Mfg. Co. v. Augusta, 277 U.S. 100, 134—135, n. 21 (1928) (Brandeis, J., dissenting) ("It is well settled that the exercise of jurisdiction under such circumstances is not to be deemed a precedent when the question is finally brought before us for determination."). Thus, we reject SoundExchange's contention that prior litigations support the argument that Section 114 confers a right of action unto SoundExchange.

In addition, a review of the prior litigations cited by SoundExchange reveals various factual and procedural factors that eliminate the precedential value of those cases. A search for SoundExchange in Westlaw reveals that all of the cases SoundExchange has brought against licensees (i) were settled or voluntarily dismissed without addressing whether SoundExchange was a proper plaintiff to enforce licensing disputes; (ii) were referred to the Copyright Royalty Board (the "CRB") for review by a subject-matter expert; or (iii) involved other sections of the Copyright Act not presently at issue.[12]

---

[12]    See, e.g., SoundExchange, Inc. v. LiveOne, Inc., 22 Civ. 4410 (C.D. Cal.

One decision cited by SoundExchange merits a somewhat more extended discussion.  SoundExchange, Inc. v. Muzak LLC, 854 F.3d 713 (D.C. Cir. 2017) ("Muzak").  There, "[t]he dispute between the parties turns on the language of the Act, specifically, what does 'preexisting subscription service' (the grandfathered category defined by the Act) mean?"  Id. at 716.  Defendant Muzak asserted that it was entitled to use the grandfathered rate in paying royalties.  SoundExchange took the opposite position.  In the district court (and indeed on appeal), Muzak did not challenge SoundExchange's authority or standing to bring the action.  However, the D.C. Circuit, sua sponte, directed the parties to submit supplemental briefs on four questions, one of which is related to the issue addressed in this case.  Specifically, the

---

Oct. 13, 2022) (settled); SoundExchange, Inc. v. Music Choice, 19 Civ. 0999, 2021 WL 5998382 (D.D.C. Dec. 20, 2021) (referred to CRB).  It also bears noting that, in Music Choice, SoundExchange specifically asked that the court "refer the question of regulatory interpretation raised . . . to the [CRB,]" stating that it was the CRB, not an Article III court, that possessed "the expertise and jurisdiction necessary to resolve the parties' [rate] dispute."  See Pl.'s Suppl. Br. at 1; SoundExchange, Inc. v. Sirius XM Radio Inc., 17 Civ. 2666 (D.D.C. July 9, 2018) (voluntarily dismissed); SoundExchange, Inc. v. AccuRadio, LLC, 24 Civ. 6125 (N.D. Ill. filed July 19, 2024) (numerous settlement conferences were held, all of which were unsuccessful, and the case is now stayed due to defendant's recent filing of a petition in bankruptcy); SoundExchange, Inc. v. Sirius XM Radio Inc., 65 F. Supp. 3d 150 (D.D.C. 2014) (referred to CRB).

D.C. Circuit asked the parties to brief the "source of appellant's (SoundExchange's) cause of action."[13]  See ECF No. 70-3 at 3 ¶ 1.

The D.C. Circuit's opinion did not directly address any of the questions it had posed to the parties, but held, as a matter of statutory interpretation, that the appellee, Muzak, could pay the royalty rate for a "preexisting subscription service."  Muzak LLC, 854 F.3d at 719.  Nonetheless, it is worth noting that an amicus brief filed by the Copyright Royalty Board, submitted at the Circuit's invitation, stated, inter alia, that the Board "20 expresse[d] no view on the source of appellant SoundExchange's cause of action."  See ECF No. 70-7 at 1 n.1.

This review of the Muzak case further undermines any suggestion that the issue before this Court has been directly

---

[13]    We note that the D.C. Circuit's demand for supplemental briefing specifically asked the parties to address (1) whether the district court "lacked jurisdiction to adjudicate appellant's (SoundExchange's) claims" and (2) whether the claims should be before the Copyright Royalty Board rather than a district court.  ECF No. 70-3 at 3.  In the supplemental briefing, defendant Muzak raised the same line of argument advanced by Sirius here, highlighting that "Section 114 does not expressly provide a cause of action for underpayment or statutory royalties" and that any cause of action would thus have to be "implied."  See ECF No. 70-4 at 9 n.2.  SoundExchange's supplemental brief similarly relied on the same arguments advanced here, namely, that the collective has been endowed with enforcement rights in an indirect manner through their ability to deduct "reasonable costs" associated with enforcement of licensing rights.  See Section 114(g)(C).

The other three questions on which the D.C. Circuit requested supplemental briefing addressed whether the Copyright Royalty Board and/or the Register of Copyrights had the jurisdiction to determine the dispute and, if so, whether the district court lacked jurisdiction, and moreover, even if the district court had authority, whether it should nonetheless refer the issue to the Copyright Royalty Board under the doctrine of primary jurisdiction.

addressed and resolved by another court, let alone one whose ruling would be binding on us.  In short, SoundExchange's assertion that there is an "unbroken line of enforcement actions under Section 114 confirm[ing] that Congress intended to provide [SoundExchange with] a right of action" is unsupported.  Opp. Br. at 14.

3. <u>Legislative History</u>

To support their reading of Section 114, SoundExchange and <u>amici</u> rely on the legislative history of the at-issue statute. Such reliance is misplaced.  Reliance on legislative history is inappropriate when the statutory text is clear.  <u>See</u> <u>Lee v. Bankers Tr. Co.</u>, 166 F.3d 540, 544 (2d Cir. 1999) ("It is axiomatic that the plain meaning of a statute controls its interpretation, and that judicial review must end at the statute's unambiguous terms. Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous.") (internal citations omitted).  Moreover, even when a statute is ambiguous and legislative history is utilized to explore Congressional intent, that legislative history will only be a supportive aid, as it "cannot overcome the plain meaning of the text."  <u>J.S. v. New York State Dep't of Corr. & Cmty. Supervision</u>, 76 F.4th 32, 38 (2d Cir. 2023).  Given our determination that the text of Section 114 is not "inescapably ambiguous" with respect to the issue presented,

<u>Garcia v. United States</u>, 469 U.S. 70, 76 n.3 (1984) (citation omitted), a resort to legislative history would be unwarranted.

Nevertheless, even if we were to consider legislative history, we would find that it fails to offer persuasive evidence of Congress's intent to empower SoundExchange with the type of litigation authority plaintiff and <u>amici</u> suggest.  Simply stated, the parties fail to cite any portion of legislative history -- which spans over thirty years -- containing a clear reference to an intent to empower SoundExchange with the authority to file lawsuits in furtherance of its delegated responsibilities.

Plaintiff and <u>amici</u> overread the available legislative history.  The issue is not whether legal enforcement power could be consistent with SoundExchange's responsibilities, but rather, whether Congress has provided for such authority, which, as we have noted, it has done neither expressly nor impliedly.  In short, the legislative history does not advance plaintiff's and <u>amici</u>'s contention that Section 114 should be read as extending litigation enforcement authority to SoundExchange.

4. <u>Associational Standing</u>

SoundExchange argues that even if Section 114 does not confer it a private right of action, it nonetheless has standing to sue under a theory of associational standing.  A party seeking to

-30-

invoke federal jurisdiction bears the burden of establishing standing, Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992), and must, if invoking associational standing, satisfy the following three-part test used to determine if "an association has standing to bring suit on behalf of its members," Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977). The tripartite analysis requires an associational plaintiff to show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id.

We struggle to see how SoundExchange can support an argument for associational standing when it is a "nonprofit collective designated by the Copyright Royalty Judges to distribute receipts from the licensing of transmissions," § 114 (g)(2), not a traditional membership-based organization.[14] See United Food &

---

[14]    The Copyright Owners that SoundExchange represents are not "members" of the collective. While a copyright holder is eligible to receive royalty payments through SoundExchange by registering with the collective, there is no need to become a "member." See Frequently Asked Questions, SoundExchange, https://www.soundexchange.com/frequently-asked-questions (last visited April 17, 2025) ("SoundExchange FAQs"); see also Lee v. Springer Nature Am., Inc., 769 F. Supp. 3d 234, 250 (S.D.N.Y. 2025) (a court deciding a motion to dismiss "may take judicial notice of . . . the current version of the [plaintiff's] website, which is publicly available"). A registered copyright holder can elevate their status from registrant to "member" by paying a fee. Id. In the

Com. Workers Union Loc. 751 v. Brown Grp., Inc., 517 U.S. 544, 555 (1996) (citing the "requirement that an organization suing as representative include at least one member with standing to present, in his or her own right, the claim pleaded by the association"). Courts have identified several features of an "organization" or "association" eligible for associational standing, including, inter alia, whether (i) the leaders of the association are selected by the individuals who the association purports to represent; (ii) the individuals in the association "alone finance its activities"; and (iii) the organization or association is the primary means by which the group "express[es] their collective views and protect[s] their collective interests." Hunt 432 U.S. at 345.

In the case of SoundExchange, its leaders are selected by the Board of Directors, not a vote of the constituent copyright owners, and it is not funded through a membership fee but rather a four-to-six percent administrative fee based on a percentage of the royalties it collects. See SoundExchange FAQs. And finally, as plaintiff and amici emphasize throughout, SoundExchange exists to

---

context of SoundExchange's operations, a "member" can utilize SoundExchange to collect royalties internationally, whereas a non-member registered copyright owner can collect only domestic statutory royalties via SoundExchange. Id. However, the term "member" is not talismanic and does not automatically convert SoundExchange into a membership organization. Id.

facilitate efficient royalty collection and distribution, not to champion the views and interests of copyright owners beyond royalty collection.  See Opp. Br. at 5-6; see also Amicus at 4-8.

All that aside, even if we were to apply the three-part Hunt analysis, plaintiff would still be unable to proceed beyond the second prong.  Hunt makes clear that associational standing will only lie where the interests of the organization "are germane to the organization's purpose," Hunt, 432 U.S. at 343, and here, SoundExchange exists as a central clearing house for royalty payments, not a legal advocacy group.  We thus decline to find a basis for associational standing here.

<strong><u>CONCLUSION</u></strong>

As demonstrated above, we conclude that Section 114 fails to confer on SoundExchange -- either expressly or impliedly -- the authority to commence a legal action.  As such, the Court grants Sirius's motion for a judgment on the pleadings and dismisses SoundExchange's complaint.  The Clerk of Court is requested to terminate the pending motion at ECF No. 61 and close this case.

**SO ORDERED.**

Dated:    August 7, 2025
          New York, New York

                                    _____
                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

-33-